# EXHIBIT B

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

| | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Metropolitan West Securities, LLC; Wachovia Bank, National Association; and Does 1-25

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

California Earthquake Authority

FILED
Superior Court Of California,
Sacramento
12/31/2009
djohnson3
By _____, Deputy
**Case Number:**
**34-2009-00067544**

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Sacramento Superior Court<br>720 Ninth Street, Sacramento Ca 95814 | CASE NUMBER<br>*(Número del Caso):* |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)*
Michael J. Strumwasser, Strumwasser & Woocher LLP, 10940 Wilshire Blvd, #2000 (310) 576-1233

| DATE:<br>*(Fecha)* | DEC 3 1 2009 | Clerk, by<br>*(Secretario)* | _____ | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010))*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant
2. ☐ as the person sued under the fictitious name of *(specify)*:

☐ on behalf of *(specify)*:

under ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
      ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
      ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
      ☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*

Page 1 of 1

**SUMMONS**

**ORIGINAL**

1  MICHAEL J. STRUMWASSER (Bar No. 58413)
2  FREDRIC D. WOOCHER (Bar No. 96689)
   APARNA SRIDHAR (Bar No. 254091)
3  JONATHAN D. KROP (Bar No. 263963)
   STRUMWASSER & WOOCHER LLP
4  10940 Wilshire Boulevard, Suite 2000
   Los Angeles, California 90024
5  Telephone: (310) 576-1233
6  Facsimile: (310) 319-0156

7  Attorneys for Plaintiff
8  *California Earthquake Authority*

**FILED**
Superior Court Of California,
Sacramento
12/31/2009
djohnson3
By _____ , Deputy
Case Number:
**34-2009-00067544**

9
10              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
11                        FOR THE COUNTY OF SACRAMENTO

12
13  | CALIFORNIA EARTHQUAKE AUTHORITY, | CASE NO. |
14  Plaintiff,
15  v.
16
17  METROPOLITAN WEST SECURITIES, LLC; WACHOVIA BANK, NATIONAL
18  ASSOCIATION; and DOES 1-25,
19
20                      Defendants.

VERIFIED COMPLAINT FOR DAMAGES, RESTITUTION, RESCISSION, AND CIVIL PENALTIES FOR:

1) BREACH OF CONTRACT;
2) BREACH OF FIDUCIARY DUTY;
3) CONSTRUCTIVE FRAUD;
4) UNFAIR BUSINESS PRACTICES, CALIFORNIA BUSINESS & PROFESSION CODE SECTION 17200 ET SEQ.

**JURY TRIAL DEMANDED**

21
22
23
24
25                          Department
                            Assignments
26                       Case Management 43
                          Law and Motion 54
27                      Minors Compromise 17
28

COMES NOW Plaintiff California Earthquake Authority ("Plaintiff" or the "CEA") alleging as follows:

1.  By this Complaint, Plaintiff seeks damages and other relief from Metropolitan West Securities, LLC and Wachovia Bank, National Association for the injuries caused by Defendants' improper and illegal actions.[1] Without direction or permission from the CEA, Defendants unlawfully and recklessly placed the CEA's funds in a high-risk investment, disregarding the statute governing permissible CEA investments, the CEA's investment policies and guidelines, and clear warning signs in the market that demonstrated that the investment was too risky to be held by public entities with well known, conservative investment policies and requirements. This investment decision was triply flawed: Wachovia made the investment even though it was illegal for the CEA to hold the security, even though it was not suitable to the CEA's financial situation and needs, and even though making the investment directly violated Wachovia's contract with the CEA, entitled "Agreement to Provide Investment and Financial Services." As a result of Wachovia's actions, the CEA has lost the vast majority of its $62.25 million investment and all the interest it would have earned on that $62.25 million.

## PARTIES

2.  The CEA is a public instrumentality of the State of California that provides residential earthquake insurance and encourages Californians to reduce their risk of earthquake loss. The CEA was created by the California Legislature in the wake of the 1994 Northridge Earthquake, which had precipitated a crisis in the state's earthquake and homeowners insurance markets and threatened the residential real estate market. Today, over 70 percent of Californians whose homes are insured for earthquake-related damage rely on the CEA for their insurance. The business model the Legislature established for the CEA

---

[1] Throughout this Complaint, the CEA refers to Metropolitan West Securities, LLC as "Metropolitan West." Wachovia Bank, National Association is referred to as "Wachovia Bank." The CEA refers to the defendants collectively as "Defendants" or "Wachovia."

consists of a permanent staff of fewer than 30, with numerous professional and technical functions outsourced to the private sector.

3.      Defendant Metropolitan West is a California limited liability company that provides financial investment advisory services. It is registered as a broker-dealer with the Securities Exchange Commission ("SEC"). Metropolitan West's principal place of business is 11440 San Vincente Boulevard, Third Floor, Los Angeles, California 90049. Metropolitan West also does business as Wachovia Global Securities Lending and Wachovia Portfolio Services.

4.      Defendant Wachovia Bank is a corporation registered in North Carolina and located at 301 South College Street, Charlotte, North Carolina 28288. Pursuant to a 2004 agreement between the CEA and Wachovia Bank (which followed the acquisition of Metropolitan West by Wachovia Bank), Wachovia Bank is assignee of Metropolitan West's contract with the CEA. Wachovia also transacts business as Wachovia Global Securities Lending and Wachovia Portfolio Services.

5.      The CEA is unaware of the true names and capacities of Defendants Does 1 through 25, inclusive. The CEA is informed and believes, and thereupon alleges, that each of Defendants Does 1 through 25 is responsible in some manner for the events and happenings referred to in this Complaint and is therefore liable for the acts and activities alleged herein. The CEA further alleges, on information and belief, that each of the defendants, including Does 1 through 25, was the agent or employee of each of the remaining defendants and was acting within the scope of that agency or employment when conducting the acts and activities alleged herein. Plaintiff will seek leave of Court to amend this Complaint to set forth the true names and capacities of these defendants when the same have been ascertained.

## VENUE

6.      Venue is proper in this Court under Code of Civil Procedure sections 395, subdivision (a) and 395.5. The Agreement to Provide Investment and Financial Services and relevant amendments were executed in Sacramento, California. The Agreement also provides that suits under the contract shall be brought in Sacramento.

1    **GENERAL ALLEGATIONS**

2    **I.    The CEA-Metropolitan West Contract**

3         7.    Metropolitan West served as an investment adviser and investment manager for

4    the CEA from the CEA's inception in 1996 until 2009. On or about July 1, 1998, the CEA

5    entered into a new Agreement to Provide Services — Investment and Financial Advisor ("the

6    Agreement") with Metropolitan West, which, with amendments over the years, remains in

7    effect. A true and correct copy of the Agreement is attached as Exhibit 1 to this Complaint.

8    The Agreement provided that the CEA "retains Metropolitan West to provide investment and

9    financial advice." (Agreement, Recital No. 2.)

10         8.    The Agreement consistently emphasized that Metropolitan West must comply

11   with applicable laws governing its investment and financial advising services. For example,

12   the Agreement recited:

13        "Pursuant to California Insurance Code section 10089.6, subdivision (b)(1), the
         CEA is authorized to invest its assets through the purchase, holding, or sale of
14        any investment or financial instrument that is among those securities eligible
15        under Section 16430 of the Government Code." (*Id.* Recital No. 1.)

16

17   The Agreement also provided that Metropolitan West

18        "must observe, comply with, and carry out its duties and responsibilities under
         this Agreement in accordance with all federal, state, city and county laws, rules,
19        and regulations that affect its services under this Agreement." (*Id.* ¶ 5.A.)
20

21   In yet another clause, Metropolitan West is required

22        "to comply with all laws applicable to it, including those laws applicable to it
23        specifically because of its relationship with the CEA." (*Id.* ¶ 7.J.)

24        9.    The Agreement also stated that Metropolitan West would, among other duties:

25        • "[a]nalyze on an ongoing basis the CEA's financial stability" (*Id.* ¶ 1.A.1);

26        • "initiate investments that meet the criteria set forth in the CEA's Investment Policy"

27        (*id.* ¶ 1.A.2);

28

3

- "[s]creen the general universe of investments and provide advice on market conditions, including both negative and positive trends" (*id.* ¶ 1.A.3);

- "ensure compliance with the CEA's Investment Policy for those [Primary and Secondary Reserve] Fund[s]" (*id.* ¶ 1.A.4);

- and "prepare industry and market analyses . . . ." (*id.* ¶ 1.A.8).

10.   In the Agreement, Metropolitan West specifically

> "acknowledge[d] that it is a fiduciary under this Agreement and as a fiduciary shall discharge its duties and exercise its powers with due care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of any enterprise of like character and aims." (*Id.* ¶ 5.R.)

11.   Generally, by executing the Agreement, Metropolitan West agreed to provide regular reports, including accounting, activity, and portfolio performance reports, and updated data on all of CEA's investments under its management. On a quarterly and annual basis, Metropolitan West promised to present a portfolio review and investment performance report.

12.   From 1998 until 2007, Wachovia managed a substantial amount of the CEA's funds and played a key role in managing and monitoring the CEA's investments. The CEA maintains approximately $3.4 billion in investments, distributed among different funds reflecting different reserve requirements. In August 2007, these funds were managed by Wachovia, Voyageur Asset Management, and Cypress Asset Management. Wachovia managed a large majority of these funds and, in particular, managed all of the commercial paper and repurchase agreements, investments that required frequent attention and especially careful professional judgment. In addition to its duties as manager of CEA funds, Wachovia was the sole investment advisor with respect to the CEA's funds and had oversight and compliance responsibilities with respect to the other investment managers.

**II.    Government Code Section 16430 and the Role of the Pooled Money Investment Board**

13.    By agreeing to comply with all applicable laws and regulations, Metropolitan West specifically agreed to abide by the restrictions set forth in Insurance Code section 10089.6 and Government Code section 16430. Insurance Code section 10089.6 requires that "[t]he investments of the [CEA] shall be limited to those securities eligible under Section 16430 of the Government Code." California Code of Regulations title 10, section 2697.5 also requires that "[t]he investments of the Authority shall be limited to those securities eligible under Section 16430 of the Government Code."

14.    Government Code section 16430 in turn provides:

"Eligible securities for the investment of surplus moneys shall be any of the following:...

(f) (1) Commercial paper of "prime" quality as defined by a nationally recognized organization that rates these securities. Eligible paper is further limited to issuing corporations, trusts, or limited liability companies *approved by the Pooled Money Investment Board* that meet the conditions in either subparagraph (A) or subparagraph (B):

(A) Both of the following:

   (i) Organized and operating within the United States.

   (ii) Having total assets in excess of five hundred million dollars ($500,000,000).

(B) Both of the following:

   (i) Organized within the United States as a special purpose corporation, trust, or limited liability company.

   (ii) Having programwide credit enhancements including, but not limited to, overcollateralization, letters of credit, or surety bond.

(2) Purchases of eligible commercial paper may not exceed 180 days' maturity, represent more than 10 percent of the outstanding paper of an issuing corporation, trust, or limited liability company, nor exceed 30 percent of the resources of an investment program. At the request of the Pooled Money Investment Board, this investment shall be secured by the issuer by depositing with the Treasurer securities

authorized by Section 53651 of a market value at least 10 percent in excess of the amount of the state's investment." (*Ibid.*, subd. (f).)

15.     The Pooled Money Investment Board ("PMIB") manages the State's Pooled Money Investment Account ("PMIA"), which has as its stated, primary investment objectives the same objectives as the Authority: safety, liquidity, and yield. (See PMIB Program Description, http://www.treasurer.ca.gov/pmia-laif/pmib-program.asp.) The PMIB consists of the State Treasurer as chairperson, the State Controller, and the Director of Finance. (Gov. Code, § 16480.1.) The PMIB is responsible for designing an effective cash management and investment program to realize maximum return through safe and prudent investments of the State of California's idle money and for designating the amount of public money temporarily available for investment. (See State Admin. Manual, § 7350.) In addition to these responsibilities, the PMIB regularly reviews and evaluates commercial paper issuers and determines whether the issuers are suitable for inclusion in the PMIA commercial paper program established by Government Code section 16430. Although the Insurance and Government Codes limit the CEA to investing in commercial paper whose issuers are approved by the PMIB, neither the California State Treasurer nor the PMIB manages CEA funds, either directly or indirectly—CEA funds are in the California Earthquake Authority Fund, which is not a fund in the State Treasury. (See Ins. Code, §10089.22, subdivision (b).)

**III.   Wachovia Bank Acquires Metropolitan West**

16.     In 2004, Metropolitan West Securities, LLC "entered into a transaction with Wachovia Bank, National Association . . . under which [Metropolitan West] . . . bec[a]me a wholly-owned subsidiary of Wachovia." (Third Amendment to Agreement to Provide Services — Investment and Financial Advisor, Exhibit 2, Recital No. 1.)

17.     On or about August 4, 2004, the CEA and Metropolitan West Securities, LLC entered into a Third Amendment to the Agreement whereby all of Metropolitan West Securities, LLC's rights and obligations under the Agreement were assigned to Wachovia Bank. (See Exh. 2.)

## IV.   The Mainsail Investment

18.   On August 8, 2007, Wachovia invested $62.25 million of the CEA's funds in commercial paper issued by Mainsail II LLC ("Mainsail"). Mainsail was an asset-backed commercial paper structured investment vehicle-lite ("SIV-lite"), operated by a British hedge fund manager, Solent Capital Partners. In general, structured investment vehicles are pools of debt such as asset-backed securities, mortgage-backed securities, and corporate bonds. They finance themselves by issuing senior debt and capital notes while seeking to optimize the spread between asset returns and the cost of funding. The senior debt is typically commercial paper or medium term notes issued in the United States and Europe. A security trustee is often required to take over the portfolio as collateral and exercise discretion over the fund if the structure falls out of compliance with a key guideline such as a capital adequacy test or a liquidity test. Mainsail was an SIV-lite, and SIV-lites differ from other structured investment vehicles in several ways: they are typically smaller, more highly leveraged, and seek larger credit spreads than traditional structured investment vehicles. A basic risk of these structures is the need for continuous funding; when outstanding commercial paper matures and payment is due, there is a risk that the SIV-lite may not be able to resell the commercial paper to new investors. Mainsail in particular was structured to sell short-term commercial paper of approximately one month's duration, among other securities — the CEA was a senior holder of Mainsail commercial paper. The commercial paper was in turn primarily backed by residential and commercial mortgage securities, many of which were backed by subprime mortgage debt.

## V.   Wachovia Invests the CEA in the Mainsail Fund

19.   In August 2007, Wachovia invested in Mainsail approximately $62.25 million of the CEA's money from three different CEA funds ($47.86 million from the Liquidity Account, $11.94 million from the Claims Paying Account, and $2.45 million from the Supplemental Claims Paying Account). At the time the investment was made, the CEA was supposed to recoup its principal in addition to approximately $309,000 in interest. The

1  combined face value of the commercial paper was $62.56 million. The investment was made
2  without the prior knowledge of the CEA.

3      20.    In placing investments for the CEA, Wachovia never consulted the PMIB's
4  approved-issuer list: When Wachovia purchased the Mainsail investment, Mainsail appeared
5  on *Wachovia's* approved list, a list compiled by the Wachovia Credit Committee with
6  assistance from a senior credit analyst and the senior investment officer, but it did not appear
7  (and had never appeared) on the PMIB list. In recommending names for Wachovia's own
8  list, the credit analyst typically reviewed rating-agency reports, prospectuses or private
9  placement memos, and pool reports, but, as the CEA learned much later, did not review the
10 PMIB's list of approved issuers.

11     21.    Although Wachovia's senior investment officer and Credit Committee generally
12 oversaw the on-site senior credit analyst, no Wachovia compliance officer was located in the
13 California office, and on-site senior credit analyst was apparently the only on-site person
14 dedicated to credit oversight and compliance, even as the U. S. credit and liquidity crisis
15 grew. The senior credit analyst was responsible for monitoring a Wachovia-approved list that
16 contained between 130 and 300 separate asset-backed commercial paper programs. The
17 senior credit analyst was further hampered in that he had to manually feed ratings changes
18 into Wachovia's security master file, rather than rely on an automated system to perform this
19 task.

20     22.    On August 8, 2007, a Wachovia trader in Los Angeles determined that the CEA
21 had cash to be invested. The trader sorted commercial paper issuers meeting Wachovia's
22 requirements for the CEA, and concluded that the Mainsail commercial paper offered by
23 Merrill Lynch Government Securities offered the most attractive yield that day. She then
24 purchased the Mainsail commercial paper. As noted above, Wachovia's approved list for the
25 CEA was not limited to the PMIB's list of approved issuers.

26     23.    In the ordinary course of the CEA's relationship with Wachovia, Wachovia
27 would purchase securities on behalf of the CEA and notify the CEA after the purchases were
28 made. Since Wachovia did not seek approval of investments on the CEA's account before

those investments were made, the CEA relied on Metropolitan West to ensure that the investments conformed to the requirements of law, including those requirements imposed by California's Insurance and Government Codes, the California Code of Regulations, and the CEA's investment policies and guidelines, a reliance that Wachovia had explicitly accepted. In fact, the CEA relied on Wachovia to make investment decisions both at a global level (by asking Wachovia to draft its Investment Policies and Guidelines) and at a day-to-day level (by making individual investments).

24.    Wachovia made the investment in spite of increasing turmoil in the subprime-mortgage securities market.  On February 7, 2007, the nation's second largest subprime-mortgage lender, New Century Financial, announced a fourth-quarter loss and an earnings restatement.  In the week following that news, Standard and Poor's Corporation ("S&P") put eighteen classes of mortgage-backed securities on watch for a downgrade.  By February 23, 2007, Reuters reported that twenty mortgage companies operating in the subprime sector had faltered.  In April 2007, New Century Financial filed for bankruptcy protection.  And, by July 2007, many reporting agencies, such as Moody's and S&P, were downgrading or putting on watch for possible downgrade many collateralized debt obligations ("CDOs"), SIVs, and other issuers whose securities were derivatively backed by residential mortgages.  In fact, in July 2007, Terry Crow, Chief Investment Officer of Wachovia Global Securities Lending, sent an email to Tim Richison, then Acting Chief Executive Officer of the CEA, stating that "[t]he rating agencies have been downgrading many private label (non-Agency) MBS [mortgage-backed securities] and ABS [asset-backed securities], CLOs (collateralized loan obligations) and CDOs (collateralized debt obligations) . . . . There is great fear in the marketplace that the Bear Stearns Hedge Funds that are being liquidated over sub prime losses are the tip of the iceberg and that there will be other liquidations going forward."

25.    When deciding to purchase the Mainsail commercial paper, at no time whatsoever did Wachovia ever disclose to the CEA that Mainsail was not on the list of approved issuers by the PMIB, that it would be illegal for the CEA to invest in Mainsail because the transaction would directly violate Insurance Code section 10089.6 and California

1  Code of Regulations title 10, section 2697.5, and that it did not conform to the CEA's
2  investment policies and guidelines. The PMIA does not now invest in, nor has it ever
3  invested in, instruments like Mainsail. The PMIB has specifically stated that it does not find
4  these types of investments appropriate for its program.

## VI.  Mainsail's Demise and the CEA's Discovery of the Impaired Status of the Investment

8      26.     The Mainsail investment began to fail in August 2007. On August 19, 2007, just
9  11 days after Wachovia invested more than $62 million of CEA funds into Mainsail, Mainsail
10  announced that it had breached a market-value compliance rule, that it had been unable to
11  issue commercial paper, and that it intended to draw on back-up liquidity arrangements. On
12  August 20, 2007, the Bank of New York, Mainsail's trustee, confirmed that the fund had
13  breached its capital adequacy test and froze Mainsail's assets.

14      27.     The rating agencies reacted swiftly to these developments. On August 21, 2007,
15  Moody's Investor Service put Mainsail commercial paper on possible watch for downgrade
16  from its Prime-1 rating and Standard & Poor's lowered its rating on Mainsail commercial
17  paper from A-1+ to A-3/Watch Negative. The following day, on August 22, 2007, Moody's
18  downgraded Mainsail three notches from a high "Prime-1" to the lowest "Not Prime" or
19  "Junk." By August 24, 2007, Standard & Poor's had lowered its rating on Mainsail
20  commercial paper from A-3/Watch Negative to B/Watch Negative.

21      28.     In early September 2007, when the CEA's investment in Mainsail was to mature,
22  the fund failed to meet its payment obligations of $62.56 million to the CEA.

23      29.     During the last week of August, Wachovia informed the CEA that Mainsail's
24  rating had been downgraded. At some point no later than September 6, 2007, Wachovia
25  informed the CEA that the Mainsail fund had failed to make its payment obligations and
26  sought and obtained authorization to represent the CEA in the Restricted Creditors
27  Committee. When asked whether the CEA should dispose of the Mainsail investment to
28  minimize the losses, Wachovia advised the CEA to be patient and hold onto the commercial

1    paper because the investment might recover and eventually pay back all of its creditors. At
2    no time during these discussions, however, did Wachovia mention the fact that the Mainsail
3    fund was not on the list of approved issuers by the PMIB or that the investment was
4    unsuitable under the CEA's Investment Policies and Guidelines.

5         30.    Upon the discovery that Mainsail was not a security on the PMIB's list of
6    approved issuers, as required by Government Code section 16430, the CEA asked Wachovia
7    why it had purchased the Mainsail commercial paper when the CEA was not legally permitted
8    to invest in Mainsail. Even though at least two of Wachovia's advisers and employees,
9    Thomas Hayes and Russell Gould, had actually served as members of the PMIB, Wachovia
10   stated that it was unaware that Insurance Code section 10089.6 required the CEA's
11   investments to comply with Government Code section 16430 *and* that it was unaware of the
12   existence any list of approved issuers created or maintained by the PMIB. In fact, Wachovia
13   had acknowledged over many years that the requirements of California Government Code
14   section 16430 govern CEA investments. The CEA also subsequently discovered that all but
15   one of the commercial paper issuers that Wachovia had chosen for the CEA were not on the
16   PMIB's list of approved issuers. In fact, in at least six cases, Wachovia invested in a security
17   issued by an entity that was not on the PMIB list, and each of those securities subsequently
18   developed liquidity or credit issues. In all of those cases, however, the liquidity and credit
19   issues developed after the CEA's investment matured, so the CEA did not suffer any financial
20   losses associated with those other securities.

21        31.    As a result of Wachovia's reckless and unlawful actions, the CEA invested over
22   $62 million in the Mainsail fund and was unable to extricate itself from this investment before
23   it defaulted and depreciated precipitously. The CEA has lost the vast majority of its $62.25
24   million investment and all the interest it would have earned on that $62.25 million.

25                        **FIRST CAUSE OF ACTION**

26                        (Breach of Written Contract)

27        (Against Defendants Metropolitan West Securities, LLC and Wachovia Bank)

28

32.     CEA incorporates herein by reference each and every allegation contained in paragraphs 1 through 31 above, as though fully set forth at length.

33.     The CEA entered into an Agreement to obtain financial and investment services from Metropolitan West on January 15, 1998. The contract took effect July 1, 1998. The contract was in effect at all times material to this Complaint. On or about August 4, 2004, this Agreement, and all the rights and obligations under the Agreement, were assigned to Wachovia Bank. The Agreement's provisions remained the same in all material respects at all times relevant to this action.

34.     The CEA has at all times performed the terms of its contract with Wachovia in the manner specified in the contract.

35.     Wachovia breached its contract with the CEA when it invested the CEA's funds in the Mainsail investment despite the fact that the fund's issuer was not among those approved by the PMIB, as required by statute. In so doing, Wachovia breached its obligation to "observe, comply with, and carry out its duties and responsibilities under the Agreement in accordance with all federal, state, city and county laws, rules, and regulations that affect its services under [the] Agreement" and its obligation to "comply with all laws applicable to it, including those laws applicable to it because of its relationship with the CEA." Secondly, Wachovia failed to "discharge its duties and exercise its powers with due care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of any enterprise of like character and aims." Because Mainsail was not listed among those issuers approved by the PMIB, Wachovia's decision to invest in Mainsail breached the Agreement's provisions.

36.     Separately, Wachovia breached its agreement to initiate investments that meet the criteria set forth in the CEA's Investment Policies and Guidelines. Wachovia is intimately familiar with these guidelines because Wachovia served as their principal drafter. For example, although the CEA's guidelines for its liquidity fund emphasize that "[s]afety of principal and adequate liquidity will be the overriding principles guiding [its] management[,]" Wachovia breached its agreement when it invested in Mainsail, a high-risk security,

particularly since the asset-backed securities market was rapidly deteriorating well before Wachovia's purchase of Mainsail on the CEA's account. Wachovia's purchase of Mainsail breached the CEA's investment policies and guidelines in other respects as well.

37.   Wachovia's breach of its contract directly damaged the CEA by investing the CEA in the Mainsail fund, an investment that rapidly depreciated in value, even though Wachovia was not legally allowed to do so. CEA has lost the majority of its $62.25 million investment and all the interest it would have earned on that $62.25 million.

38.   The CEA has been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

(Breach of Fiduciary Duty)

(Against Metropolitan West Securities, LLC and Wachovia Bank)

39.   CEA incorporates herein by reference each and every allegation contained in paragraphs 1 through 38 above, as though fully set forth at length.

40.   Wachovia was in a fiduciary relationship with the CEA because Wachovia contractually agreed to serve as the CEA's financial and investment advisor. Moreover, the parties specifically agreed that Wachovia would serve as a fiduciary to the CEA. In assuming this role, Wachovia agreed to provide financial and investment services in with due care, skill, prudence, and diligence. The CEA placed its trust and confidence in Wachovia's integrity and fidelity.

41.   Wachovia breached its fiduciary duty to the CEA by investing in the Mainsail fund even though it was not among those issuers approved by the PMIB pursuant to Government Code section 16430. An investment adviser exercising due care does not place its clients in illegal investments. Moreover, it is clear that Wachovia made no effort to comply with Government Code section 16430; its Credit Committee did not even consider the PMIB list in approving issuers of securities in which the CEA might invest. Wachovia further breached its fiduciary duty by investing in Mainsail when the investment did not conform to the CEA's investment policies and guidelines.

42. Wachovia also breached its duty to the CEA when it represented to the CEA that the CEA should retain its holdings in Mainsail because the investment could recover and pay back all of its creditors. Based on its investment advice, upon which the CEA relied, the CEA retained the Mainsail investment even as it declined in value. As a result of Wachovia's breach of fiduciary duty, the CEA invested over $62 million in the Mainsail fund and was unable to extricate itself from this investment before it defaulted and depreciated precipitously. The CEA has lost the majority of its $62.25 million investment and all the interest it would have earned on that $62.25 million.

43. The CEA has been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

(Constructive Fraud)

(Against Metropolitan West Securities, LLC and Wachovia Bank)

44. CEA incorporates herein by reference each and every allegation contained in paragraphs 1 through 43 above, as though fully set forth at length.

45. Wachovia was in a fiduciary relationship with the CEA because Wachovia contractually agreed to serve as the CEA's financial and investment advisor. Moreover, the parties specifically agreed that Wachovia would serve as a fiduciary to the CEA. In assuming this role, Wachovia agreed to provide financial and investment services with a high degree of care, skill, prudence, and diligence. The CEA placed its trust and confidence in Wachovia's integrity and fidelity.

46. Wachovia made numerous material misrepresentations to the CEA about the nature of the Mainsail investment upon which the CEA detrimentally relied. For example, Wachovia represented in its Agreement with the CEA that it would carry out its obligation to invest the CEA's funds in conformance with all applicable laws, including Insurance Code section 10089.6 and Government Code section 16430. This representation proved to be false because Wachovia invested the CEA's funds in Mainsail, a security not listed among those issuers approved by the PMIB. In addition, Wachovia failed to disclose that Mainsail was not an approved issuer on the PMIB's list.

47.   Further, by the early summer of 2007, many asset-backed securities' ratings had been placed on watch for downgrade or had been downgraded. The market outlook was that securities issuers holding mortgage-backed assets would experience significant problems in the coming months. Entirely consistent with this sentiment, Mainsail II experienced major financial problems and defaulted on the repayment of its commercial paper. Despite the declining health of the market for securities ultimately backed by residential mortgages, Wachovia encouraged the CEA to hold its Mainsail investment, arguing that the structured investment vehicle could eventually pay out its creditors, thereby allowing the CEA to recoup all of its approximately $62 million investment. Based on Wachovia's representations and advice about Mainsail, the CEA did not sell the Mainsail investment.

48.   At no time did the CEA know the falsity of Wachovia's representations and, in fact, the CEA believed them to be true. In reliance on these misrepresentations and omissions, the CEA invested over $62 million in Mainsail. Subsequent misrepresentations by Wachovia caused the CEA to not sell the Mainsail investment when it could have recouped some of its losses. As a proximate result of Wachovia's misrepresentations and the CEA's reliance on these misrepresentations, the CEA has lost the majority of its $62.25 million investment and all the interest it would have earned on that $62.25 million.

49.   The CEA was damaged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

(For Violation of Business & Professions Code section 17200 *et seq.*)

(Against Metropolitan West Securities, LLC and Wachovia Bank)

50.   CEA incorporates herein by reference each and every allegation contained in paragraphs 1 through 49 above, as though fully set forth at length.

51.   Wachovia has violated California Business & Professions Code section 17200 *et seq.*, which prohibits business acts or practices that are "unlawful, unfair or fraudulent" and which provides a cause of action for practices that violate either state or federal law. Wachovia's breach of fiduciary duties and constructive fraud, as set forth more fully above,

constitute unlawful, unfair, and fraudulent acts, policies or practices prohibited by section 17200.

52.     As a direct and proximate result of Wachovia's wrongful acts, the CEA has suffered and will continue to suffer substantial pecuniary losses. As such, restitution is not adequate to compensate for injuries inflicted by Defendants.  Accordingly, the CEA seeks civil penalties in addition to restitution.    Wachovia wrongfully obtained significant transaction fees as a result of purchasing the CEA's interest in Mainsail.

//

//

VERIFIED COMPLAINT

**PRAYER FOR RELIEF**

The CEA prays for judgment against Defendants as follows:

1.  On each and every claim, that all damages incurred by the CEA as a result of Defendants' wrongful actions be awarded to the CEA;

2.  On the first cause of action, that the Mainsail transactions be rescinded and that the full amount paid by the CEA be restored to the CEA and any lost profits be awarded to the CEA;

3.  On the third cause of action, that this Court award punitive damages;

4.  On the fourth cause of action, that this Court award restitution and civil penalties;

5.  On each and every cause of action, that this Court grant the CEA its costs of suit, including out-of-pocket expenses and reasonable attorneys' fees; and

6.  On each and every cause of action, that this Court grant prejudgment and postjudgment interest and such other, different, or further relief as the Court deems proper.

Dated: December 30, 2009

STRUMWASSER & WOOCHER LLP
Michael J. Strumwasser
Fredric D. Woocher
Aparna Sridhar
Jonathan D. Krop

By _____
Michael J. Strumwasser

*Attorneys for Plaintiff*
*California Earthquake Authority*

17

**VERIFICATION**

1      I, Glenn Pomeroy, am the Chief Executive Officer of the California Earthquake

2  Authority, and I am entitled to make this verification on its behalf.  I have read the foregoing

3  Complaint and know its contents.  I am informed and believe and on that ground allege that

4  the matters stated in the Complaint are true.

5      I declare under penalty of perjury under the laws of the State of California that the

6  foregoing is true and correct.

7      Executed on December ___30___, 2009, at Sacramento, California.

8                                      _____

9                                      Glenn Pomeroy, Chief Executive Officer

10                                     California Earthquake Authority

18