MUNGER, TOLLES & OLSON LLP
  Marc T.G. Dworsky (SB# 157413)
  James C. Rutten (SB# 201791)
  Karen J. Ephraim (SB# 233824)
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
(213) 683-9100; (213) 687-3702 (fax)
marc.dworsky@mto.com
james.rutten@mto.com
karen.ephraim@mto.com

Attorneys for Defendants WACHOVIA
BANK, N.A. and METROPOLITAN WEST
SECURITIES LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| CALIFORNIA EARTHQUAKE AUTHORITY,<br><br>                    Plaintiff,<br><br>        vs.<br><br>METROPOLITAN WEST SECURITIES LLC; WACHOVIA BANK, N.A.; and DOES 1 through 25,<br><br>                    Defendants. | Case No. 2:10-CV-00291-FCD-GGH<br><br>**(1)   OPPOSITION TO MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS**<br><br>**(2)   DECLARATION OF RICHARD DROOYAN**<br><br>**(3)   DECLARATION OF JAMES RUTTEN**<br><br>Date: April 23, 2010<br>Time: 10:00 a.m.<br>Judge: Honorable Frank C. Damrell, Jr. |

9772900.6

OPPOSITION TO MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................. 1

II.  BACKGROUND ............................................................................................. 3

    A.  MTO's Non-Work For Plaintiff ............................................................. 3

    B.  MTO's Representation Of Wachovia ..................................................... 5

III. ARGUMENT ................................................................................................. 7

    A.  Because Any Purported Attorney-Client Relationship Ended Long Ago,
        MTO's Representation Of Wachovia Does Not Violate The Rule Against
        Concurrently Representing Adverse Interests .......................................... 8

    B.  MTO's Representation Of Wachovia Does Not Violate The Rule Against
        Being Adverse To A Former Client In A "Substantially Related" Matter .......... 11

        1.  Plaintiff Has Not Shown and Cannot Show That the Two Matters
            Raise Similar Factual or Legal Issues ......................................... 11

        2.  In any Event, Mr. Drooyan's Three-Hour Meeting With Outside
            Counsel Seven Years Ago Does Not Warrant Depriving Wachovia
            of Its Counsel of Choice .......................................................... 14

    C.  Plaintiff's Motion Should Be Denied For The Additional Reason That It Is
        Untimely ............................................................................................. 15

IV.  CONCLUSION ............................................................................................. 17

OPPOSITION TO MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS

# TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Abbott Labs. v. Centaur Chem. Co.,*
  497 F. Supp. 269 (N.D. Ill. 1980) ........................................................................ 9

*Bank Melli Iran v. Pahlavi,*
  58 F.3d 1406 (9th Cir. 1995)................................................................................ 13

*Eaton v. Siemens,*
  2007 WL 2318531 (E.D. Cal. Aug. 10, 2007) .................................................... 13

*Leber Assocs. v. Entm't Group Fund,*
  2001 U.S. Dist. LEXIS 20352 (S.D.N.Y. Dec. 7, 2001)....................................... 8

*Miller v. Alagna,*
  138 F. Supp. 2d 1252 (C.D. Cal. 2000).................................................................. 2

*Shurance v. Planning Control Int'l, Inc.,*
  839 F.2d 1347 (9th Cir. 1988).............................................................................. 7

*Simonica v. Mukasey,*
  2008 WL 5113757 (E.D. Cal. Nov. 25, 2008) ................................................ 7, 11

*Travelers Cas. & Sur. Co. v. Claude E. Atkins Enters., Inc.,*
  2006 WL 3589746 (E.D. Cal. Dec. 11, 2006)....................................................... 7

*Trust Corp. v. Piper Aircraft Corp.,*
  701 F.2d 85 (9th Cir. 1983)................................................................................. 15

*Zyburra v. Metech Int'l, Inc.,*
  2000 WL 1920372 (C.D. Cal. Dec. 12, 2000) ...................................................... 8

### STATE CASES

*Consol. Theatres, Inc. v. Theatrical Stage Employees Union Local 16,*
  69 Cal. 2d 713 (1968) ........................................................................................... 8

*Crouse v. Brobeck, Phleger & Harrison,*
  67 Cal. App. 4th 1509 (1998)................................................................................ 8

*Elliot v. McFarland Unified Sch. Dist.,*
  165 Cal. App. 3d 562 (1985)............................................................................... 13

*Flatt v. Superior Court,*
  9 Cal. 4th 275 (1995) ......................................................................................... 16

*Fremont Indem. Co. v. Fremont Gen. Corp.,*
  143 Cal. App. 4th 50 (2006)................................................................... 11, 12, 13

*Gregori v. Bank of Am.,*
  207 Cal. App. 3d 291 (1989)................................................................................. 7

*H.F. Ahmanson & Co. v. Salomon Brothers, Inc.,*
  229 Cal. App. 3d 1445 (1991)................................................................. 11, 14, 15

*Henrickson v. Great American Savings & Loan,*
  11 Cal. App. 4th 109 (1992)............................................................................... 16

ii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Zimmerman*,
  16 Cal. App. 4th 556 (1993)..................................................................... 14

*Johnson v. Superior Court*,
  159 Cal. App. 3d 573 (1984)..................................................................... 7

*Kirk Corp. v. First Am. Title Co.*,
  220 Cal. App. 3d 785, 804, 813 (1990)..................................................... 11

*Kirk v. First Am. Title Ins. Co.*,
  _ Cal. App. 4th _, 2010 WL 1346403 (Apr. 7, 2010) ................................. 14, 16, 17

*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*,
  36 Cal. App. 4th 1832 (1995)................................................................... 10

*People ex rel. Department of Corporations v. SpeeDee Oil Change Systems*,
  20 Cal. 4th 1135 (1999) ........................................................................ 16

*Powers v. City of Richmond*,
  10 Cal. 4th 85 (1995) ........................................................................... 10

*Rhaburn v. Superior Court*,
  140 Cal. App. 4th 1566 (2006)................................................................. 7

*River West Inc. v. Nickel*,
  188 Cal. App. 3d 1297 (1987)................................................................. 16

*Santa Teresa Citizen Action Group v. City of San Jose*,
  114 Cal. App. 4th 689 (2003)................................................................. 11

*Truong v. Glasser*,
  181 Cal. App. 4th 102 (2009)................................................................. 9

*Western Continental Co. v. Natural Gas Corp.*,
  212 Cal. App. 3d 752 (1989)................................................................. 15

*Worthington v. Rusconi*,
  29 Cal. App. 4th 1488 (1994)................................................................. 1, 8

**RULES**

California Rule of Professional Conduct 3-700 ........................................... 10

**OTHER AUTHORITIES**

Federal Sentencing Guidelines Manual § 8A1.2, Former Application Note 3(k) (2002)............. 12

Federal Sentencing Guidelines Manual § 8C2.5(f) (2002) ............................. 3

Richard E. Flamm, Disqualification Motions and Appeals (2009)................................. 1

9772900.6

OPPOSITION TO MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS

# I.    INTRODUCTION

Plaintiff's motion to disqualify Munger, Tolles & Olson LLP ("MTO") from representing Defendants Wachovia Bank, N.A. and Metropolitan West Securities LLC (collectively, "Wachovia") is meritless and should be denied.  The facts are these:

(1)    MTO was approached by Plaintiff's outside counsel in 2002 about possibly providing advice concerning whether, if Plaintiff were convicted of a federal crime, a compliance program counsel was developing would qualify Plaintiff for a downward adjustment under the United States Sentencing Guidelines.

(3)    MTO and Plaintiff entered into a retainer agreement setting out the terms and conditions under which MTO would provide such advice if – and that's a big "if" – MTO ever were called upon to do so.

(3)    In fact, MTO was not called upon to do so because Plaintiff never followed up.

(4)    MTO billed a grand total of three hours to Plaintiff, solely for the time spent at an introductory meeting with Plaintiff's outside counsel.

Plaintiff's motion to disqualify MTO fails in light of these indisputable facts.  *First*, Plaintiff cannot establish that MTO's representation of Wachovia violates the rule against concurrently representing clients that are adverse to each other.  Though Plaintiff claims that it "believed" it enjoyed a perpetual attorney-client relationship with MTO despite never giving MTO any work to do,[1] "[c]ontinuity of representation ultimately depends, not on a client's subjective beliefs, but rather on evidence of an ongoing mutual relationship and of activities in furtherance of the relationship."  *Worthington v. Rusconi*, 29 Cal. App. 4th 1488, 1498 (1994) (emphasis omitted).  This is true "[e]ven when attorney and client have not clearly expressed the intention of terminating their relationship," because the law will "imply an end to that relationship . . . where it would be objectively unreasonable to continue to bind the parties to one another."  Richard E. Flamm, Disqualification Motions and Appeals 114-15 (2009).  Plaintiff, having

---

[1] Decl. of Daniel P. Marshall III ("Marshall Decl."), dated Dec. 30, 2009 and filed Feb. 24, 2010, at ¶ 13.  Throughout this brief, any emphasis in quotations is added, and any internal quotation marks, citations, footnotes, brackets, and ellipses are omitted unless otherwise indicated.

1

1    declined to use MTO's services at any time since 2002, cannot possibly establish its fanciful

2    claim that it "was still [MTO's] client" some seven years later in 2009.[2]

3         *Second*, Plaintiff cannot establish that MTO's representation of Wachovia violates the rule

4    against being adverse to a former client in a matter that is substantially related to the former

5    representation.  Plaintiff's outside counsel approached MTO in 2002 about a narrow question of

6    federal criminal law.  By contrast, Plaintiff's current lawsuit, in which Plaintiff seeks to cast an

7    investment loss onto Wachovia, presents questions of state contract and fiduciary duty law, *e.g.*,

8    whether Wachovia's purchase, on Plaintiff's behalf, of commercial paper issued by a structured

9    investment vehicle known as Mainsail II LLC ("Mainsail") was authorized by the parties'

10   contract and Plaintiff's investment policy, and whether the Mainsail investment was suitable for a

11   sophisticated investor with Plaintiff's appetite for risk and return.  Plaintiff cannot possibly show

12   a "substantial relation" between the issue of criminal law its outside counsel abortively

13   approached MTO about in 2002, and the current investment dispute.

14        *Third*, Plaintiff's motion is as untimely as it is unmeritorious.  Plaintiff has known since

15   2008 that MTO was representing Wachovia, yet Plaintiff did not seek to enjoin MTO, did not file

16   a Bar complaint, and did not take any other formal action until New Year's Eve of 2009, when it

17   finally filed its motion.  While Plaintiff, in the words of its general counsel, "acquiesce[d]" in

18   MTO's representation of Wachovia,[3] Plaintiff happily accepted four mediation briefs that were

19   researched and drafted by MTO, and negotiated against MTO attorneys during two mediation

20   sessions in New York and California.  In short, Plaintiff sat on its hands for an entire year while

21   MTO attorneys spent hundreds of hours engaging in the mediation process on two coasts,

22   interviewing witnesses, researching questions of fact and law, and so forth.  If Plaintiff's motion

23   were granted, Wachovia would suffer substantial prejudice because new counsel would have to

24   replicate much of this work just to get up to speed.  Because Plaintiff "unreasonabl[y] delay[ed]

25   in bringing the motion causing prejudice to [Wachovia], disqualification should not be ordered."

26   *Miller v. Alagna*, 138 F. Supp. 2d 1252, 1258-59 (C.D. Cal. 2000).

27   _____

28   [2] Pl.'s Mem. of P. & A. in Supp. of Mot. to Disqualify Counsel for Defs. ("Mot.") at 8.

[3] Marshall Decl. ¶ 13.

2

## II.  BACKGROUND

### A.  MTO's Non-Work For Plaintiff

In 2002, Richard Wolf, Esq. of Lewis, Brisbois, Bisgaard & Smith LLP, outside counsel for Plaintiff, contacted Richard Drooyan, Esq. of MTO.[4]  Mr. Wolf approached Mr. Drooyan about possibly reviewing a proposed employee compliance program to ensure it would qualify Plaintiff for a downward adjustment under the Sentencing Guidelines if Plaintiff were convicted of a federal crime.[5]  *See* Federal Sentencing Guidelines Manual § 8C2.5(f) (2002).  Mr. Wolf apparently did not have prior experience with the Sentencing Guidelines, whereas Mr. Drooyan had been a federal prosecutor for a number of years, including as Chief of the Criminal Division and Chief Assistant United States Attorney in the Central District of California.[6]  Messrs. Wolf and Drooyan thereafter had a single three-hour meeting on August 26, 2002, during which they discussed in general terms Plaintiff's earthquake insurance business and the proposed compliance program, and Mr. Drooyan explained how the Sentencing Guidelines work.[7]

A draft retainer agreement was e-mailed to Mr. Drooyan the following day by Plaintiff's general counsel.[8]  The draft provided, in a section entitled "Scope of Work," that MTO "will provide legal representation to [Plaintiff] *as directed by [Plaintiff's] Contract Manager*" on issues pertaining to "a proposed compliance program for [Plaintiff], related legal issues, and other issue areas [Plaintiff] may face in the conduct of its business."[9]  The agreement was signed by Mr. Drooyan on October 11, 2002, and a week later, he sent Plaintiff a bill totaling $1,365 for the three hours spent speaking with Plaintiff's outside counsel before signing the retainer agreement.[10]  The agreement was signed by one of Plaintiff's representatives on October 31, 2002, and the bill for the pre-retainer meeting with Plaintiff's outside counsel was paid.[11]

---

[4] Decl. of Richard E. Drooyan ("Drooyan Decl.") attached hereto at ¶ 3.

[5] *See id.*

[6] *See id.* ¶¶ 2-3.

[7] *See id.* ¶¶ 4, 6.

[8] *See id.* ¶ 5.

[9] Agmt., attached as Ex. 1 to the Marshall Decl., at § 1.0.

[10] *See* Drooyan Decl. ¶¶ 5, 8.

[11] *See id.* ¶ 8; Agmt. attached as Ex. 1 to the Marshall Decl., at 8.

3

1      That is where things ended.  Neither Plaintiff's "Contract Manager," its inside or outside

2   counsel, nor any of its other representatives ever followed up to pursue the work contemplated by

3   the retainer agreement.[12]  They never "directed" or asked Mr. Drooyan to do anything.[13]  In fact,

4   they never had any further contact with him whatsoever.[14]

5      Moreover, Plaintiff appears never to have sent Mr. Drooyan any substantive information

6   or documents.  Immediately after Plaintiff filed the present motion, MTO wrote to Plaintiff and

7   asked it to provide certain limited categories of documents "so that the Court can have a fully

8   developed record when it addresses the motion."[15]  Plaintiff was asked to provide copies of "[a]ny

9   written materials that [Plaintiff] contends were provided to MTO in connection with the purported

10   attorney-client relationship, including compliance guidelines or manuals," and "[a]ny documents

11   constituting or reflecting communications between [Plaintiff] and MTO."[16]  Plaintiff has been

12   unable to produce any such documents.[17]

13      Further, MTO retrieved its file pertaining to Plaintiff from the offsite storage facility to

14   which it long ago had been consigned.[18]  It contains nothing besides an MTO client intake form

15   and conflict check e-mail, the e-mail from Plaintiff's general counsel transmitting the draft

16   retention agreement, a post-it note from Mr. Drooyan's secretary regarding a call she made to

17   request the final agreement, the fully-executed retention agreement with a cover letter

18   transmitting it, and the October 2002 bill for the pre-retainer meeting with Plaintiff's outside

19   counsel.[19]  In short, the file contained nothing of substance.

20   _____

21   [12] *See* Drooyan Decl. ¶¶ 4, 7, 10-11.

    [13] *See id.*

22   [14] *See id.*

23   [15] Jan. 12, 2010 Ltr. from MTO to Pls.' Counsel, attached as Ex. 1 to the Decl. of James Rutten
    appended hereto ("Rutten Decl."), at 1.

24   [16] *Id.* at 1-2.

25   [17] *See* Rutten Decl. ¶ 11.  Plaintiff initially declined to respond to MTO's requests on the ground
    that MTO has a conflict, insisting that Wachovia's in-house counsel make the request directly.
26   (*See id.*)  Even after Wachovia's in-house counsel did so, Plaintiff still did not produce anything.
    (*See id.* ¶¶ 12-13 & Ex. 2 thereto (e-mail from Wachovia's in-house counsel to Plaintiff's counsel
27   adopting MTO's requests as her own).)

    [18] *See* Drooyan Decl. ¶ 12.
28
    [19] *See Id.*

                                        4

**B.    MTO's Representation Of Wachovia**

In November 2008, Wachovia contacted MTO about representing it in an action Plaintiff was threatening to bring.[20] Wachovia had been one of Plaintiff's private investment managers with discretionary authority to make investments on Plaintiff's behalf in accordance with Plaintiff's investment policy.[21] Wachovia had purchased Mainsail commercial paper on Plaintiff's behalf in August 2007, at a time when Mainsail enjoyed the highest credit ratings available from two rating agencies designated by the Securities and Exchange Commission as Nationally Recognized Statistical Rating Organizations. After Wachovia made this purchase, the credit crisis hit, and Mainsail, like many other asset-backed commercial paper programs, failed, causing losses to Plaintiff and what Plaintiff describes as "[a] number of public and private entities [that] had almost the same experience" and "financial organizations of every stripe, from every country, that found themselves in virtually the same boat."[22] Plaintiff nevertheless threatened to sue Wachovia, contending that the Mainsail investment, which was virtually identical to hundreds, if not thousands, of other highly profitable investments Wachovia had made on Plaintiff's behalf for many years, was somehow imprudent and unauthorized by the parties' contract and Plaintiff's investment policy.[23]

When MTO was contacted by Wachovia in November 2008, the parties already had attended an unsuccessful mediation session before The Honorable Daniel Weinstein and were anticipating a second mediation session.[24] Plaintiff had been represented by outside counsel at the first mediation session, but Wachovia had not.[25] MTO ran a conflict check and determined that representing Wachovia in the matter would not pose an actual or potential conflict.[26]

---

[20] *See* Rutten Decl. ¶ 2.

[21] *See* Compl. filed Dec. 31, 2009 at ¶ 23.

[22] Pl.'s June 25, 2009 Governing Board Memo. at 1, attached as Ex. 3 to the Rutten Decl.

[23] *See, e.g.*, Compl. ¶¶ 1, 19-20, 22-23, 41-42, 46.

[24] *See* Rutten Decl. ¶ 2.

[25] *See id.*

[26] *See id.*

5

1    MTO spent significant time, at significant expense to Wachovia, getting up to speed on

2    the complex factual and legal issues presented.[27]  On January 19, 2009, MTO submitted a

3    mediation brief to Judge Weinstein in advance of the second mediation session, which was

4    scheduled for January 29, 2009 in New York.[28]

5         Four days later, Plaintiff's general counsel sent a letter to MTO claiming, for the first time

6    in nearly seven years, that Plaintiff had "an existing attorney-client relationship" with MTO.[29]

7    The letter did *not* assert that MTO had done any work for Plaintiff since 2002, nor did it request

8    that MTO cease its representation of Wachovia.  It merely read, "At this point I simply wanted to

9    identify the problem and to state that your present representation of Wachovia, including at the

10   January 29, 2009 mediation, does not constitute any waiver of [Plaintiff's] rights with respect to

11   the conflict."[30]

12        MTO responded to Plaintiff's letter on January 27, 2009.  MTO stated that inasmuch as

13   MTO had not done any work for Plaintiff whatsoever since 2002 – if indeed it had done any work

14   then – "any representation necessarily terminated long ago."[31]  MTO's letter concluded by

15   saying:  "We take our ethical obligations very seriously and would be pleased to consider the

16   matter further if you have additional facts or legal authority you would like us to consider."[32]

17   Plaintiff apparently had nothing to add, because it did not respond to the letter.[33]

18        MTO thereafter undertook significant additional work on behalf of Wachovia, with the

19   full knowledge of Plaintiff.  For example, MTO representatives attended two mediation sessions

20   in front of Judge Weinstein (one in New York in January 2009 and one in California in August

21   2009) with the full participation of Plaintiff and its counsel.  MTO also researched and drafted

22   four mediation briefs addressing complex questions of fact and law, which were exchanged with

23

---

24   [27] *See id.* ¶ 3.

25   [28] *See id.*

26   [29] Jan. 23, 2009 Ltr. from Pl.'s General Counsel, attached as Ex. 2 to the Marshall Decl.

     [30] *Id.*

27   [31] Jan. 27, 2009 Ltr. from MTO to Plaintiff, attached as Ex. 3 to the Marshall Decl.

28   [32] *Id.*

     [33] *See* Rutten Decl. ¶ 7.

1    Plaintiff.[34]  Throughout, MTO did everything counsel has to do in a complex case in which the

2    plaintiff seeks to force the defendant to pay some $62 million to turn a losing investment into a

3    winning one.  MTO interviewed numerous witnesses, gathered pertinent documents, researched

4    numerous questions of law, interviewed potential expert consultants, and so forth.[35]  MTO spent

5    literally hundreds of hours being adverse to Plaintiff – all with Plaintiff's self-admitted

6    "acquiescence."[36]

## III.  ARGUMENT

8         "A disqualification motion is often tactically motivated and tends to derail the efficient

9    progress of litigation." *Travelers Cas. & Sur. Co. v. Claude E. Atkins Enters., Inc.*, 2006 WL

10   3589746, at *4 (E.D. Cal. Dec. 11, 2006).  Disqualification also "imposes a substantial hardship

11   on the disqualified attorney's . . . client, who must bear the monetary and other costs of finding a

12   replacement." *Gregori v. Bank of Am.*, 207 Cal. App. 3d 291, 300 (1989); *accord Rhaburn v.*

13   *Superior Court*, 140 Cal. App. 4th 1566, 1575-77, 1581 (2006) (observing that a "rigid rule of

14   disqualification can create hardship" to the client and that disqualification motions can be "abused

15   as an improper tactical maneuver").  Accordingly, "disqualification motions should be subjected

16   to particularly strict judicial scrutiny," *Shurance v. Planning Control Int'l, Inc.*, 839 F.2d 1347,

17   1349 (9th Cir. 1988), and, as this Court has observed, the "drastic measure" of disqualification

18   should not be ordered "except when of absolute necessity." *Simonica v. Mukasey*, 2008 WL

19   5113757, at *2 (E.D. Cal. Nov. 25, 2008) (Damrell, J.); *accord Johnson v. Superior Court*, 159

20   Cal. App. 3d 573, 580 (1984) ("The right of a party to be represented in litigation by the attorney

21   of his or her choice is a significant right . . . and ought not to be abrogated in the absence of some

22   indication the integrity of the judicial process will otherwise be injured.").

23         As shown below, no grounds for disqualification exist here.

24

25

26

----

27   [34] *See id.* ¶ 8.

     [35] *See id.* ¶ 9.

28   [36] *See* Marshall Decl. ¶ 13.

7

OPPOSITION TO MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS

A.    **Because Any Purported Attorney-Client Relationship Ended Long Ago, MTO's Representation Of Wachovia Does Not Violate The Rule Against Concurrently Representing Adverse Interests.**

"Continuity of representation ultimately depends . . . on evidence of an *ongoing mutual relationship and of activities in furtherance of the relationship*." *Worthington*, 29 Cal. App. 4th at 1498 (second emphasis in original). A representation ends as a matter of law once "the agreed tasks have been completed or events inherent in the representation have occurred." *Crouse v. Brobeck, Phleger & Harrison*, 67 Cal. App. 4th 1509, 1528 (1998).

This standard is dispositive of Plaintiff's claim that it "was still [MTO's] client in 2009."[37] There has been no "relationship" and no "activities in furtherance of the relationship" since 2002. *Worthington*, 29 Cal. App. 4th at 1498. Further, the "agreed tasks" and "events inherent in the representation," *Crouse*, 67 Cal. App. 4th at 1528, necessarily occurred long ago – although they apparently occurred with another law firm, because Plaintiff elected not to use MTO. Plaintiff cannot possibly establish that, having given MTO no work in 2002, and no work in 2003, 2004, 2005, 2006, 2007, 2008, or 2009, it somehow was MTO's client in 2009 and entitled to conflict MTO out of representing a client that actually does want to use MTO's services.

Plaintiff's arguments to the contrary are easily dispatched. Plaintiff first notes that the retainer agreement provided that it would be of "no defined duration," and then contends that this means that its duration not only was defined, but was defined to extend into infinity – like a perpetual motion machine, but with no actual motion taking place. Plaintiff's argument is meritless, for it is well settled that "[i]n construing contracts . . . which contain no express term of duration," the duration is implied "from the nature of the contract and the circumstances surrounding it." *Consol. Theatres, Inc. v. Theatrical Stage Employees Union Local 16*, 69 Cal. 2d 713, 725 (1968) (emphasis omitted); *accord Zyburra v. Metech Int'l, Inc.*, 2000 WL 1920372, at *2 (C.D. Cal. Dec. 12, 2000).

Here, the "nature" and "circumstances" of the representation concerned putative advice about the Sentencing Guidelines in connection with a compliance program Plaintiff was developing – a project that necessarily had a finite duration. *Cf. Leber Assocs. v. Entm't Group*

---

[37] Mot. at 8.

9772900.6

1    *Fund*, 2001 U.S. Dist. LEXIS 20352, at *16 (S.D.N.Y. Dec. 7, 2001) ("Although . . . a will and

2    living trust are continuing legal products that may be amended from time to time, the services

3    performed by an attorney in preparing a will and setting up a trust are finite tasks.  Since there is

4    no credible evidence in this case that [plaintiff] returned to the firm for additional work on these

5    or any other legal matters, the record reflects that the attorney-client relationship ended years

6    ago."); *Abbott Labs. v. Centaur Chem. Co.*, 497 F. Supp. 269, 271 (N.D. Ill. 1980) (holding that a

7    lawyer's representation of the plaintiff in an earlier matter did not preclude his firm from

8    representing the defendant, where 11 months had passed since the prior representation and there

9    was little more than a possibility the lawyer would be called upon to represent the plaintiff again).

10   Further, the "nature" and "circumstances" of the representation were expressly limited by the

11   contract itself, which provided that the "Scope of Work" would be only as "directed by

12   [Plaintiff's] Contract Manager."[38]  Arguably there was never any representation in the first place,

13   because neither Plaintiff's Contract Manager nor anyone else from Plaintiff ever directed or asked

14   MTO to do *anything*.[39]

15           Plaintiff next argues that the attorney-client relationship purportedly created in 2002

16   extended into 2009 because neither Plaintiff nor MTO specifically invoked the contract's

17   termination provision.  Plaintiff's argument misses the mark, for "[e]ven when attorney and client

18   have not clearly expressed the intention of terminating their relationship, the law will usually

19   imply an end to that relationship . . . where it would be objectively unreasonable to continue to

20   bind the parties to one another" – which certainly is the case here.  Flamm, *supra*, at 114-15; *see*

21   *also, e.g.*, *Truong v. Glasser*, 181 Cal. App. 4th 102, 116 (2009) (explaining that the conclusion

22   of an attorney's representation "does not depend on a formal termination . . . but rather on

23

24   _____

     [38] Agmt., attached as Ex. 1 to the Marshall Decl., at § 1.0.

25   [39] Drooyan Decl. ¶¶ 4, 7, 10-11.  The contract's fee provision underscores that the contract did
     not extend into perpetuity.  The contract provided that Plaintiff would compensate MTO at a rate
     of $455 per hour for Mr. Drooyan's time.  (*See* Agmt. (Marshall Decl. Ex. 1) at § 4.1.)  That was

26   Mr. Drooyan's rate in 2002, and it has gone up since then.  (*See* Drooyan Decl. ¶ 9.)  Plainly,
     Plaintiff could have no enforceable expectation of entering into this contract in 2002, and then

27   phoning up MTO in 2009 and obtaining legal services at 2002 rates.  Just as plainly, Plaintiff
     could have no enforceable expectation of entering into this contract in 2002, giving MTO no

28   work for seven years, and then conflicting MTO out of a representation on the theory that the
     contract created an attorney-client relationship into perpetuity.

1  evidence of an ongoing mutual relationship and of activities in furtherance of the relationship"

2  and holding that there was no ongoing relationship where the attorney did not give "any advice or

3  services" for some 20 months) (emphasis omitted). Further, Plaintiff and MTO did not agree that

4  expressly terminating the contract was the *only* way it could terminate; they agreed that "[e]ither

5  party *can* terminate this Agreement" expressly,[40] but did not preclude the possibility that the

6  contract could be terminated in other ways, such as by dint of seven years of inactivity. *See*

7  *Powers v. City of Richmond*, 10 Cal. 4th 85, 173 (1995) (contrasting a "mandatory word like

8  'must'" with the "permissive word 'can'").

9      Plaintiff cites *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*, 36 Cal. App. 4th 1832

10  (1995), for the proposition that seven years of inactivity does not mean that the representation

11  terminated. *MGM* could not be more inapt. In *MGM*, the law firm hired by the defendant had

12  been the plaintiff's "primary outside counsel in both litigation and transactional matters" for more

13  than *25 years*, a fact the court found "compelling" in holding that the attorney-client relationship

14  had not ended. *Id.* at 1836, 1841. The law firm also was still *counsel of record* for plaintiff in a

15  *pending* lawsuit. *See id.* at 1841. That *MGM* is the best authority Plaintiff can muster is telling.

16      Plaintiff next argues, citing California Rule of Professional Conduct 3-700, that the

17  purported attorney-client relationship could not have ended because "[a] [lawyer] shall not

18  withdraw from employment" without "allowing time for [the] employment of other counsel" and

19  "returning all client papers and property."[41] But MTO did not "withdraw" from representing

20  Plaintiff – MTO never was given any work to begin with – and it makes no sense to speak of

21  Plaintiff needing "time for the employment of other counsel" in this context, particularly when

22  Plaintiff already had other counsel (Mr. Wolf). Further, even assuming Plaintiff gave MTO

23  "papers or property" – and neither MTO, nor, apparently, Plaintiff, has any record of Plaintiff

24  having done so – MTO had no duty to return them absent a "request of the client." Cal. R. Prof.

25  Conduct 3-700(D). Plaintiff does not claim to have made any such request, nor does MTO have a

26  record of one.[42]

---

27  [40] *See* Agmt. (Marshall Decl. Ex. 1) at § 7.1.

[41] Mot. at 10.

28  [42] *See* Drooyan Decl. ¶¶ 4, 7, 10-11.

10

OPPOSITION TO MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS

Simply put, Plaintiff was not MTO's client in 2009, and MTO's representation of

Wachovia does not violate the rule against concurrently representing adverse interests.

**B.    MTO's Representation Of Wachovia Does Not Violate The Rule Against Being Adverse To A Former Client In A "Substantially Related" Matter.**

**1.    Plaintiff Has Not Shown and Cannot Show That the Two Matters Raise Similar Factual or Legal Issues.**

Two matters are not "substantially related" merely if, unlike here, they involve the same

subject matter. *See, e.g.*, *Kirk Corp. v. First Am. Title Co.*, 220 Cal. App. 3d 785, 804, 813

(1990) (disqualification inappropriate even where a member of the law firm representing the

defendant in litigation had assisted the plaintiffs in preparing a declaration of covenants,

conditions, and restrictions for the same condominium project involved in the litigation). Two

matters cannot be deemed "substantially related" unless, at a minimum, "the *issues* are

sufficiently similar to support a reasonable inference that the attorney in the course of the prior

representation was likely to have obtained confidential information *material* to the current

representation." *Fremont Indem. Co. v. Fremont Gen. Corp.*, 143 Cal. App. 4th 50, 67 (2006);

*accord Santa Teresa Citizen Action Group v. City of San Jose*, 114 Cal. App. 4th 689, 711 (2003)

(even where "two representations involve the same general subject [matter], disqualification is

not required if the nature of the factual and legal questions posed are not similar"). This is

because the purpose of the rule against being adverse to a former client in a substantially related

matter is not to prohibit related representations as such, but to prevent client information obtained

in one matter from being used against the client in a subsequent matter. *See generally H.F.*

*Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal. App. 3d 1445, 1454-55 (1991).

Unlike in other areas of the law, in the context of the "drastic" remedy of disqualification,

*Simonica*, 2008 WL 5113757, at * 2, the standard for "materiality" is stringent, requiring a

showing that information likely to have been imparted in the first representation will be "directly

at issue" or of "critical importance" in the second representation:

> To create a conflict requiring disqualification, . . . the information acquired during
> the first representation . . . must be found to be *directly at issue* in, or have some
> *critical importance* to, the second representation. . . . Thus, for example, the
> attorney's acquisition during the first representation of general information about
> the first client's "overall structure and practices" would not of itself require

11

OPPOSITION TO MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS

disqualification unless it were found to be "material" – *i.e.*, directly in issue or of critical importance – in the second representation.

*Fremont*, 143 Cal. App. 4th at 69.

Plaintiff's motion fails under these controlling standards. Whether Plaintiff's employee compliance program might qualify it for a downward adjustment under the Sentencing Guidelines (the subject about which Plaintiff's outside counsel approached Mr. Drooyan) has nothing to do with whether Wachovia breached fiduciary or contractual duties in connection with investing Plaintiff in commercial paper issued by Mainsail or in any other respect (the subject of this lawsuit). Whether Plaintiff's compliance program satisfied the Sentencing Guidelines involved questions of, for example, whether "[s]pecific individual(s) within high-level personnel [were] assigned overall responsibility to oversee compliance," whether these individuals were known to have "a propensity to engage in illegal activities," whether Plaintiff "utiliz[ed] monitoring and auditing systems reasonably designed to detect *criminal* conduct," and whether the compliance "standards [were] consistently enforced through appropriate disciplinary mechanisms." Federal Sentencing Guidelines Manual § 8A1.2, Former Application Note 3(k) (2002). By contrast, Plaintiff's current lawsuit involves questions of, for example, whether Plaintiff's investment policy authorized Wachovia to purchase Mainsail commercial paper on Plaintiff's behalf, whether Wachovia was contractually or statutorily required to invest only in commercial paper that had been approved by the California Pooled Money Investment Board, and whether Mainsail commercial paper was suitable for a sophisticated institutional investor with Plaintiff's appetite for risk and return. It is difficult to hypothesize two matters that are less similar, both factually and legally.

Plaintiff strains to manufacture some threadbare connection between the two matters by asserting that Mr. Drooyan received "confidential communications discussing the CEA's governing statutes and, in particular, statutes that address the CEA's relationships with its contractors, and that he also participated in conversations regarding the kinds of exposure the CEA might face based on the actions of its contractors and how a contract-compliance program

9772900.6

1    might address those risks."[43]  Tellingly, however, Plaintiff makes these assertions entirely on

2    *information and belief*,[44] which renders them irrelevant and inadmissible.  *See Bank Melli Iran v.*

3    *Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995) (giving "no weight" to declarant's assertions based

4    on "information and belief"); *Eaton v. Siemens*, 2007 WL 2318531, at *5 (E.D. Cal. Aug. 10,

5    2007) (Damrell, J.) ("A motion to disqualify should be accompanied by declarations and

6    admissible evidence sufficient to establish the factual predicate upon which the motion

7    depends.").

8         Plaintiff also asserts (whether on "information and belief" is unclear) that it imparted

9    information to Mr. Drooyan concerning "strengths and possible weaknesses of [Plaintiff's]

10   contractor-compliance function."[45]  Plaintiff, however, describes this purported information in the

11   most conclusory terms imaginable, and studiously *avoids* saying that the information pertained in

12   any way, much less in any pertinent way, to Plaintiff's investment policy, to compliance by

13   Plaintiff's investment managers with that policy, or to the contracts or statutes governing

14   Plaintiff's investments.  Plaintiff thus has failed to carry its burden of showing that the

15   information will be "directly at issue" or of "critical importance" to the current litigation; for that

16   matter, Plaintiff has not even shown that it is tangentially relevant.  *Fremont*, 143 Cal. App. 4th at

17   69; *accord Elliot v. McFarland Unified Sch. Dist.*, 165 Cal. App. 3d 562, 572 (1985) (statement

18   that attorneys acquired information that was "germane and vital" to the lawsuit concerning the

19   moving party were conclusory and insufficient).

20        Plaintiff's reticence is no accident.  Plaintiff's own publicly available board materials

21   demonstrate beyond cavil that the compliance program it discussed with Mr. Drooyan in 2002

22   was not an investment compliance program.  Plaintiff's board materials show that Plaintiff did not

23   begin developing an investment compliance program until 2008, and that it did not actually adopt

24   one until June 2009 – many years after Plaintiff's outside counsel spoke with Mr. Drooyan, and

---

26   [43] Marshall Decl. ¶ 10.  Plaintiff's assertions are at odds with Mr. Drooyan's recollection and
     understanding that the compliance program was an *employee* compliance program, not a
27   contractor compliance program.  *See* Drooyan Decl. ¶ 6.

     [44] *See* Marshall Decl. ¶ 10.

28   [45] *Id.* ¶ 10.

1    indeed, *after* the Mainsail investment that is at issue in this case.[46]

2         What we have, then, is a situation where (1) the prior and current matters concern

3    different factual and legal issues; (2) Plaintiff does not and cannot claim that any information it

4    imparted to Mr. Drooyan concerned an investment compliance program or investments in any

5    respect; and (3) Mr. Drooyan does not recall receiving any information relating to such topics.[47]

6    In these circumstances, Plaintiff has not met and cannot meet its burden of showing that issues in

7    the two matters are similar, much less so similar that any (unspecified) information purportedly

8    imparted to Mr. Drooyan is likely to be "directly at issue" or of "critical importance" to the

9    current case.

10   **2.    In any Event, Mr. Drooyan's Three-Hour Meeting With Outside Counsel**
         **Seven Years Ago Does Not Warrant Depriving Wachovia of Its Counsel of**
11       **Choice.**

12        Disqualification is inappropriate where counsel's involvement in even a substantially

13   similar matter was minimal, as measured by (1) the nature and extent of counsel's involvement;

14   (2) the time counsel spent on the prior matter; (3) the type of work performed; and (4) the

15   potential that counsel was exposed to formulation of policy or strategy. *See Ahmanson*, 229 Cal.

16   App. 3d at 1454-55. Disqualification manifestly would be inappropriate here, even if it somehow

17   could be said that the two matters raise similar issues, because Mr. Drooyan merely had one

18   introductory meeting with Plaintiff's outside counsel; spent a grand total of three hours on the

19   matter; never did any work thereafter; and aside from Plaintiff's insufficient assertions about its

20   compliance program, is not alleged to have been privy to Plaintiff's legal or business plans,

21   policies, or strategies.

22        Indeed, just two days ago, the California Court of Appeal recognized a "qualitative

23   distinction between an attorney who had a brief preliminary meeting with counsel for the first

24   client" – *precisely* the situation here – "and an attorney who was actively involved with the first

25   client's representation." *Kirk v. First Am. Title Ins. Co.*, _ Cal. App. 4th _, 2010 WL 1346403, at

26   *12 n.20 (Apr. 7, 2010); *accord In re Zimmerman*, 16 Cal. App. 4th 556, 564 (1993)

27   _____

28   [46] *See* Plaintiff's June 25, 2009 Governing Board Memo., attached as Ex. 3 to the Rutten Decl.
     [47] *See* Drooyan Decl. ¶¶ 10-11.

                                    14

1  (disqualification properly denied where the attorney "merely engaged in a preliminary

2  consultation" with the former client, and where even though the attorney "may have offered [the

3  client] his initial impressions of the case, he obviously was not called upon to formulate a legal

4  strategy"); *Ahmanson*, 229 Cal. App. 3d at 1457 ("[T]here is reason to differentiate for

5  disqualification purposes between lawyers who become heavily involved in the facts of a

6  particular matter and those who enter briefly on the periphery for a limited and specific purpose

7  relating solely to legal questions.").

8       Plaintiff's motion is meritless and should be denied.

9  **C.    Plaintiff's Motion Should Be Denied For The Additional Reason That It Is Untimely.**

10      In any event, "[i]t is well settled that a former client who is entitled to object to an

11  attorney representing an opposing party on the ground of conflict of interest but who knowingly

12  refrains from asserting it promptly is deemed to have waived that right." *Trust Corp. v. Piper*

13  *Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983).  Accordingly, "[w]here the party opposing the

14  motion can demonstrate prima facie evidence of unreasonable delay in bringing the motion

15  causing prejudice to the present client, disqualification should not be ordered." *Western*

16  *Continental Co. v. Natural Gas Corp.*, 212 Cal. App. 3d 752, 763 (1989).

17      As noted above, Plaintiff learned back in 2008 that MTO was representing Wachovia, yet

18  Plaintiff did absolutely nothing – not a suit to enjoin MTO, not a Bar complaint, nothing – other

19  than sending a letter expressly stating that Plaintiff was *not* then demanding that MTO cease its

20  representation, and offering the hollow *ipse dixit* that Plaintiff was not waiving its rights.[48]  In

21  effect, Plaintiff sought by its letter unilaterally to exempt itself from the rule that a party seeking

22  to disqualify a law firm must do so promptly.  Indeed, Plaintiff freely admits that it

23  "acquiesce[d]" in what it calls "Munger's temporary representation of Wachovia during the

24  mediation."[49]  What Plaintiff does not tell the Court is that that "temporary representation"

25  involved a mediation process that took eight months, multiple mediation briefs involving complex

26  issues of fact and law, substantial factual investigation and legal research, and a host of other pre-

27

28  _____
[48] *See* Jan. 23, 2009 Ltr. from Pl.'s General Counsel (Marshall Decl. Ex. 2).
[49] Marshall Decl. ¶ 13.

9772900.6

OPPOSITION TO MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS

1    litigation activities adding up to hundreds of hours in attorney time and other personnel time.[50]

2    Only after Plaintiff and Wachovia failed to settle their dispute and Plaintiff filed this lawsuit did

3    Plaintiff finally move to deprive Wachovia of its counsel of choice – counsel that, by then,

4    Wachovia had been using for more than a year.

5        Obviously, Wachovia would be significantly prejudiced if it were required to find new

6    counsel at this late date. Wachovia would have to spend substantial time and money in

7    connection with getting new counsel up to speed to the point where MTO has been for quite some

8    time. Further, Wachovia is currently using MTO to defend another lawsuit in the Northern

9    District of California brought by another institutional investor seeking to cast its losses from its

10    Mainsail investment onto Wachovia, and that lawsuit raises many of the same factual and legal

11    issues as the instant lawsuit.[51] If Wachovia were forced to retain new counsel in the instant

12    lawsuit, it would lose the advantages associated with having one set of lawyers handle two

13    closely related lawsuits.[52]

14        In sum, even putting aside the lack of substantive merit to Plaintiff's motion, Plaintiff's

15    calculated delay in seeking to deprive Wachovia of its counsel of choice requires denial of its

16    motion.[53]

---

17    [50] *See* Rutten Decl. ¶¶ 8-9.

18    [51] *See id.* ¶ 14.

19    [52] Once the party opposing disqualification shows unreasonable delay and resulting prejudice, the
burden shifts to the moving party to justify the delay. *River West Inc. v. Nickel*, 188 Cal. App. 3d
1297, 1309 (1987). Plaintiff cannot justify its delay here. The relevant factors are how long the

20    moving party knew of the purported conflict (here, a year), whether the moving party was
represented by counsel (Plaintiff was), whether anyone prevented the moving party from seeking

21    relief earlier (no one did), and whether seeking relief earlier would have been futile (it would
have been, but only because Plaintiff's arguments lack merit, not because Plaintiff lacked a viable

22    avenue by which to seek relief, such as a suit for an injunction or a Bar complaint).

23    [53] Even if the Court were to find a conflict and that Plaintiff timely sought relief, the rule of
absolute vicarious disqualification Plaintiff advocates was recently laid to rest. Plaintiff relies on

24    *Flatt v. Superior Court*, 9 Cal. 4th 275 (1995), to argue for an absolute rule, but just two days ago,
the California Court of Appeal held that "it is improper to rely on *Flatt* as creating an absolute

25    rule of vicarious disqualification." *Kirk v. First Am. Title Ins. Co.*, _ Cal. App. 4th _, 2010 WL
1346403, at *12 (Apr. 7, 2010). The court also rejected reliance on another case Plaintiff cites,

26    *People ex rel. Department of Corporations v. SpeeDee Oil Change Systems*, 20 Cal. 4th 1135
(1999), observing that that case did not "address[] the issue of whether vicarious disqualification

27    is absolute." *Kirk*, 2010 WL 1346403, at *12. Further, the court observed that yet another case
Plaintiff relies on, *Henrickson v. Great American Savings & Loan*, 11 Cal. App. 4th 109 (1992),

28    is confined to the situation where an attorney "possessing actual confidential information from a
representation[] *switches sides in the same case*." *Kirk*, 2010 WL 1346403, at *12. The court
held that whether vicarious disqualification is required in the context of successive

16

OPPOSITION TO MOTION TO DISQUALIFY COUNSEL FOR DEFENDANTS

1

## IV.  CONCLUSION

2      For the reasons set forth above, Plaintiff's disqualification motion should be denied.

3   DATED: April 9, 2010                MUNGER, TOLLES & OLSON LLP

4

5                                       By:  /s/ James C. Rutten
                                             James C. Rutten
6
                                        Attorneys for Defendants WACHOVIA BANK, N.A.
7                                       and METROPOLITAN WEST SECURITIES LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   representations ultimately depends on whether, in the particular case, "the court is satisfied that
28   the tainted attorney has not had and will not have any improper communication with others at the
     firm concerning the litigation."  *Id.* at *19.

                                          17

## DECLARATION OF RICHARD DROOYAN

I, Richard E. Drooyan, declare as follows:

1.    I have personal knowledge of the facts stated below, and competently could testify to them if called upon to do so.  I make this declaration in support of Defendants' Opposition to Plaintiff's Motion to Disqualify Counsel for Defendants in the above-captioned matter.

2.    I am a partner in the law firm of Munger, Tolles & Olson LLP ("MTO"), and have been since I joined the firm in 1999.  Before I joined MTO, I spent several years as a federal prosecutor, including as Chief of the Criminal Division and Chief Assistant United States Attorney in the Central District of California.

3.    In 2002, I was contacted by Richard Wolf, Esq. of Lewis, Brisbois, Bisgaard & Smith LLP about possibly assisting him with work he was doing for his client, Plaintiff herein.  I understood the potential work to consist of reviewing a compliance program he was developing for Plaintiff to ensure that it would meet certain requirements of the United States Sentencing Guidelines for organizations, as explained more fully below.  I understood that he desired my assistance because he did not personally have expertise with respect to the Sentencing Guidelines, whereas I did because of my background as a federal prosecutor, including as Chief of the Criminal Division and Chief Assistant United States Attorney in the Central District of California.

4.    I met Mr. Wolf in person one time in connection with this matter, and based on my time sheets, the meeting took place on August 26, 2002 and lasted approximately three hours.  I recall Mr. Wolf describing Plaintiff's earthquake insurance business and a compliance program he was developing in general terms.  I do not recall anything specific about what he said.  I also do not specifically recall him showing me any compliance manual he was developing, although it is possible that he did so.  I do not recall him saying anything, or providing me with any documents or other information, about Plaintiff's investment policy, Plaintiff's contracts with its investment managers, statutes governing Plaintiff's investments, or anything else pertaining to investments.  Those subjects were not within my area of expertise or experience.  I explained to Mr. Wolf how the Sentencing Guidelines worked and showed him the sections of the Sentencing

1

DECLARATION OF RICHARD DROOYAN

1    Guidelines that pertain to compliance programs for organizations. I did not have any other

2    meeting, and I do not recall any other communication of any kind, with Mr. Wolf in connection

3    with this matter.

4        5.        I received an e-mail the day after the meeting, August 27, 2002, from Plaintiff's

5    general counsel Daniel P. Marshall III, attaching a draft retainer agreement. I signed the

6    agreement on October 11, 2002 and mailed it back to him. I subsequently received a fully

7    executed copy from one of Plaintiff's representatives, a copy of which is attached as Exhibit 1 to

8    Mr. Marshall's declaration submitted in support of Plaintiff's disqualification motion. I do not

9    recall having any conversation or any other communication with Mr. Marshall or any other

10   representative of Plaintiff, although it is possible I had one or more conversations about the

11   retainer agreement.

12       6.        In signing the retainer agreement, I anticipated that I would be called upon to

13   review the compliance program Mr. Wolf was developing to ensure that it would be considered

14   an "effective" program under the Sentencing Guidelines for organizations. One factor courts

15   evaluate in determining the fine to impose on an organization convicted of a crime is whether the

16   organization had an effective program to prevent and to detect crimes by its employees and other

17   agents. That is, if an organization had an effective program, but an employee or agent

18   nevertheless committed a crime, the fact that the entity had the program to try to prevent the

19   crime is a mitigating factor that can warrant a downward adjustment in the sentencing calculation.

20   Because, as I understand it, under federal criminal law a company is not liable for the acts of its

21   outside contractors (unless the company engages in its own wrongdoing by, for example, aiding

22   and abetting their criminal acts), the Sentencing Guidelines focus on the compliance of an

23   organization's own employees and agents, not the conduct of outside contractors. I do not recall

24   Mr. Wolf saying anything, or showing or providing me with any information, concerning

25   Plaintiff's contractors or compliance by Plaintiff's contractors.

26       7.        I was never actually called upon to do any of the work I anticipated doing when I

27   signed the retainer agreement. I never heard further from Mr. Wolf or any other representative of

28

9772900.6

DECLARATION OF RICHARD DROOYAN

1   Plaintiff. I assumed that Plaintiff had decided not to develop a compliance program or had

2   concluded that it could develop and finalize its compliance program without my services.

3        8.    Based upon my review of MTO records, it appears that on October 18, 2002, I

4   mailed a billing letter to Mr. Marshall requesting payment for the three hours of time I had spent

5   in the introductory meeting with Mr. Wolf prior to signing the retainer agreement. The bill

6   totaled $1365 and eventually was paid. I have not billed Plaintiff for any other work, nor was

7   there ever any other work, on the compliance program matter or any other matter for Plaintiff.

8        9.    In entering into the retainer agreement, I did not understand it to create, and I

9   certainly did not intend it to create, an attorney-client relationship with MTO in perpetuity. The

10  retainer agreement provided that its term was to be of "no defined duration" – as distinct from a

11  perpetual duration – because it was not certain at the time as to how long it would take to

12  complete the compliance project and whether Mr. Wolf would have any need for follow-up

13  assistance from me. I did not believe that the retainer agreement obligated MTO to provide

14  continuing legal assistance to Plaintiff in connection with its compliance program or any other

15  matter. I note that the agreement specified that MTO would be paid $455 per hour for any work I

16  performed. That was my billing rate at the time, and it since has increased.

17       10.   I never did any work for Plaintiff on the compliance program matter or any other

18  matter except for the three hours I spent at the introductory meeting with Mr. Wolf. I do not

19  recall having, and do not have any record of, any substantive communication with Plaintiff or Mr.

20  Wolf except the communications I had with Mr. Wolf during that meeting. I do not recall having,

21  and do not have any record of, any non-substantive communications with Plaintiff or Mr. Wolf

22  except as described herein. I do not recall seeing or receiving any written materials from Plaintiff

23  or Mr. Wolf except as described herein. I do not recall having, and do not have any record of,

24  any communications of any kind concerning Plaintiff's investment policy, Plaintiff's contracts

25  with its investment managers, statutes governing Plaintiff's investments, anything else pertaining

26  to investments, Plaintiff's contractors, or compliance by Plaintiff's contractors.

27       11.   I do not recall, and do not have a record of, ever receiving any papers or property

28  from Plaintiff or its outside counsel (other than the retainer agreement). I do not recall, and do

9772900.6

3

DECLARATION OF RICHARD DROOYAN

20

1   not have a record of, ever receiving any request from Plaintiff or its outside counsel to return any

2   papers or property.

3       12.   My files pertaining to Plaintiff were long ago sent to an offsite storage facility.

4   After I learned that Plaintiff was asserting that MTO had a conflict in representing Wachovia

5   based on my limited interactions with Plaintiff in 2002, I retrieved the file and reviewed it.

6   Consistent with my recollection about the extent of my involvement and interactions with

7   Plaintiff and my lack of receipt of papers or property, the file was empty aside from an MTO

8   Client Intake Form, an internal MTO e-mail reflecting a conflict check, the e-mail from Mr.

9   Marshall transmitting the draft retention agreement, a post-it note from my secretary regarding a

10  call she made to request the final agreement, the fully-executed retention agreement with a cover

11  letter transmitting it, and the October 2002 invoice.

12      13.   I have not been involved in MTO's representation of Defendants in the instant

13  case, aside from conferring with counsel and reviewing documents in connection with Plaintiff's

14  efforts to disqualify MTO.  I do not anticipate being involved in MTO's work for Wachovia in

15  the instant case in any other respect.

16      I declare under penalty of perjury under the laws of the United States of America and of

17  the State of California that the foregoing is true and correct, and that this declaration was

18  executed on April 8, 2010 at Los Angeles, California.

19

20  _____
                            Richard E. Drooyan
21

22

23

24

25

26

27

28

9772900.5

4

DECLARATION OF RICHARD DROOYAN

21

# DECLARATION OF JAMES RUTTEN

I, James C. Rutten, declare:

1.       I am a member of the State Bar of California and a partner in the law firm of Munger, Tolles & Olson LLP ("MTO"), counsel of record for Defendants Wachovia Bank, N.A. and Metropolitan West Securities LLC (collectively, "Wachovia") in the above-referenced matter. I have personal knowledge of the facts stated below, and competently could testify to them if called upon to do so. I make this declaration in support of Wachovia's Opposition to Plaintiff's Motion to Disqualify Counsel for Defendants.

2.       In November 2008, MTO was contacted by Wachovia about representing it in a dispute with Plaintiff concerning an investment Wachovia had made on Plaintiff's behalf in commercial paper issued by Mainsail II LLC ("Mainsail"). I understand that, at the time, Wachovia and Plaintiff already had attended one mediation session before The Honorable Daniel Weinstein, that Wachovia had not been represented by outside counsel at that mediation but that Plaintiff had been, and that the parties were anticipating a second mediation session sometime in the near future. MTO undertook a conflict check and determined that representing Wachovia in the matter would not pose an actual or potential conflict.

3.       MTO spent significant time, at significant expense to Wachovia, getting up to speed on the complex factual and legal issues presented. On January 19, 2009, MTO submitted a mediation brief to Judge Weinstein in advance of the second mediation session, which was scheduled for January 29, 2009 in New York.

4.       Four days later, I received a letter from Plaintiff's general counsel contending that Plaintiff had "an existing attorney-client relationship" with MTO based on interactions Plaintiff had had in 2002 with my partner Richard Drooyan. The letter did not request that MTO cease its representation of Wachovia. Instead, it read, "At this point I simply wanted to identify the problem and to state that your present representation of Wachovia, including at the January 29, 2009, mediation, does not constitute any waiver of [Plaintiff's] rights with respect to the conflict." A true and correct copy of the letter is attached as Exhibit 2 to the Declaration of Daniel P.

1

1    Marshall III (the "Marshall Declaration"), dated December 30, 2009 and filed in this action on

2    February 24, 2010.

3        5.    I conferred with Mr. Drooyan about the nature of his interactions with Plaintiff and

4    any work he may have done for Plaintiff in 2002 or thereafter.  I also reviewed his file pertaining

5    to Plaintiff, which had to be retrieved from an offsite storage facility.

6        6.    On January 27, 2009, I responded to Plaintiff's letter.  I stated that inasmuch as

7    MTO had not done any work for Plaintiff whatsoever since 2002 – if indeed it had done any work

8    at that time – "any representation necessarily terminated long ago."  I concluded my letter by

9    stating: "We take our ethical obligations very seriously and would be pleased to consider the

10   matter further if you have additional facts or legal authority you would like us to consider."  A

11   true and correct copy of my letter is attached as Exhibit 3 to the Marshall Declaration.

12       7.    Plaintiff never responded to my letter and did not provide any "additional facts or

13   legal authority [for] us to consider."

14       8.    MTO thereafter undertook significant additional work on behalf of Wachovia.  For

15   example, MTO representatives attended two mediation sessions in front of Judge Weinstein (one

16   in New York in January 2009 and one in California in August 2009) with the participation of

17   Plaintiff and its counsel.  MTO also researched and drafted four mediation briefs addressing

18   complex questions of fact and law, which were exchanged with Plaintiff.

19       9.    Participating in this lengthy mediation process and otherwise representing

20   Wachovia's interests effectively involved more than just writing briefs and attending mediation

21   sessions.  It also involved interviewing numerous witnesses, gathering pertinent documents,

22   researching and analyzing numerous questions of law, and speaking with potential expert

23   consultants.  MTO attorneys and other personnel devoted hundreds of hours to the case.

24       10.   Plaintiff filed its disqualification motion on December 31, 2009, simultaneously

25   with filing the Complaint in state court (the case was subsequently removed to federal court).  On

26   January 12, 2010, I sent a letter to Plaintiff's general counsel asking him to provide certain

27   limited categories of documents "so that the Court can have a fully developed record when it

28   addresses the motion."  I asked Plaintiff to provide, for example, copies of "[a]ny written

2

1    materials that [Plaintiff] contends were provided to MTO in connection with the purported

2    attorney-client relationship, including compliance guidelines or manuals," and "[a]ny documents

3    constituting or reflecting communications between [Plaintiff] and MTO." I requested a response

4    by January 19, 2010. A true and correct copy of my letter is attached hereto as Exhibit 1.

5           11.    I never received a response to my letter. I telephoned Plaintiff's outside counsel,

6    Fredric Woocher, Esq., and he informed me that Plaintiff was uncomfortable communicating with

7    me because of Plaintiff's position that MTO has a conflict. Although I disagreed that there was

8    any reason for counsel not to communicate with each other, as an accommodation to Plaintiff and

9    to move the ball forward, I told Mr. Woocher that I would ask Wachovia's in-house counsel who

10   is overseeing the litigation, Pamela Pearson, Esq., to communicate with him directly. He

11   indicated that this would be acceptable.

12          12.    On January 27, 2010, Ms. Pearson sent an e-mail to Plaintiff's counsel that stated:

13   "While I . . . believe that discussions with our outside counsel are entirely appropriate, in order to

14   move the ball forward . . . , I thought I would reach out to you directly. . . . [I]f the CEA is more

15   comfortable treating outside counsel's letter of January 12, 2010 as coming from me, then please

16   do so. I adopt that letter as my own and ask that the CEA respond to it, either to me or to outside

17   counsel." A true and correct copy of Ms. Pearson's e-mail is attached hereto as Exhibit 2.

18          13.    I still did not receive a response to my January 12, 2010 letter. I am unaware of

19   Ms. Pearson ever receiving a response to the letter or to the pertinent portion of her e-mail – even

20   though she *did* receive a response to other portions of her e-mail relating to *other* topics. I have

21   never received any of the materials that my letter asked Plaintiff to provide. I assume that this is

22   because there are no such materials.

23          14.    MTO currently is representing Wachovia in a separate lawsuit pending in the

24   United States District Court for the Northern District of California. That lawsuit also was brought

25   by a disappointed investor in Mainsail commercial paper. That lawsuit, like the instant lawsuit,

26   raises questions about the suitability of an investment in Mainsail commercial paper for an

27   allegedly conservative investor. Some of the factual and legal issues in that lawsuit overlap with

28   the factual and legal issues in the instant lawsuit. I believe that Wachovia enjoys substantial

1    advantages, efficiencies, and cost-savings from having a single law firm represent it in both

2    lawsuits.

3           15.    Attached hereto as Exhibit 3 is a true and correct copy of a June 25, 2009

4    document obtained from Plaintiff's website at www.earthquakeauthority.com.  The document

5    states that it is a memorandum provided to Plaintiff's Governing Board concerning a "Proposed

6    New CEA Investment Compliance Program."

7           I declare under penalty of perjury under the laws of the United States of America and of

8    the State of California that the foregoing is true and correct, and that this declaration was

9    executed on April 9, 2010 at Los Angeles, California.

10                                         _____

11                                              James C. Rutten

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              4

# EXHIBIT 1

MUNGER, TOLLES & OLSON LLP

355 SOUTH GRAND AVENUE

THIRTY-FIFTH FLOOR

LOS ANGELES, CALIFORNIA 90071-1560

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

—————

560 MISSION STREET

SAN FRANCISCO, CALIFORNIA 94105-2907

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

January 12, 2010

WRITER'S DIRECT LINE
(213) 683-9189
(213) 683-4056 FAX
James.Rutten@mto.com

**VIA FACSIMILE AND U.S. MAIL**

Fredric D. Woocher, Esq.
Strumwasser & Woocher LLP
100 Wilshire Boulevard, Suite 1900
Santa Monica, California  90401

      Re:    *California Earthquake Authority v. Wachovia Bank, N.A.*

Dear Mr. Woocher:

      I write regarding the disqualification motion that the California Earthquake Authority ("CEA") filed in the above-referenced action.

      The motion asserts that the CEA became a client of this firm ("MTO") in 2002 and remained so at least through January 2009.  As I noted in my January 27, 2009 letter to Daniel Marshall, our records show that our firm billed only about three hours of time to the CEA, and this more than seven years ago in August 2002.  Our records also reflect receipt from the CEA of only the contract that is attached to your motion.  Our records do not reflect receipt of any substantive documents or client confidences, or the provision of any legal advice to the CEA. Rather, while the CEA's outside counsel at the time initially thought it might call upon Richard Drooyan of our firm to provide specialized assistance in conjunction with a project that such counsel was handling, counsel and the CEA ultimately did not utilize our services.

      We ask that the CEA provide us with the following materials so that the Court can have a fully developed record when it addresses the motion:

MUNGER, TOLLES & OLSON LLP

Frederic D. Woocher, Esq.
January 12, 2010
Page 2

1.    Any documents constituting or reflecting communications between the CEA and
      MTO pursuant to what the CEA contends was its attorney-client relationship with
      MTO, including e-mail communications, letters, notes of telephone calls, and the
      like;

2.    Any written materials that the CEA contends were provided to MTO in
      connection with the purported attorney-client relationship, including compliance
      guidelines or manuals; and

3.    If the CEA contends that MTO ever sent it any bill for work other than the three
      hours in August 2002, copies of all such bills.

Please provide us with the foregoing by no later than January 19, 2010.  Thank you for
your anticipated courtesy and cooperation.

Sincerely,

James C. Rutten

JCR:imj

9694278.2

```
                    ************************
              ***    TX REPORT   ***
                    ************************


         TRANSMISSION OK

         TX/RX NO            4837
         RECIPIENT ADDRESS   13103190156
         DESTINATION ID
         ST. TIME            01/12 12:27
         TIME USE            01'13
         PAGES SENT          3
         RESULT              OK
```

## MUNGER, TOLLES & OLSON LLP
### 355 SOUTH GRAND AVENUE
THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
PHONE: (213) 683-9189   FAX: (213) 683-4056

| FROM: | James C. Rutten | | |
|---|---|---|---|
| | | FAX | PHONE |
| TO: | Fredric D. Woocher, Esq.<br>Strumwasser & Woocher LLP | (310) 319 - 0156 | (310) 576 - 1233 |
| DATE: | January 12, 2010 | | |
| CLIENT: | 27381-00009 | | |
| PAGES: | 3 (including cover page) | | |

MESSAGE:

# EXHIBIT 2

## Rutten, James

| | |
|---|---|
| **From:** | pamela.pearson@wachovia.com |
| **Sent:** | Wednesday, January 27, 2010 8:38 AM |
| **To:** | fwoocher@strumwooch.com |
| **Subject:** | CEA |

**Attachments:** LGP2-#720500-v1-Stipulation_re_Deadline_to_Resp__to_Compl__DOC.DOC

Fred:

I understand that you spoke with our outside counsel about various matters, and that you believe that discussions directly with me would be more appropriate pending resolution of the CEA's disqualification motion. While I disagree and believe that discussions with our outside counsel are entirely appropriate, in order to move the ball forward on the issues raised below, I thought I would reach out to you directly.

As I indicated earlier, if the CEA is more comfortable treating outside counsel's letter of January 12, 2010 as coming from me, then please do so. I adopt that letter as my own and ask that the CEA respond to it, either to me or to outside counsel.

Second, as you know, Wachovia believes it likely that it will remove the case to federal court by the February 18 deadline to do so. This creates issues with respect to the CEA's disqualification motion, which is set for hearing that same day. We would propose that the hearing on that motion be continued by approximately a month so that Wachovia's deadline to respond to the motion does not precede the removal deadline. Once the case is in federal court, the motion can be set for a hearing at the earliest opportunity and a response filed in due course. Please let me know if this is acceptable to the CEA.

The possibility of removal also will require some changes to the draft stip you sent me (among other things, to remove the reference to the "superior court" deciding the disqualification motion). We'd be happy to take the lead on editing the stip, and again appreciate the CEA's agreement to the 45 days. A draft stipulation is attached.

Obviously, all of the foregoing would be without prejudice to the CEA's right to file a motion to remand if it desires to do so.

Third, we note that the CEA's complaint alleges that Wachovia earned "transaction fees" from the Mainsail transaction. We believe these allegations to be in error. We understand that Wachovia was compensated on an "assets under management" basis. Would you please take another look at these allegations and let us know whether you agree that they need to be corrected? If so, we would be satisfied with an errata correcting the allegations, or if need be, a stip to the same effect.

Thank you.

Pam


Pamela M. Pearson
Managing Counsel
Wells Fargo Law Department
One Wachovia Center - D1053-300
301 South College Street
Charlotte, NC  28202-6000

Tel:  704-715-2411
Fax:  704-383-0649
Cell:  704-641-4845

CONFIDENTIALITY NOTICE:  The contents of this message may be a confidential attorney/client communication, confidential attorney work product, or a confidential communication of proprietary information.  If you are not the intended recipient, please destroy and notify the sender.

# EXHIBIT 3

## Governing Board Memorandum

June 25, 2009

Agenda Item 7:                  Proposed new CEA Investment Compliance Program

Recommended Action:             Approve adoption of proposed new CEA Investment Compliance
                                Program and related actions

---

Background:

Since its inception, the California Earthquake Authority has devoted considerable effort toward achieving excellence and best practices in its complex operational areas, and as a result, it and a number of its staff have become uniquely recognized world leaders in many areas of catastrophe insurance.

As important to this organization's long-term health and integrity, however, are the parts of the organization that operate to assure that such critical areas as audit and compliance, legal requirements, and information technology have every bit the horsepower and attention as the business side of the operation—the quality of these support areas, in fact, and the observance of certain structural requirements for them, can make the difference between continued success and sudden, unexpected loss and failure.

As the CEA has grown from a start-up, uniquely imagined by a small team and set in motion by the California Legislature to sell residential earthquake insurance and provide mitigation services to California families, to a mature organization with a significant footprint in world financial markets and a robust reputation for effective, decisive action, appropriate focus on important support functions is absolutely crucial.   One such area is *investment compliance*—with almost $4 billion in invested assets by the end of this year and a cadre of investment managers spread across the country, it is undeniable that a comprehensive approach to investment compliance is not an option:  it is mandatory that such an operation be approached seriously and implemented consistently and professionally.

After exploring methods to assure that sound investment compliance systems can be applied to the CEA's unique investment practices, CEA staff is now presenting to the Board for its approval a customized, best-practices approach that is designed to provide security for the CEA and its Governing Board and yet be effective, manageable, and transparent.

Analysis:

In 2007, the CEA suffered a significant investment loss—the only such loss in its history—but it was by no means alone among financial organizations of every stripe, from every country, that found themselves in virtually the same boat.  A number of public and private entities had almost the same experience, which occurred as a result of trying to earn a reasonably healthy reward

---

from investing in widely available, wildly popular instruments whose intrinsic qualities were understood by few.

As the CEA Board considered that situation in December 2007 and acted immediately to commission quick action to seek out the underlying facts and conditions that led to that unique loss, it also put in motion a process to investigate possibilities for a program of best-practices compliance that would be applicable to and supportive of the CEA's unique investment setting, going forward. The same professional organization hired to assist the CEA's internal legal operation in fact-finding was hired and consulted to assist the CEA in engineering and establishing a state of the art investment compliance function that will work in the CEA's public-private setting.

**General compliance principles**

Any compliance operation in modern corporate America is based on operating principles and policy statements contained in the *Federal Sentencing Guidelines*. Those Guidelines are promulgated by the United States Sentencing Commission, and while they were first issued in the 1960s in response to issues with sentencing laws, they have become the primary source for statements of the minimum requirements of an effective compliance program. In fact, as the CEA moves to implement a variety of compliance measures internally, the Guidelines are a constant reference.

What the Guidelines provide for is not so much a series of litmus tests or hard and fast program elements, but rather the identification and manifestation of indicators that due diligence and promotion of a *culture of compliance* are occurring within an organization. An organization's management must be active in promoting and demonstrating behavior that is consistent with the purposes of a compliance program, so that management constantly *aligns* itself and the organization with the compliance culture.

As the Commission has moved through its work in the recent past, it has moved to providing what commentators call a *compliance paradigm*:
- Codes of conduct and compliance efforts must extend beyond mere adherence to rules—a commitment to ethics-driven behavior and ethics-based standards and procedures are sought.
- An organization's leadership bears real responsibility and must be accountable for moving the entity into and instilling an effective compliance culture.
- An organization will put an operative compliance program into effect most successfully when it identifies, faces, and deals with its areas of risk, wherever they may be found. Starting from this point of understanding allows an entity to tailor a compliance program, which leads most efficiently to good outcomes that flow from targeted compliance.

So, all at the same time, a compliance program requires nurturing and attention, it requires a hands-on approach that starts with the "tone at the top," it cannot be satisfied with merely expecting staff to follow rules just because they are posted or announced, and it must identify and face its areas of risk and direct both light and effective attention there.

In the case of the CEA, it also requires a degree of outside help, since the CEA depends for much of its operational and compliance muscle on outside contractors, professionals, and consultants.

**PricewaterhouseCoopers**

For the seven years leading up to and including 2007, the CEA's independent outside auditing firm was PricewaterhouseCoopers ("PwC"). PwC is a large, worldwide firm with a number of operational areas other than auditing—one of these is corporate compliance, and the CEA has been fortunate enough to engage two highly qualified PwC professionals with whom to work and who have taken the time to study and understand the unique qualities of the CEA, including its staffing picture and related challenges.

A team from the CEA's Legal & Compliance Department, which included a legal staffer, the CEA's internal compliance manager, and the CEA's chief auditor, consulted over an extended time with the PwC experts. The result has been a proposal for a new CEA Investment Compliance Program that has found a favorable response not only from the CEA's Legal & Compliance and Finance & Accounting departments, but also garnered the unanimous support of the CEA's executive staff and the personal support of CEO Glenn Pomeroy.

**Program Details**

Essentially, the program presented today can be best described as a customized and achievable investment compliance program for the Authority, that is in keeping with the standards and best practices for effective compliance programs and is tailored to the organizational requirements of a unique entity. Here are some details, which are expanded on in *Attachment A*.

- Substantive framework of the proposed program is considered 'best practices' by recognized experts.
- CEA resource limitations and techniques are respected through strategic use of appropriate internal staff and contracted, highly qualified outside professionals.
- The CEA will contract for an outside expert to serve in role of investment compliance manager – will report administratively to CEA general counsel but will have direct reporting relationship with the Governing Board. This techniques purposely elevates compliance function and assures that compliant behavior receives full, integrated support of the Board's plenary authority over CEA affairs and the Board's desires that compliance become an innate culture within the CEA.
- An investment compliance committee will be formed to oversee the drafting, vetting, and presentation to the Board of appropriate *investment policies*. The Board will continue its responsibility of approving those investment policies.
  - o Promulgating *investment guidelines*, which allow the investment policies to respond quickly and flexibly to changing market conditions, will also be the responsibility of the committee.
  - o Committee members are the CEA's chief financial officer, assistant chief financial officer, general counsel, chief auditor, and compliance manager; the CEA's independent financial advisor and the new investment compliance manager also are committee members.

- o The committee also has a direct reporting responsibility to the Board.
- Advantages of the new program:
  - o For the Board, it assures investment policy is broadly vetted and consistently enforced through application of diverse perspectives.
  - o Risk management goals are met – a multi-pronged approach to risk management allows the CEA to leverage its internal expertise through external resources, to greatly reduce financial and organizational risks.
  - o The business and compliance functions within the CEA will be much more closely aligned. Communication—of both positive and negative information—will become more timely and effective.

**Next steps**

The immediate next step is to conduct a competitive procurement to obtain a highly qualified person or firm to serve as the CEA's investment compliance manager. If a firm qualifies through the competitive process, CEA will seek consistency in staffing to assure that no disconnects happen within that firm that might interfere with knowledge flow, communication, and management of the investment-compliance process.

The experts at PwC will be on board throughout implementation and afterward, to help guide the CEA through the establishment of the new investment compliance program.

Recommendations:

- Declare and direct the proposed investment compliance program to be broadly adopted and thoroughly implemented throughout the CEA's business and support departments in order that it be most effective and consistent with best practices requirements.
- Authorize the CEA staff under guidance of the CEA general counsel to begin immediate implementation of the investment compliance committee system, using the resources now available to the organization both internally and through PwC and other professionals under contract to the CEA, including legal and financial professionals.
- Authorize staff to seek the services of a qualified investment compliance manager through a competitive procurement, with the services contract for that person or entity to be presented to the Board when negotiated.



# CEA CALIFORNIA EARTHQUAKE AUTHORITY

# INVESTMENT COMPLIANCE PROGRAM



Attachment A

34

# Background

- Legal and compliance team consulted with PricewaterhouseCoopers
  - Louis Anon – Manager of Compliance & Corporate Governance
  - Shona Banfield – Manager – Financial Services Regulator Practice
  - Both are recognized industry experts in investment compliance programs
- Tailored investment compliance program to meet the specific needs of the CEA



Attachment A                                    2

# Goals

- Adopt universally accepted best practice for firms with fiduciary responsibilities
- Satisfy best practice compliance requirements
  - U.S. Federal Sentencing Guidelines require compliance programs
- Optimize CEA resources
  - Align business and compliance function, taking into account CEA's limited internal and contracted/external resources



Attachment A                                3

36

# Compliance Program Requirements

- Provide objective compliance, which assures due diligence
  - Strengthen investment performance
  - Reduce investment risk
- Ensure strongest controls
  - Prevent violations of investment policy



Attachment A                                    4

# Compliance Program Requirements (con't)

▸ Strengthen Governing Board's oversight
- Board's involvement becomes "hands on"
- Allow real input into investment policy, from drafting to enforcement
- Give the Board more confidence policy is broadly vetted and is being followed



Attachment A                                    5

# Program Framework

- Create the role of an independent investment compliance manager
- Create the investment committee



Attachment A                                                   6

39

# Investment Compliance Manager

- Acts under Governing Board's authority, independently of CEA staff
  - Communicates directly with Board
  - Is independent of CEA management
  - Is independent of investment/business function
- Analyzes investments for portfolio suitability
- Oversees general asset manager compliance
  - Participates in weekly asset manager calls
- Reports to Compliance Officer (CEA General Counsel)



Attachment A                                                                7

40

# Investment Committee Role

▸ Creates and maintains investment policy
  ◦ Provides for quick response to market conditions
  ◦ Reviews analysis of market trends, as reported by investment compliance manager and others
  ◦ Issues/revises guidelines, adjusting to market trends, as reported by committee members
▸ Ensures investment policy adherence



Attachment A                                    8

# Investment Committee Role (con't)

- Formalizes communication paths among all investment committee participants
  - Receives information on investments, trends, etc., from a variety of sources
  - Ensures prompt notification to all committee members and assures appropriate consideration of negative information



Attachment A                                    9

# Investment Committee Members

- Chief Financial Officer
- Assistant Chief Financial Officer
- General Counsel
- Internal Auditor
- Compliance Manager
- Financial Advisor
- Investment Compliance Manager



Attachment A                                    10

43

# Advantages of New Investment Compliance Structure

- Board
  - Ensures investment policy is broadly vetted and consistently enforced
    - Brings diverse perspectives into the policy process
- Risk
  - Uses multi-prong approach to risk management
    - Accesses additional expertise of committee and investment compliance manager
    - Broadens CEA resources
  - Greatly reduces financial and organizational risks

Attachment A                                    11

44

# Advantages of New Investment Compliance Structure (con't)

▸ Collaboration
  ◦ Aligns business and compliance functions
  ◦ Enhances communication
    ◦ Internal
    ◦ Board
    ◦ Timely
  ◦ Broad-based participation from a variety of sources



Attachment A                                    12

# Conclusion

▸ Investment Compliance Program
  ◦ Protects organization and investments
  ◦ Satisfies compliance requirements
  ◦ Adopts universally accepted best practices
  ◦ Ensures strongest controls
  ◦ Facilitates robust, up-to-date policy for CEA as a mature organization
  ◦ Guarantees necessary communication among Board, business function, asset-management function, and compliance function



Attachment A                    13

46

# Recommendation

- ‣ Authorize presentation of Investment Compliance Program to the Board
- ‣ Recommend Board approve development and implementation of Investment Compliance Program
- ‣ PricewaterhouseCoopers experts are on board to assist in procurements and implementation



Attachment A                    14