1  MICHAEL J. STRUMWASSER (Bar No. 58413)
   FREDRIC D. WOOCHER (Bar No. 96689)
2  JONATHAN D. KROP (Bar No. 263963)
   STRUMWASSER & WOOCHER LLP
3  10940 Wilshire Boulevard, Suite 2000
   Los Angeles, California 90024
4  Telephone: (310) 576-1233
   Facsimile: (310) 319-0156
5  E-mail: mstrumwasser@strumwooch.com
          fwoocher@strumwooch.com
6          jkrop@strumwooch.com

7  Attorneys for Plaintiff
   *California Earthquake Authority*

8

9

10              UNITED STATES DISTRICT COURT

11     EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

12

13  CALIFORNIA EARTHQUAKE              CASE NO. 2:10-CV-00291-FCD-GGH
    AUTHORITY,

14                      Plaintiff,

15        v.                          DECLARATION OF
                                      RICHARD B. WOLF, ESQ.
16

17  METROPOLITAN WEST SECURITIES,
    LLC; WACHOVIA BANK, NATIONAL
18  ASSOCIATION; and DOES 1-25,

19

20                      Defendants.    Hearing Date:  April 23, 2010
                                       Time:          10:00 a.m.
21                                     Courtroom:     2 (Hon. Frank C. Damrell, Jr.)

22

23

24                                     Date action removed: February 4, 2010
                                       Trial date: None set
25

26

27

28

I, Richard B. Wolf, declare and state as follows:

1.    I am an attorney admitted to practice in the State of California and am a contract partner in the law firm of Lewis Brisbois Bisgaard & Smith LLP ("Lewis Brisbois"). I have personal knowledge of the following facts and if called as a witness I could and would competently testify thereto.

2.    In 2002, the California Earthquake Authority ("CEA") retained Lewis, Brisbois to assist it in developing a compliance program for the Authority. I was the attorney who was principally responsible for that project at Lewis, Brisbois, along with my colleague at the firm, Eric Castro.

3.    In the course of developing the program, I suggested to Daniel Marshall, the CEA's General Counsel, that the CEA should also hire Richard Drooyan of Munger, Tolles & Olson LLP ("Munger") in connection with the matter. Because many corporate compliance systems were based in part on the Federal Sentencing Guidelines, I believed that Mr. Drooyan's extensive experience in corporate compliance and federal criminal law would be of great assistance in designing a suitable compliance program for the CEA.

4.    On August 26, 2002, I had a lengthy meeting with Mr. Drooyan in which we discussed, among other issues, the purpose of a compliance program for the CEA and what matters should be considered in developing a program. My discussion with Mr. Drooyan specifically focused on addressing which aspects of the CEA's business operations created the greatest risk of liability and criminal law exposure that should be addressed by CEA policies, procedures, and controls. During the course of our meeting, Mr. Drooyan asked me a number of questions regarding how the CEA operated, and I attempted to respond to his inquiries.

5.    Shortly after my meeting with Mr. Drooyan, I sent him a number of documents regarding the CEA's organization, governance structure, and plan of operations that I thought would be of assistance in developing an appropriate compliance program for the Authority. I had received these documents from the CEA, and I am not aware whether they would otherwise have been publicly available to Mr. Drooyan. Attached hereto as Exhibit 1

1

1   is a true and correct copy (unsigned) of my letter to Mr. Drooyan dated August 29, 2002,
2   transmitting these documents to him.  I recently caused a copy of this letter to be retrieved
3   from our firm's document program at the request of the CEA and its counsel in this action,
4   Strumwasser & Woocher LLP.

5       6.      On January 27, 2003, I wrote a memorandum to my colleague, Eric Castro,
6   summarizing my meeting with Mr. Drooyan regarding the elements of a compliance program
7   for the CEA.  Mr. Castro had agreed to prepare an initial proposal for a compliance program
8   for the CEA.  I had worked on developing a proposed compliance program for another client
9   of Lewis, Brisbois, and my memorandum to Mr. Castro contained a handful of references to
10  this other client.  Attached hereto as Exhibit 2 is a true and correct copy retrieved from our
11  firm's document program of my January 27, 2003, memorandum to Mr. Castro,
12  appropriately redacted to conceal the identity of the firm's other client.

13

14      I declare under penalty of perjury under the laws of the State of California and the
15  United States of America that the foregoing is true and correct.  Executed this 15th day of
16  April, 2010, at Los Angeles, California.

17

18

19

20                                      Richard B. Wolf

21

22

23

24

25

26

27

28

2

# EXHIBIT 1

# LEWIS BRISBOIS BISGAARD & SMITH LLP

SAN DIEGO OFFICE
SUITE 800
550 WEST "C" STREET
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 233-1006

COSTA MESA OFFICE
SUITE 1400
650 TOWN CENTER DRIVE
CENTER TOWER BUILDING
COSTA MESA, CALIFORNIA 92626
TELEPHONE (714) 545-9200

SAN FRANCISCO OFFICE
SUITE 1400
ONE SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 362-2580

RICHARD B. WOLF
DIRECT DIAL: (213) 680-5108
E-MAIL: WOLFR@LBBSLAW.COM

LAWYERS

SUITE 1200

221 NORTH FIGUEROA STREET

LOS ANGELES, CALIFORNIA 90012

TELEPHONE (213) 250-1800

WWW.LBBSLAW.COM

FACSIMILES:
LOS ANGELES: (213) 250-7900
SAN DIEGO: (619) 233-8627
COSTA MESA: (714) 850-1030
SAN FRANCISCO: (415) 434-0882
SAN BERNARDINO: (909) 387-1138
SACRAMENTO: (916) 564-5444
NEW YORK: (212) 344-2341

INLAND EMPIRE OFFICE
TRI-CITY CORPORATE CENTRE
SUITE 600
650 EAST HOSPITALITY LANE
SAN BERNARDINO, CALIFORNIA 92408
TELEPHONE (909) 387-1130

SACRAMENTO OFFICE
SUITE 200
2500 VENTURE OAKS WAY
SACRAMENTO, CALIFORNIA 95833
TELEPHONE (916) 564-5400

NEW YORK OFFICE
SUITE 900
100 WALL STREET
NEW YORK, NEW YORK 10005-3701
TELEPHONE (212) 548-0448

OUR FILE NO.
25917-0013

August 29, 2002

Richard E. Drooyan, Esq.
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560

     Re:   <u>California Earthquake Authority Compliance Program</u>

Dear Mr. Richard:

     Enclosed please find CEA Documents provided to Tillinghast Towers-Perrin as follows:

1. Organizational Chart of the CEA;
2. Letter dated May 10, 2001 from Insurance Commissioner Low to Charlie O'Bert and responses to interview questions;
3. The CEA Plan of Operations;
4. The CEA Articles of Governance; and

LA2002:118623.1

3

Richard E. Drooyan, Esq.
August 29, 2002
Page 2

     5.     Appendix E to CEA Project Consulting Team Report dated July 5, 2001, submitted by the Tillinghast - Towers Perrin.

I will be on vacation until September 17, 2002, and will be in touch with you upon my return.

          Very truly yours,

          Richard B. Wolf of
          LEWIS BRISBOIS BISGAARD & SMITH LLP

RBW:syj
Enclosure

cc: Daniel Marshall, Esq.

LA2002:118623.1

4

# EXHIBIT 2

# MEMORANDUM

TO:         Eric Castro, Esq.

FROM:       Richard B. Wolf, Esq.

DATE:       January 27, 2003

RE:         CEA COMPLIANCE PROGRAM

FILE NO.:   25397-13

This memo summarizes and amplifies notes of my meeting of August 26, 2002, with attorney Richard Drooyan of Munger Tolles & Olson concerning the elements of compliance program for CEA, which you have agreed to prepare.

I am attaching a copy of my letter of November 13, 2000, to concerning my evaluation of their compliance programs, and my recommendations concerning their modification. I think you may be able to follow that format as modified by Drooyan's observations below, along with the treatise entitled <u>Compliance Programs and the Corporate Sentencing Guidelines</u>, which I will deliver to you with this memo.

As explained in the treatise, and as you probably know, the purpose of a compliance program is to avoid or minimize criminal sanctions against CEA by establishing a program that discourages criminal activity in CEA's name, for its benefit, or by its personnel. The federal sentencing guidelines form the basis for the key ingredients of a compliance program.

Drooyan assisted me in modifying            existing procedures to satisfy the needs of a compliance program. In my meeting with him he said the methodology we used for the            would apply here: (1) Identify CEA's business operations creating the greatest risk of criminal law exposure to CEA, (2) analyze existing CEA policies or procedures, and controls for these operations, and (3) suggest modifications to satisfy the criminal compliance needs of the organization.

Business operations with the greatest risk of criminal law exposure are:

1.      Those having the potential for unfair financial treatment of customers,
2.      Those having the potential for making misrepresentations or concealments to government regulators.

4832-7603-6864.1

5

Eric Castro
Re:    CEA Compliance Program
January 24, 2003
Page 2

        For              which itself operates as an insurer, the greatest risk of criminal liability arose from underwriting and claims activities, because it was those activities that could unfairly benefit   .            even incidently, at the expense of its customers, by overcharging customers, holding down claim payments, or misrepresenting these matters to government regulators such as the Department of Insurance or the Insurance Commissioner.

        With respect to the CEA, Drooyan recommended that we similarly attempt identifying the business operations with the greatest potential for criminal liability, but we must do so in light of the fact that CEA does not operate as a customary insurer. Rather, many of the underwriting functions (decisions to insure, cancellation, collection of premiums)[1] and claims handling are handled by CEA's participating insurers, not CEA itself.

        Accordingly, the analysis of exposure to CEA, based on underwriting and claims activities, depends on a different model than that of a traditional insurance company, or even                    The CEA's criminal law exposure analysis depends on what happens when an insurance company hires third party independent contractors to perform its insuring functions.

        Drooyan stated that absent evidence of any conspiracy,  criminal fraud involved in the selling of a product, including insurance, by an independent contractor such as the participating companies which are not employees of CEA, would not render CEA liable criminally.  Conspiracy exposure, according to Drooyan, depends upon two things, (1) whether CEA knew that its contractors were engaging in criminal behavior, and (2) whether the illegal activity benefitted the CEA.

        Benefit is broadly defined.  Any benefit to the organization would suffice, and even if the wrongdoer or someone within CEA was also personally benefitted.

        A substitute test would also include, as a predicate for criminal exposure, pressures or incentives that would were imposed or offered by CEA to its contractors.

---

    [1]Not rate making, rating of properties, but these are decided, respectively, by the Insurance Commissioner and independent contractors, I think.

4832-7603-6864.1

6

Eric Castro
Re:    CEA Compliance Program
January 24, 2003
Page 3

The purpose of the compliance program in this regard is to police the behavior of the independent contractors so that if misdeeds are being committed in the name of CEA, or for its benefit, they will be discovered and stopped.

The compliance program, according to Drooyan, should protect against a situation where CEA fails to exercise its right under a contract between CEA and another that permits CEA to monitor or correct the behavior and conduct of the other party, which commits a crime for the benefit or in the name of CEA. The argument that could be made in such a situation was that, by failing to exercise its right to influence the behavior of its independent contractors, the CEA was acting recklessly. Usually, Drooyan said, that would expose CEA to civil, not criminal, liability.

If the fact is added, however, that CEA gets a tip that illegal behavior is occurring in its behalf, and ignores the tip, the knowledge element of criminal exposure would be imputed to CEA, on the basis that it has deliberately closed its eyes to the wrong doing.

If auditing machinery that is available to CEA is not used, then, the question to address in connection with criminal prosecution exposure is why the CEA did not follow through. If it was simply negligence, there would be no criminal exposure. If CEA was afraid of what it would find, the likelihood of exposure increases.

One issue that Drooyan said he would like to take a further look at is the question of ostensible authority between an employee of an independent contractor of CEA and CEA. He expressed the belief that an alter ego relationship would need to exist between CEA and the independent contractor before there could be any criminal exposure based on an ostensible agency relationship between the independent contractor and CEA. Clearly, it would be very difficult for anyone to establish an alter ego relationship between CEA and its participating insurers. (I have not heard from Drooyan on whether he has considered the question further. Of course, neither have I called him to ask.)

Some general questions that Drooyan raised in our meeting were as follows:

1.    Is there such a thing as a "quasi" participating insurer of CEA, for which provision must be made in the CEA compliance program?

2.    Where does reinsurance fit into the picture? As you know, CEA is a major purchaser of reinsurance for its exposures. We should explore whether there is any criminal exposure to the CEA arising from its reinsurance transactions.

4832-7603-6864.1

7

Eric Castro
Re:    CEA Compliance Program
January 24, 2003
Page 4

3.    The $1 billion statutory limit upon the insurance industry's loss participation, and the other layers of responsibility, should be analyzed for possible criminal law exposure. (There is a surcharge provision that should be explored for criminal law exposure, based on attempts to access a surcharge artificially.) Could someone attempt to manipulate the loss payments to confine the losses of a major earthquake in order to affect those financially responsible for the losses?

4.    CEA has a credit facility that should be analyzed for criminal law exposure.

5.    CEA has bonding authority, raising spectre of the possible illegal diversion of funds raised by the sale of bonds.

6.    A general question is whether CEA has any regulatory authority over its participating insurers. If so, does that give rise to any criminal exposure, or defense, for the activities of those insurers or their employees.

7.    Are private earthquake insurers participating insurers within CEA. If so, could they be accused of "cherry picking" risks for their own portfolios, allowing less attractive risks to be placed with CEA? This probably would not give rise to an exposure of the CEA, since the CEA would be the victim. However, if the CEA were to acquiesce in such behavior, permitting itself to be used as a conduit to those ultimately bearing losses, could CEA be held criminally responsible for causing losses improperly to fall upon those at the "wrong" end of the conduit?

8.    We should consider the possibility of "Northridge -type" cheating allegations as a possible basis for visiting criminal liability on CEA. This refers to the allegations that insurers attempted to procure less than objective engineering reports and repair estimates in adjusting losses arising from the Northridge Earthquake.

The relevant questions include whether CEA even has an incentive to cheat policyholders. The analysis should consider the financial loss payment structure under the statute. The $1 billion statutory limit upon the insurance industry's loss participation is not the entire picture, and the complete mosaic could give rise to various motivations that should be addressed carefully in the analysis. Specifically, we may want to consider whether there is a potential for abuse where participating insurers are also bondholders or

4832-7603-6864.1

8

Eric Castro
Re:    CEA Compliance Program
January 24, 2003
Page 5

reinsurers. We may want to consider whether there are, or should be, operational procedures sufficiently detailed so that there is no need for audit procedures for claims, which are primarily handled by the participating insurers for their own policyholders.

The need for auditing the handling of claims by participating insurers would seem to be muted by the lack of any incentive on the part of those insurers to steal from their own insureds, especially since, except in the case of a very large earthquake loss, all of the payments are to be funded by CEA or its reinsures. (We learn the exact loss payment scheme in order to make this evaluation).

The question may arise as to whether participating insurers would have an incentive to cheat on claims to cover up their poor underwriting judgments and avoid insolvency or the loss of jobs. Drooyan's observation was that CEA would not have control over the claims processing, however. He stated that he thought that a very high standard of proof (e.g., a "smoking gun" memo) would be needed in order to convince a prosecutor to pursue such a case.

The bottom line, according to Drooyan, is that as long as the manuals of CEA required the participating insurers to perform objectively, and absent any reason to know that they are not following those rules, only civil, not criminal, liability could be visited upon CEA. He believes that, without actual knowledge and a perceived benefit to the CEA, there would be little exposure to punitive damages, much less criminal prosecution. The manuals, he emphasized, should direct the participating insurers to provide fair treatment and accuracy.

After you have had an opportunity to review this memo, and my letter to of November 13, 2000, and to generally review the CEA materials, could we discuss the specifics of the CEA compliance program study?

I appreciate your help, as usual.

4832-7603-6864.1