IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA EARTHQUAKE
AUTHORITY,

            Plaintiff,           No. 2:10-cv-291 MCE GGH

      v.

METROPOLITAN WEST
SECURITIES, LLC et al.,

            Defendants.         <u>ORDER</u>
_____/

        Presently before the court is plaintiff California Earthquake Authority's ("CEA") motion to quash a subpoena duces tecum, which was originally filed on June 21, 2012 and, after a joint request to continue the hearing, came on for hearing on July 26, 2012.  (Dkt. Nos. 58, 61, 63, 74.)  Defendants Metropolitan West Securities, LLC and Wells Fargo Bank, N.A., successor by merger to Wachovia Bank, N.A. (collectively, "Wells Fargo") filed an opposition on July 10, 2012, and CEA filed a reply brief on July 19, 2012.  (Dkt. Nos. 67, 72.)

        At the hearing, Michael Strumwasser and Patricia Pei appeared on behalf of CEA, and Jesse Miller and Christopher Foster appeared on behalf of Wells Fargo.  After considering the papers in support of and in opposition to the motion, the oral arguments of counsel, the

1

1  court's record in this matter, and the applicable law, the court now issues the following order.

2  BACKGROUND

3        The background facts are taken from the operative pleadings and the parties'

4  briefing related to the instant motion and previous discovery motions.

5              Background Facts Giving Rise to the Litigation

6        Plaintiff CEA, a publicly run, privately funded insurer, was specially created by

7  the Legislature following the Northridge Earthquake in 1994 when earthquake insurance for

8  homeowners became very difficult to obtain.  See Cal. Ins. Code § 10089.6(a).  The statutes that

9  created CEA set forth certain restrictions on CEA's permitted investments, limiting them "to

10 those securities eligible under Section 16430 of the Government Code."  Cal. Ins. Code §

11 10089.6(b)(1).[1]

12       Shortly after CEA's formation, Metropolitan West was retained by the California

13 Department of Insurance to provide financial and investment services to CEA.  Pursuant to that

14 agreement, a set of Investment Policies was drafted, setting forth certain rules directing and

15 limiting the manner in which CEA's funds were to be invested.  The Investment Policies were

16 ultimately approved by CEA's Governing Board on October 7, 1996, with subsequent revisions

17 approved on several later dates.  Following the initial drafting of the Investment Policies, CEA

18 continued to engage Metropolitan West's services, and around July 1, 1998, Metropolitan West

19 entered into an agreement directly with CEA to act as CEA's investment and financial advisor.

20 In 2004, Wachovia Bank acquired Metropolitan West, all of Metropolitan West's rights and

21 obligations under the 1998 agreement were assigned to Wachovia Bank, and Wachovia Bank

22 thereafter continued to serve as CEA's financial and investment advisor until 2008.

23 Subsequently, Wachovia was acquired by Wells Fargo.  For the sake of convenience only, the

24 court refers to all defendants as Wells Fargo.

25 _____

26       [1] Cal. Gov't Code § 16430 provides a listing of eligible securities for investment of the
State of California's surplus moneys.

1     On August 8, 2007, Wells Fargo invested approximately $62.25 million of CEA's

2  funds in commercial paper issued by Mainsail II LLC ("Mainsail"), a structured investment

3  vehicle-lite ("SIV-lite") managed by Solent Capital Partners.  CEA claims that the investment

4  was backed primarily by sub-prime residential mortgage-backed securities.  The investment was

5  scheduled to mature on September 10, 2007, and was to earn around $309,000 in interest for

6  CEA.  However, around August 20, 2007, Mainsail breached a market-value compliance rule, as

7  a result of which its assets were frozen.  More than a year later, after Mainsail went into a

8  receivership and underwent a restructuring process, CEA recovered some of its principal

9  investment, but over $47 million of its original $62.25 million investment was ultimately lost.

10  According to CEA, this was the first and only investment loss sustained by CEA to date.

11     Subsequently, on December 31, 2009, CEA filed the instant action against Wells

12  Fargo in the Sacramento County Superior Court, alleging causes of action for breach of contract,

13  breach of fiduciary duty, constructive fraud, and unfair business practices, and seeking to recover

14  its loss on the Mainsail investment with interest as well as punitive damages and civil penalties.

15     CEA contends that Wells Fargo is liable on essentially two theories.  First, CEA

16  claims that the Mainsail investment was illegal, because the Mainsail investment was neither

17  permitted by law under Cal. Gov't Code § 16430 nor in keeping with CEA's Investment Policies.

18  CEA asserts that, to the extent Wells Fargo relied solely on CEA's Investment Policies to make

19  its investment decisions, Wells Fargo remains at fault for failing to draft a set of policies that

20  fully incorporated section 16430's requirements.  Wells Fargo disputes this, arguing that

21  Mainsail was a suitable investment for CEA and complied with the Investment Policies, which it

22  contends were developed in conjunction with CEA and which CEA's board ultimately adopted.

23  Second, CEA contends that the Mainsail investment was imprudent, i.e. that Wells Fargo knew

24  or should have known, based on both the characteristics of the Mainsail investment itself and the

25  prevailing market conditions at the time, that Mainsail was a highly risky and inappropriate

26  investment for CEA.  Wells Fargo also disputes this characterization of the Mainsail investment.

1  Wells Fargo ultimately removed the action to this court on February 4, 2010.  (Dkt. No. 1.)

2              <u>Background Facts Related to the Discovery Dispute</u>

3              This particular discovery dispute arises from a subpoena duces tecum issued by

4  Wells Fargo to non-party PricewaterhouseCoopers LLC ("PwC").  Around December 2007, after

5  CEA came to the conclusion that it was unlikely to recover its losses on the Mainsail investment,

6  it decided to initiate an inquiry into the events and circumstances leading up to the Mainsail

7  investment.  After initial negotiations, CEA entered into an agreement with independent auditing

8  firm PwC to conduct such an investigation and analysis and prepare a report to the CEA's

9  Governing Board.  In the course of its work in the first half of 2008, PwC interviewed key CEA

10  employees and received and reviewed copies of relevant internal CEA documents and

11  correspondence.  Although the CEA-PwC agreement recognized that third parties such as Wells

12  Fargo had no obligation to cooperate with the investigation, Wells Fargo nevertheless agreed to

13  do so, and PwC actually interviewed various Wells Fargo employees and received and reviewed

14  copies of relevant Wells Fargo documents.  On June 13, 2008, PwC provided CEA with a draft

15  report, which was forwarded to the CEA Governing Board and CEA's outside counsel but for

16  some reason never finalized.  PwC retained documents related to the Mainsail investigation in a

17  single engagement file known as the "Mainsail Engagement File."

18              Around June 5, 2012, Wells Fargo served a subpoena duces tecum on PwC,

19  essentially requesting, for purposes of this motion, all documents in PwC's possession relating to

20  the Mainsail investigation, i.e. those documents contained in the Mainsail Engagement File.  (See

21  Dkt. No. 60, Ex. 2.)  According to CEA, the Mainsail Engagement File contains the following

22  categories of documents:

23          (1) Background documents provided by CEA to PwC as potentially
             relevant to its investigation, including (a) correspondence (i)
24          internally between CEA staff, (ii) between CEA and Wells Fargo,
             (iii) between CEA staff and CEA's General Counsel or outside
25          counsel; (b) CEA account statements; and (c) other miscellaneous
             background documents;

26

4

(2) Background documents provided by Wells Fargo to PwC as potentially relevant to its investigation;

(3) PwC correspondence, including correspondence (a) between PwC and CEA's General Counsel and (b) internally between PwC staff; and

(4) Work papers generated by PwC in the course of its investigation, including (a) notes from interviews with CEA individuals; (b) notes from interviews with Wells Fargo individuals; (c) graphs, charts, and memos reflecting PwC's own research into the facts underlying the Mainsail transaction; and (d) report drafts.

CEA brings the instant partial motion to quash the subpoena on the grounds that it requires production of protected attorney work product and/or attorney-client communications with respect to categories (1)(a)(iii); (3); and (4)(a), (c), and (d).[2]

CEA contends that PwC was retained as an independent consultant and that the PwC investigation was conducted under the supervision and oversight of CEA's General Counsel in an attempt to assess the facts underlying a potential lawsuit.  By contrast, Wells Fargo argues that the PwC investigation was not undertaken in anticipation of litigation, but rather for business purposes, i.e. to understand how CEA's investment policies, practices, and procedures led to the investment loss and how such a loss could be avoided in the future.[3]

DISCUSSION

The court addresses the issues concerning application of the attorney work product doctrine and the attorney-client privilege separately below.

\\\

---

[2] CEA represents that all relevant documents in category (1), with the exception of correspondence between CEA staff and CEA's General Counsel or outside counsel, have already been provided to Wells Fargo.  Additionally, Category (2) involves Wells Fargo's own documents, and CEA does not object to production of PwC's notes of interviews with Wells Fargo individuals in category 4(b).

[3] Wells Fargo also generally posits, without providing details, that CEA did not like PwC's findings and now seeks to suppress them by purported application of the attorney work product doctrine and the attorney-client privilege.

1      Attorney Work Product Doctrine

2          Since the attorney work product doctrine involves a procedural consideration and

3  not application of a substantive privilege, federal law applies. Great American Assurance Co. v.

4  Liberty Surplus Ins. Corp., 669 F. Supp. 2d 1084, 1090 (N.D. Cal. 2009); Connolly Data

5  Systems, Inc. v. Victor Technologies, Inc., 114 F.R.D. 89, 95 (S.D. Cal. Feb. 17, 1987). Fed. R.

6  Civ. P. 26(b)(3) provides, in part, that:

7          (A) Ordinarily, a party may not discover documents and tangible
           things that are prepared in anticipation of litigation or for trial by or
8          for another party or its representative (including the other party's
           attorney, consultant, surety, indemnitor, insurer, or agent). But,
9          subject to Rule 26(b)(4), those materials may be discovered if: (i)
           they are otherwise discoverable under Rule 26(b)(1); and (ii) the
10         party shows that it has substantial need for the materials to prepare
           its case and cannot, without undue hardship, obtain their
11         substantial equivalent by other means.

12  Thus, "to qualify for protection against discovery under Rule 26(b)(3), documents must have two

13  characteristics: (1) they must be prepared in anticipation of litigation or for trial and (2) they must

14  be prepared by or for another party or by or for that other party's representative." In re Grand

15  Jury Subpoena (Mark Torf/Torf Environmental Management) ("Torf"), 357 F.3d 900, 907 (9th

16  Cir. 2004). The work product doctrine applies to investigators or agents working for attorneys

17  provided that the documents were created in anticipation of litigation. Id. (citing United States v.

18  Nobles, 422 U.S. 225, 239 (1975)).

19         In this case, there is no question that PwC was hired to perform an investigation or

20  audit under the supervision and oversight of CEA's General Counsel. Even though the CEA-

21  PwC agreement was formally executed by CEA's CFO and acting CEO Tim Richison, initial

22  correspondence between CEA's General Counsel, Daniel P. Marshall III, and PwC, as well as the

23  CEA-PwC agreement and engagement letter itself, indicate that the investigation was to be

24  supervised by Mr. Marshall and that he was to serve as CEA's sole contact with PwC. (See Dkt.

25  \\\\\

26  \\\\\

6

No. 60 at 40, 51, 53, 56, 60.)[4]  Instead, the issue is whether the documents at issue were created in anticipation of litigation.  CEA concedes that, in addition to the purpose of discovering the facts regarding the Mainsail investment for purposes of potential litigation, the PwC investigation/audit also served other business purposes, such as reviewing CEA's investment policies, procedures, and portfolio to reduce the risk of similar investment losses in the future.  Nevertheless, CEA argues that the existence of dual purposes do not necessarily preclude work product protection under Ninth Circuit law, and particularly not under the facts and circumstances in this case.

The Ninth Circuit has held that "a document should be deemed prepared in anticipation of litigation and thus eligible for work product protection under Rule 26(b)(3) if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation."  Torf, 357 F.3d at 907.  This standard "does not consider whether litigation was a primary or secondary motive behind the creation of a document.  Rather, it considers the totality of the circumstances and affords protection when it can fairly be said that the document was created because of anticipated litigation and would not have been created in substantially similar form but for the prospect of that litigation."  Id. at 908.  "When there is a true independent purpose for creating a document, work product protection is less likely," but documents are entitled to such protection when, taking into account the facts surrounding their creation, "their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole."  Id. at 908-10.  In evaluating whether documents were generated by a consultant in anticipation of litigation, "courts have weighed factors such as the timing of retention of the non-testifying expert in relation to the litigation at issue and the existence of

---

[4] Mr. Marshall explained that the reason for Mr. Richison's execution of the CEA-PwC agreement was that only CEA's CEO was delegated the authority by the CEA Governing Board to sign contracts with vendors or consultants.  (Dkt. No. 73, ¶ 3.)

1   evidence including supporting affidavits and engagement letters." <u>U.S. Inspection Services, Inc.</u>

2   <u>v. NL Engineered Solutions, LLC</u>, 268 F.R.D. 614, 619 (N.D. Cal. Jul. 12, 2010).

3              In light of these principles and for the reasons discussed below, the court finds

4   that the documents and correspondence generated by PwC in the course of the Mainsail

5   investigation/audit under the supervision of CEA's General Counsel were created in anticipation

6   of litigation.  In December 2007, Mr. Marshall contacted CEA's outside counsel to discuss the

7   possibility that CEA may pursue litigation related to the Mainsail investment loss.  (Dkt. No. 60,

8   ¶ 11.)  On December 13, 2007, CEA's General Counsel instituted a litigation hold on documents

9   related to CEA's investments, investment policies, and investment management.  (Dkt No. 60, ¶

10  10; Dkt. No. 60 at 38.)  Around this same time, Mr. Marshall also contacted PwC to explore the

11  possibility of an audit or investigation.  (Dkt. No. 60, ¶¶ 12-13; Dkt. No. 60 at 40.)  CEA and

12  PwC then ultimately entered into an agreement in early 2008 for PwC to conduct the

13  audit/investigation under the supervision of Mr. Marshall as CEA's General Counsel.  (Dkt. No.

14  60 at 42-69.)  Certainly the timing of the negotiations and ultimate retention of PwC,

15  contemporaneous with CEA's discussions with outside counsel and the institution of a litigation

16  hold, plausibly suggests that PwC was retained in anticipation of litigation.  <u>U.S. Inspection</u>

17  <u>Services, Inc.</u>, 268 F.R.D. at 619-20.

18             The CEA-PwC agreement and attached engagement letter further confirm that

19  anticipated litigation "animated every document [PwC] prepared" in the scope of the Mainsail

20  investigation.  <u>Torf</u>, 357 F.3d at 908.  The Agreement states that "CEA hereby retains PwC to

21  provide investigative services, and create and produce requested reports and outputs stated in the

22  Engagement letter...."  (Dkt. No. 60 at 42.)  In turn, the engagement letter provides, in part:

23             This letter confirms that [PwC] is pleased to be engaged by you,
              Daniel P. Marshall, III, General Counsel ("you"), on behalf of
24             [CEA], to provide the services described below to assist you in
              connection with your *giving legal advice to CEA*.
25
              Scope of Our Services
26

1
2
3
4
5

> You, on behalf of CEA, are engaging us to review actions and transactions related to certain portfolio security investments held by CEA, including *due diligence performed by the investment adviser to ensure all investments were appropriate and eligible investments and made in accordance with CEA investment guidelines and restrictions.* In addition, PwC will assess the operational effectiveness of CEA's compliance policies and procedures in the areas of portfolio management, risk assessment and trading operations.

6  (Dkt. No. 60 at 56 [emphasis added].) The more detailed scope of work summary attached to the

7  engagement letter further makes clear that a substantial portion of PwC's investigation related to

8  the Mainsail investment and the specific actions taken, and decision-making employed, by

9  Wachovia and others with respect to that investment. (See Dkt. No. 60 at 61-62.) This strongly

10  militates against a finding that the investigation was merely intended to review CEA's own

11  policies and procedures, or that the investigation would have taken on substantially the same

12  form regardless of any anticipated litigation.

13  Additionally, in the course of retaining PwC and during the PwC investigation,

14  Mr. Marshall provided several confidential updates to the CEA Governing Board regarding the

15  progress of the investigation itself and its relationship to potential litigation. For example, on

16  January 11, 2008, Mr. Marshall e-mailed the board members, stating:

17
18
19
20
21
22

> I've attached for your review a draft engagement letter between the CEA and [PwC] that sets the ground rules and outputs of the Mainsail investigation...I have retained and consulted with outside legal counsel on the legal aspects of this situation. As you have seen from the notice/agenda for the January 16th Board meeting, there is a litigation-related closed session added – at that closed session, counsel will be present to brief the Board on its options, *to the extent those can be described at this pre-investigation stage. I expect that in connection with the PwC investigation, CEA's outside counsel will be quite active as well....*

23  (Dkt. No. 60 at 74-75 [emphasis added].) In a subsequent e-mail to board members, Mr.

24  Marshall provided another update regarding the Mainsail investigation, indicating that

25  "[i]nformation has been flowing between us, and document production preparation has

26  proceeded, in order to square the legal-case investigation ongoing in the background with the

9

1   PwC compliance investigation." (Dkt. No. 60 at 77.)  Also, on March 12, 2008, Mr. Marshall

2   advised the board members that "[o]ur fullest understanding of those rights, of course, are being

3   developed, in part, through the PwC investigation and also through legal analysis by litigation

4   counsel...The investigation of Wachovia and Merrill is proceeding according to an engagement

5   letter between PwC and the CEA, negotiated by me, approved by Tim Richison as to form, and

6   then signed by me...Because these matters pertain directly to pending litigation under active

7   consideration, we can discuss any them [sic] during closed session tomorrow." (Dkt. No. 60 at

8   82-86.)  These communications, as well as the closed-session meetings of the CEA Governing

9   Board pursuant to a statutory exception allowing closed-session meetings to deliberate regarding

10  pending litigation or whether to initiate litigation, see Cal. Gov't Code § 11126(e), lend credence

11  to the notion that PwC's retention was infused with the purpose of evaluating potential litigation

12  against Wachovia or others.

13          Finally, it is also informative that CEA sent Wells Fargo a formal request for

14  mediation pursuant to the dispute resolution provision of their contract around the time that PwC

15  completed its investigation and draft report in June 2008.  (Dkt. No. 60, ¶¶ 22-23.)  When

16  informal dispute resolution efforts eventually broke down, this litigation ensued in December

17  2009.  (Dkt. No. 60, ¶ 23.)

18          Based on the above, the court finds that CEA has presented substantial evidence

19  that the PwC investigation/audit was conducted because of the prospect of litigation.  To be sure,

20  as CEA acknowledges, it was also interested in simultaneously analyzing its investment policies

21  and procedures to avoid repetition of future investment losses and identifying any similar

22  purportedly risky investments in its portfolio.  However, in this case these corollary business

23  purposes were "profoundly interconnected" with the audit's litigation purposes.  Torf, 357 F.3d

24  at 908.  The same investigation that would identify what duties were allegedly breached and from

25  whom remedies could purportedly be sought would likely illuminate any necessary changes to

26  existing investment policies, procedures, and investments to avoid reoccurrence of such a loss.

1     Moreover, because CEA also contends that Wells Fargo was responsible for drafting, and may

2     have failed to draft, legally compliant investment policies for CEA, PwC's findings regarding

3     necessary changes to investment policies and procedures would also be integrally related to

4     evaluating potential litigation.  Simply put, the business purposes of the audit/investigation here

5     were "grounded in the same set of facts that created the anticipation of litigation." Id. at 909.

6     Thus, the documents generated by PwC in the course of its investigation are entitled to work

7     product protection because, "taking into account the facts surrounding their creation, their

8     litigation purpose so permeates any non-litigation purpose that the two purposes cannot be

9     discretely separated from the factual nexus as a whole." Id. at 910; see also U.S. Inspection

10     Services, Inc., 268 F.R.D. at 618-23.[5]

11            In support of its contention that the PwC audit/investigation was not in

12     anticipation of litigation, Wells Fargo makes several arguments that the court ultimately finds

13     unpersuasive.  First, Wells Fargo references statements by individual CEA officers and board

14     members at a December 13, 2007 board meeting that purportedly suggest that PwC was only

15     engaged to audit CEA's own investment policies for the business purpose of preventing future

16     losses.  For example, Wells Fargo refers to a portion of acting CEO Mr. Richison's statement

17     that the audit would "review the CEA investment policy, procedures, and portfolio" and allow

18     CEA to determine the Mainsail investment's current value and "make the appropriate accounting

19

20           [5] Wells Fargo cites to dicta in a prior unpublished opinion of this court, stating that "if there is any ambiguity regarding the role played by its consultants in reviewing or creating documents, *and if not strictly for the limited purpose of litigation*, it should be resolved in favor

21     of the party seeking discovery." Fru-Con Construction Corp. v. Sacramento Municipal Utility District, 2006 WL 2050999, at *4 n.3 (E.D. Cal. Jul. 20, 2006) (emphasis added).  When read in

22     isolation, this statement arguably supports Wells Fargo's position.  However, even though the general principle articulated with respect to resolution of any ambiguity is consistent with Torf,

23     the italicized portion does somewhat overstate the requirements for application of work product protection.  Accordingly, the court instead follows, as it must, the Ninth Circuit's formulation of

24     the requirements as outlined in Torf.  Additionally, the court notes that it does not find ambiguity with respect to the role played by PwC in this case.  As discussed above, substantial evidence

25     supports a finding that the PwC investigation/audit was conducted because of the prospect of litigation and that it significantly shaped the contours of that investigation, even if the

26     investigation simultaneously served some of CEA's other business interests.

1   entry to write down the securities value in a portfolio." (Dkt. No. 69-1 at 9.)  However, Wells

2   Fargo conveniently omits another important part of his statement – that the review "would also

3   inquire into all circumstances concerning the purchase transaction for that commercial paper."

4   (Dkt. No. 69-1 at 9.)  While it is true that the words "anticipation of litigation" were not

5   expressly used at the December 13, 2007 meeting, this is hardly surprising.  It was the first

6   meeting at which CEA's Governing Board was informed about the Mainsail investment loss.

7   (Dkt. No. 69-1 at 8-10; Dkt. No. 73, ¶ 4.)  As CEA succinctly puts it, "[Wells Fargo] surely

8   cannot expect the CEA to declare, in the midst of a publicly broadcast Board meeting, that it is in

9   the early stages of determining whether to bring a lawsuit against one or more parties whose

10  identities have yet to be ascertained."  (Reply, Dkt. No. 72 at 7.)[6]

11          Wells Fargo also highlights the opinion of the board's chairman regarding the

12  propriety of an independent investigation of "not just the circumstances of the Mainsail purchase

13  and its devaluation, but, more generally, whether we need to have any changes to our investment

14  policies and procedures.  It would also include, then any look at the rest of the portfolio...."  (Dkt.

15  No. 69-1 at 10.)  As an initial matter, while this statement suggests that CEA may have had dual

16  purposes for the investigation, it is not inconsistent with CEA's claim that it anticipated

17  litigation.  Moreover, other board members deemed an investigation of Wells Fargo's activities,

18  the subject of this litigation, to be an important part of the audit, as reflected by one board

19  member's question to CFO and acting CEO Mr. Richison:

20          Q.  And looking at the description of what the auditor would do, is
            it going to encompass as well reviewing, not just whether policies

21

22          [6] Wells Fargo also notes that the express terms of the agreement and engagement letter do
     not state that PwC was retained for litigation purposes.  However, such a statement is not
23   necessary to a finding that a consultant was retained in anticipation of litigation.  U.S. Inspection
     Services, Inc., 268 F.R.D. at 622 ("The engagement letter need not have stated explicitly that [the
24   consultant] was retained for litigation purposes.")  Moreover, given that CEA's contracts with
     vendors are often available for public inspection, it stands to reason that CEA would not include
25   information regarding potential litigation in such documents, especially when it was still
     investigating its prospects.  Nonetheless, the engagement letter here stated that PwC was retained
26   to assist CEA's General Counsel in providing *legal advice* to CEA.  (Dkt. No. 60 at 56.)

1   were followed but the investment advisor also has discretion – I
    mean, if there's a security that is allowed under the policy, but the
2   advisor deems that that's not a safe security, then the advisor
    shouldn't just blindly just invest in the highest securities that are
3   approved by the policy.  So I would hope that the review would
    also look at the performance of the investment advisor in this
4   circumstance in terms of whether they were exercising, you know,
    rational, good, discretion even if they were following the policy.
5   A.  That is our intention, yes.

6   (Dkt. No. 69-1 at 12.)  In any event, as discussed above, CEA's dual purposes for the

7   investigation do not preclude application of the work product doctrine under the circumstances

8   here.

9           Second, Wells Fargo argues that CEA was under an independent duty to

10  commission the PwC investigation in substantially similar form, regardless of the prospect of

11  litigation, thereby making it ineligible for work product protection.  The court disagrees.

12  Although Cal. Gov't Code § 16430 ostensibly sets limits on CEA's investments, it does not

13  prescribe any specific investigation into breaches of its terms.  Moreover, contrary to Wells

14  Fargo's contention, the isolated statement of a non-attorney board member that he thinks the

15  investigation is part of the board's fiduciary responsibility is not dispositive.  (Dkt. No. 69-1 at

16  12.)  Indeed, Wells Fargo provides no authority for the proposition that a general fiduciary duty

17  to protect an entity's legal interests (as opposed to a specific statutory duty to commission a

18  particular investigation/assessment or generate a specific report) constitutes an "independent

19  duty" sufficient to preclude work product protection.  Such a broadly drawn exception would

20  virtually swallow the rule itself.[7]

21  \\\\

22

23          [7] As CEA puts it, "[v]irtually every lawsuit brought by a public or corporate entity to
    recover for the breach of a duty owed that entity will begin with an assessment by the entity of
24  whether it has a right to recovery.  If it finds such a right, the entity then has a fiduciary duty to
    pursue recovery.  According to [Wells Fargo], however, whenever such an entity's counsel
25  conducts an investigation to determine whether such a right exists (and to assess all the other
    factors relevant to the exercise of fiduciary duty), the fruits of that inquiry are automatically and
26  inevitably available to opposing counsel."  (Reply, Dkt. No. 72 at 10.)  That cannot be the law.

1    Third, Wells Fargo claims that the PwC engagement letter itself contradicts

2  CEA's assertion of work product protection, because it allegedly contemplates that the final audit

3  report would be shared with Wachovia.  This argument lacks merit.  The pertinent provision of

4  the engagement letter generally stated that PwC's work was not intended to be relied upon by

5  third parties and was not to be distributed to third parties without PwC's written consent.  (Dkt.

6  No. 60 at 57.)  It then continued as follows:

7         Notwithstanding any of the foregoing, the parties agree that the
          PwC investigative work product will include written reports,
8         including a final written report, to the CEA Governing Board and
          that the written reports to the CEA Board *may also be provided by*
9         *CEA to Wachovia and other CEA vendors* (and others) because,
          under California law, the document portion of the PwC work
10        product *may* be required to be made available to the public...."

11  (Dkt. No. 60 at 57 [emphasis added].)  This provision merely reserves CEA's right to provide

12  PwC reports to Wachovia or other third parties, if appropriate, but does not guarantee that CEA

13  would do so or indicate that CEA would actually be required to do so.

14       Finally, Wells Fargo claims that CEA obtained the cooperation of Wells Fargo in

15  the PwC audit based on representations that the purpose of the audit was to improve CEA's

16  investment practices.  According to the Declaration of Wells Fargo's Managing Counsel, Pamela

17  M. Pearson, her understanding was that the audit was to be a business assessment to "evaluate

18  the CEA's investment practices and procedures, particularly as they related to an unrealized loss"

19  on the Mainsail investment.  (Dkt. No. 68, ¶¶ 3, 5.)  She states that Wells Fargo continued its role

20  as CEA's investment advisor throughout the audit and that Mr. Marshall even represented that

21  PwC's final report would be shared with Wells Fargo so that it could improve its investment

22  services to CEA.   (Dkt. No. 68, ¶ 6.)  She also asserts that he never informed her that the audit's

23  purpose was to prepare for litigation against Wells Fargo – had he done so, Wells Fargo would

24  not have cooperated with the audit.  (Dkt. No. 68, ¶ 8.)

25       In turn, Mr. Marshall disputes Ms. Pearson's characterization of their discussions,

26  stating that he explained that CEA would "ultimately decide what course of action to take based

14

1 | in part on the information developed through the PwC investigation." (Dkt. No. 73, ¶ 11.)
2 | According to Mr. Marshall, he never represented to Wells Fargo that CEA was not considering
3 | litigation or that CEA would commit to revealing the product of the PwC investigation to Wells
4 | Fargo or any other vendor. (Dkt. No. 73 at ¶¶ 9, 12-14.)

5 |        The court does not doubt that CEA never outright threatened Wells Fargo with
6 | litigation when seeking its cooperation in the audit/investigation. To the contrary, CEA may well
7 | have cajoled Wells Fargo into cooperation with vague and generalized statements regarding the
8 | audit. That said, the court ultimately finds Wells Fargo's argument unpersuasive, because Wells
9 | Fargo notably provides no e-mails, letters, or other documentary evidence of actual
10 | misrepresentation by CEA. Also, cooperation would likely have been in Wells Fargo's interests
11 | given that CEA was still its client at the time of the audit. Failure to cooperate may have resulted
12 | in loss of CEA as a client and an even heightened risk of litigation. Wells Fargo also does not
13 | represent that it requested a hold-harmless agreement in exchange for cooperation with the
14 | investigation.

15 |        Therefore, after considering the totality of circumstances, the court concludes that
16 | documents and correspondence generated by PwC in the course of the Mainsail
17 | investigation/audit under the supervision of CEA's General Counsel were created in anticipation
18 | of litigation and are subject to work product protection.[8] To the extent that these documents have
19 | dual purposes, the court finds that they were not prepared in the ordinary course of business or

20 |
21 |    [8] At the hearing, Wells Fargo also directed the court's attention to a purportedly analogous case in which work product protection was found not to apply to documents generated
22 | during an investigation by a banking expert on behalf of a bank after discovery of a rogue trading scheme by one of its traders. Allied Irish Banks v. Bank of America, N.A., 240 F.R.D. 96
23 | (S.D.N.Y. 2007). However, in that case, the bank's board directly appointed the expert; the expert was not supervised by in-house counsel or outside counsel, but instead headed up the
24 | investigation conducted jointly with a law firm; the scope of the expert's work was almost entirely focused on operation of the bank's policies and procedures and recommendations for
25 | improvement; the expert's report was released to the public; and it was apparent that the primary purpose of the investigation was to restore the confidence of customers and employees. Id. In
26 | light of these significant factual dissimilarities, the court finds Allied Irish Banks to be inapposite.

1   pursuant to a separable independent duty, but instead that "their litigation purpose so permeates

2   any non-litigation purpose that the two purposes cannot be discretely separated from the factual

3   nexus as a whole." Torf, 357 F.3d at 910. This would include the documents in categories (3)

4   and (4)(a), (c), and (d), as outlined above.[9]

5          Even if documents are subject to work product protection, such protection is not

6   absolute. In the case of non-opinion work product, it may be discovered if the requesting party

7   shows that "it has substantial need for the materials to prepare its case and cannot, without undue

8   hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3). Even

9   opinion work product may be discovered "when mental impressions are *at issue* in a case and the

10  need for the material is compelling." Holmgren v. State Farm Mut. Automobile Ins. Co., 976

11  F.2d 573, 577 (9th Cir. 1992) (emphasis in original). However, because Wells Fargo did not

12  advance such concerns or arguments in this case, the court declines to address these issues *sua*

13  *sponte*.

14          Attorney-Client Privilege

15          In diversity cases, issues regarding privilege are determined under the state law

16  that governs decision of the case. See Fed. R. Evid. 501; Star Editorial, Inc. v. United States

17  District Court for the Central District of California, 7 F.3d 856, 859 (9th Cir. 1993). Thus, in

18  determining the existence or extent of the attorney-client privilege in this case, California law

19  controls.

20          Under California law, the attorney-client privilege confers a privilege on the client

21  "to refuse to disclose, and to prevent another from disclosing, a confidential communication

22  between client and lawyer...." Cal. Evid. Code § 954. The phrase "confidential communication

23  between client and lawyer" means "information transmitted between a client and his or her

24  ────────────

25          [9] Having concluded that these documents, which all relate to a single investigation/audit, were prepared in anticipation of litigation, the court finds it unnecessary under the circumstances

26  of this case to order CEA to prepare a log claiming attorney work product protection as to each individual document.

1   lawyer in the course of that relationship and in confidence by a means which, so far as the client

2   is aware, discloses the information to no third persons other than those who are present to further

3   the interest of the client in the consultation or those to whom disclosure is reasonably necessary

4   for the transmission of the information or the accomplishment of the purpose for which the

5   lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in

6   the course of that relationship." Cal. Evid. Code § 952. As such, the privilege also protects

7   communications involving agents of the attorney, the client, or both in furtherance of the

8   attorney-client relationship. See City & County of San Francisco v. Superior Ct., 37 Cal. 2d 227,

9   234-38 (1951).

10          "The party claiming the privilege has the burden of establishing the preliminary

11   facts necessary to support its exercise, i.e., a communication made in the course of an attorney-

12   client relationship. Once that party establishes facts necessary to support a prima facie claim of

13   privilege, the communication is presumed to have been made in confidence and the opponent of

14   the claim of privilege has the burden of proof to establish the communication was not

15   confidential or that the privilege does not for other reasons apply." Costco Wholesale Corp. v.

16   Superior Court, 47 Cal. 4th 725, 733 (2009) (internal citations omitted).

17          "[T]o determine whether a communication is privileged, the focus of the inquiry

18   is the dominant purpose of the *relationship* between the parties to the communication. Under

19   that approach, when the party claiming the privilege shows the dominant purpose of the

20   relationship between the parties to the communication was one of attorney-client, the

21   communication is protected by the privilege." Clark v. Superior Court, 196 Cal. App. 4th 37, 51

22   (2011) (citing Costco Wholesale Corp. v. Superior Ct., 47 Cal. 4th 725 (2009)). The California

23   Supreme Court emphasized that, once such a showing is made, it would be error for the court to

24   order an examination of the contents of each specific communication in camera to determine the

25   dominant purpose of the individual communication; indeed Cal. Evid. Code § 915(a) expressly

26   \\\\\

1   prohibits such an order.[10]  This is because, under California law, the privilege protects the

2   transmission in the context of such a relationship irrespective of its content, and "there should be

3   no need to examine the content in order to rule on a claim of privilege."  Costco Wholesale

4   Corp., 47 Cal. 4th at 736-39.

5          The court has already concluded that document categories (3) and (4)(a), (c), and

6   (d) may be withheld on grounds of work product protection.  Accordingly, the court declines to

7   address any claim of attorney-client privilege with respect to those documents and turns to the

8   only remaining documents at issue – category 1(a)(iii) – which involves correspondence between

9   CEA staff and CEA's General Counsel or outside counsel that was provided by CEA to PwC as

10  background documents potentially relevant to its investigation.

11         Although Wells Fargo states that it is presently unable to challenge assertion of

12  the privilege with respect to individual documents without a privilege log,[11] it does not

13  necessarily dispute the initial privileged nature of these documents on a global basis.  Instead,

14  Wells Fargo argues that CEA has not shown that providing these documents to PwC was

15  reasonably necessary to accomplish the Mainsail investigation and that CEA may therefore have

16  waived the privilege.  This argument lacks merit.  CEA explained that these were privileged

17  communications that CEA's General Counsel, together with his staff, culled from CEA's files

18  based on a determination of relevance to the Mainsail inquiry and forwarded to PwC to include

19  in its analysis.  Although the court will require CEA to provide Wells Fargo with a privilege log

20  providing the foundational details for asserting the privilege as to the documents in this category,

21

22  [10] Cal. Evid. Code § 915(a) provides, with exceptions not applicable here, that "the
    presiding officer may not require disclosure of information claimed to be privileged under this
23  division...in order to rule on the claim of privilege...."

24  [11] CEA explains that it was unable to prepare a privilege log to date, because the copy of
    documents in the Mainsail Engagement File provided by PwC for CEA's review had no metadata
25  associated with it.  Ordinarily, this court requires a responding party to provide a privilege log
    forthwith – however, the court appreciates that matters here were somewhat complicated by the
26  fact that responsive documents were in possession of a third party.

18

1    the court declines to compel CEA to provide extensive reasoning as to why each particular

2    communication was provided to PwC as its consultant.  To require more detail would essentially

3    compel CEA's General Counsel to reveal his analysis and strategy, and would unduly interfere

4    with the attorney-client relationship.

5    <u>CONCLUSION</u>

6            For the foregoing reasons, IT IS HEREBY ORDERED THAT:

7            1.  CEA's partial motion to quash (dkt. no. 58) is GRANTED along the terms

8    outlined in this order.  PwC shall not produce documents in categories (1)(a)(iii); (3); and (4)(a),

9    (c), and (d), as outlined above, in response to the subpoena duces tecum.  All remaining

10    responsive documents shall be produced.

11            2.  CEA shall serve a privilege log regarding all documents withheld in category

12    (1)(a)(iii) on the basis of the attorney-client privilege within 14 days of this order.

13    DATED: August 1, 2012

14

15                     /s/ Gregory G. Hollows
                 UNITED STATES MAGISTRATE JUDGE

16

17

18

19    GGH/wvr
    CEA.291.mtq.wpd

20

21

22

23

24

25

26