IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA EARTHQUAKE
AUTHORITY,

       Plaintiff,                     No. 2:10-cv-0291 MCE GGH

    v.

METROPOLITAN WEST
SECURITIES, LLC et al.,

       Defendants.           <u>ORDER</u>
_____/

Before the undersigned is defendant Metropolitan West Securities, LLC's ("MetWest") motion to compel the production of documents from non-party witness the California State Treasurer's office ("STO"). Dkt. 97. The undersigned heard argument in this matter on November 8, 2012. At hearing, and by order issued November 21, 2012, STO was directed to file a motion supporting its assertion of privilege over certain withheld documents and to further explain its production process for each of defendant's requests for which it has produced responsive documents. Dkt. 108. The discovery deadline in this case was December 3, 2012. Thus, the undersigned issues the following order subject to an extension of discovery as permitted by the District Judge and limited to the sole purpose of complying with this order.

\\\\\

Having considered the briefs and declarations submitted by both parties, the undersigned issues the following order.

BACKGROUND

This discovery dispute arises from litigation between CEA and defendants MetWest and Wells Fargo Bank, N.A. ("MetWest"), seeking recovery of the majority of MetWest's approximately $62 million investment of CEA funds into Mainsail, a structured investment vehicle holding residential mortgage-backed securities.[1] Shortly after the August 2007 purchase of the Mainsail investment, the fund encountered severe liquidity issues which resulted in its assets being frozen. More than a year later, after Mainsail went into a receivership and underwent a restructuring process, CEA recovered some of its principle investment but ultimately lost over $47 million of its original purchase.

STO was a member of plaintiff CEA's Governing Board ("the Board") since its inception.[2] The Board, in turn, approved CEA's Investment Guidelines and oversaw its investment practices and procedures, participated in compliance oversight, and supervised its financial performance. Dkt. 97 at 2. Further, STO presided over the Pooled Money Investment Board ("PMIB") which issued the list of commercial paper investments that CEA claims MetWest should have relied on. Id. In short, STO, through its Board representative, was involved in governing CEA and, according to defendant Met West, was in regular contact with CEA concerning its investments, audits and oversight of MetWest and of the Mainsail transaction at issue in this litigation. Consequently, Met West believes STO possesses highly relevant documents, including emails, memoranda, and audit materials, among other things, that are discoverable evidence.

---

[1] A more detailed statement of the facts giving rise to the litigation can be found in the court's order dated August 1, 2012. Dkt. 75.

[2] The facts of STO's relationship with plaintiff are taken from defendant's motion to compel, but are not disputed by STO in its opposition or at hearing. Dkt. 97 at 2, 11/8/2012 Hr'g. 10:00amPST.

1    MetWest served a third-party subpoena on STO on September 11, 2012,
2 requesting all documents and correspondence arising from STO's role in CEA's investment
3 activity. Dkt. 98 at 2. STO objected to the subpoena on general and specific grounds but
4 nonetheless claims to have produced all documents in its possession that are responsive to the
5 subpoena and not subject to a claim of privilege. Dkt. 101 at 4. MetWest filed a motion to
6 compel on October 21, 2012, bringing this dispute before the undersigned. At the November 8,
7 2012 hearing, the court discerned two specific issues requiring further explication by the parties
8 before a final order could issue: (1) the basis for STO's assertion of a "deliberative process
9 privilege"; and (2) the process by which STO identified, collected, searched and produced
10 documents responsive to MetWest's subpoena.
11    On November 21, 2012, STO filed its brief explaining the basis for withholding
12 documents under the deliberative process privilege along with a declaration addressing the
13 sufficiency of its production. Dkts. 111, 112. MetWest filed its reply on November 28, 2012.
14 Dkt. 113. A Further Supplemental Declaration was filed by STO on November 30, 2012 which
15 set forth, in more detail, the search it undertook in responding to the MetWest subpoena. Dkt.
16 114.
17    The court will now address each of these issues in turn.
18 DISCUSSION
19    *Privilege Claims*
20    In a production chart created by STO and sent to defendants on October 22, 2012,
21 STO lists 13 documents over which it claims a "deliberative process" privilege. See Dkt. 101-6
22 at 19-21. The documents are described generally as internal briefing memos, internal staff
23 reports, internal notes, and draft documents, with more specific descriptions of the topics covered
24 in the documents. In its brief and the accompanying declaration, STO describes the withheld
25 documents as falling into four categories: pre and post- meeting briefing memos, briefing memos
26 regarding on-going issues involving the CEA board; and notes prepared by the memo author in

1  advance of finalizing a briefing memo. Dkt. 111 at 2; 112 at 2-3.  STO claims that all of these
2  documents are subject to the deliberative process privilege because releasing them to the public
3  "would render it impossible for the STO to maintain an internal, confidential written record of its
4  anlaysis, thoughts, and recommendations on matters that come before the CEA board."  Dkt. 111
5  at 4.  MetWest counters that STO has not met its burden of establishing that the privilege applies
6  to these documents.  Dkt. 113 at 3.

7        Before turning to the merits of the privilege claim, the court must decide which
8  law to apply to the substantive privilege issue before it.  MetWest applies the federal common
9  law governing the deliberative process privilege while STO looks to California state law.
10 See Dkts. 113, 111.  A federal court sitting in diversity will apply the state law of the forum in
11 which it sits to substantive issues of privilege.  See Fed. R. Evid. 501, Star Editorial, Inc. V. U.S.
12 Dist. Court for the Central Dist. Of California, 7 F.3d 856, 859 (9th Cir. 1993), Theme
13 Promotions, Inc. v. News America Marketing FSI, 546 F.3d 991, 1007 (9th Cir. 2008).  Thus, in
14 this diversity action, the substance of the deliberative process privilege will be governed by
15 California state law.  Pagano v. Oroville Hospital, 145 F.R.D. 683, 687 (E.D.Cal. 1993);[3] see also
16 First Pacific Networks, Inc. v. Atlantic Mutual Ins. Co., 163 F.R.D. 574, 576 (N.D. Cal. 1995),
17 Bank of the West v. Valley Nat'l Bank of Ariz., 132 F.R.D. 250, 251 (N.D. Cal. 1990).

18       There is little state law precedent relating to the deliberative process privilege and
19 the boundaries of the privilege are not well drawn.  Nonetheless, the seminal case which
20 established the privilege sets forth the principles governing its application and provides sufficient
21 guidance for resolving the instant discovery dispute before the court.

22       In Times Mirror Co. v. Superior Court of Sacramento County, 53 Cal.3d 1325
23 (1991), the California Supreme Court created a common law deliberative process privilege by

---

25    [3] Despite the observations in a few cases that Pagano had been implicitly overruled by the Supreme Court (on matters unrelated to the proposition advanced herein), no such overruling
26 ever took place.

4

drawing on federal decisions applying exemptions from the Freedom of Information Act and from the broad language of exemptions found in the California Public Records Act, Gov. Code § 6250 et seq. The privilege — which shields documents otherwise subject to public disclosure — reflects a policy of protecting the decision-making processes of government agencies and a concern that the quality of decision making suffers when that process is prematurely exposed to public scrutiny. See Times, 53 Cal.3d 1325, 1340 (1991). Specifically, the court sought "to prevent injury to the quality of executive decisions" by "protect[ing] communications to the decisionmaker before the decision is made." Id at 1341.

"Under the deliberative process privilege, senior officials of all three branches of government enjoy a qualified, limited privilege not to disclose or to be examined concerning not only the mental processes by which a given decision was reached, but the substance of conversations, discussions, debates, deliberations and like materials reflecting advice, opinions, and recommendations by which government policy is processed and formulated." Regents of University of California v. Superior Court, 20 Cal.4th 509, 540 (1999) (concurrence). The privilege rests on the policy of protecting the "decision making processes of government agencies [.]" Id at 541 citing NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975). In all cases, the key question is "whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its function." Times, 53 Cal.3d at 1342. Thus, the privilege is intended to protect the deliberative *process* of government and not the materials at issue *per se*. Id at 1341.

The STO seeks application of the privilege to briefing memos and other internal documents received by the Treasurer that discuss matters pending before the CEA Board. Dkt. 111. Their claim confuses the purpose of the privilege and the roles played by the different parties involved in this dispute. If applicable, the deliberative process privilege would shield documents exposing the deliberative process by which the *STO* makes decisions. Here, however,

5

no decisions of that agency, or the Treasurer himself, are implicated.  Rather, it is the Board of the CEA that ultimately renders decisions on the issues presented in the briefing memos.  See Dkt. 111 at 4.  The memos serve only to inform how the Treasurer will cast his vote among Board members.  In other words, the decision-maker here is not the state agency, it is the CEA Board, of which the Treasurer sits as a single member.  STO makes no claim that the CEA is a state agency or is otherwise entitled to the same protection as that afforded STO, and even if it did, it would have no standing to do so.

It is unsurprising then, that STO fails to identify how disclosing the documents at issue "would expose an agency's decisionmaking process" and "undermine the agency's ability to perform its function."  See Times, 53 Cal.3d at 1342.  It is not STO's decision-making process that is implicated by these documents.  The STO acknowledges as much by claiming that the release of these memos would allow CEA board members and staff to become apprised of the STO's thoughts on matters and actions to be taken and *decisions to be made by the CEA Board*. See Dkt. 111 at 4 (emphasis added).  But the privilege does not exist to protect an individual within an agency from the scrutiny of his peers sitting on the board of an entirely different entity; it exists to protect the government agency decision-maker.  See Times, 53 Cal.3d at 1340.  Here, that is not the Treasurer and the privilege does not extend accordingly.  The cases relied on by STO and gathered by this court are in accord.  See e.g., Times, 53 Cal.3d at 1339-40 (applying the privilege to decisions of the Governor), Wilson v. Superior Court, 51 Cal. App.4th 1136, 1143 (1996) (same), California First Amendment Coalition v. Superior Court, 67 Cal. App.4th 159, 172 (1998) (same); and see San Joaquin Local Agency Formation Commission. v. Superior Court, 162 Cal. App. 4th 159, 163, 172 (2008) (shielding commissioners of local agency who denied plaintiff's application from inquiry into their decision-making process), Rogers v. Superior Court, 19 Cal.App.4th 469, 478 (1993) (shielding decisions of a city council member).

STO's claim that "[i]t is vital that the Treasurer be allowed to arrive at his decisions regarding Board action, independently and outside the influence of other members or

1  CEA staff" similarly misses the mark.  The decisions of the Board are not protected by the
2  deliberative process privilege for the simple reason that CEA is not a government agency, or is
3  not a government agency at issue here.  See Times, 53 Cal.3d at 1340.  Accordingly, the
4  decision-making process of the Board or any of its members is not shielded from public scrutiny.
5         A footnote in STO's brief appears to raise an additional basis for withholding the
6  documents at issue.  Specifically, STO cites to Cal. Evid. Code § 1040(a) for the proposition that
7  "information acquired in confidence by a public employee in the course of his or her duty and not
8  open, or officially disclosed, to the public prior to the time the claim of privilege is made is
9  'official information'" thereby attaching a "conditional privilege" if the court determines that
10 "disclosure is against the public interest."  Dkt. 111 at 4 n. 4 (citing Cal. Evid. Code §
11 1040(b)(2), County of San Diego v. Superior Court, 176 Cal.App.3d 1009, 1018-19 (Cal.App.4
12 1986)).  Nonetheless, STO makes no showing that any of the withheld documents fall within the
13 purview of this official information privilege.  No facts purport to demonstrate that the
14 information contained in the memos was acquired in confidence by a public employee in the
15 course of their duties.  See Shepherd v. Superior Court, 17 Cal.3d 107, 123-25 (Cal. 1976)
16 (overruled on other grounds).  Nor is there a showing that a weighing of the interests at stake tips
17 in favor of non-disclosure.  Id.  Since STO bears the burden of establishing the privilege it seeks
18 to invoke, the court will not speculate as to how such a showing might be made.  See HLC
19 Properties, Ltd. V. Superior Court, 35 Cal.4th 54, 59-60 (2005) (party claiming privilege
20 shoulders the burden of showing that the evidence it seeks to suppress falls within the terms of an
21 applicable statute).  Accordingly, the documents at issue will not be subject to the official
22 information privilege.
23         The court notes that STO provided briefing only in support of its assertion of the
24 deliberative process privilege and not for its "closed session" privilege which is affixed to five
25 documents on its production chart.  STO was required to provide briefing on "why any privilege
26 other than attorney-client properly applies to the documents withheld."  Dkt. 108 at 4.  Because

1  STO presents argument only as to the one privilege, the court considers the deliberative process
2  privilege as the sole basis for withholding the memos at issue.  Accordingly, because the
3  deliberative process privilege does not apply to the documents at issue, all documents in the
4  production chart that are not subject to the attorney-client privilege will be produced to MetWest.

   *Sufficiency of Production*

6          STO was required to "fully explicate the process it used to identify and produce"
7  documents responsive to each of MetWest's requests for production.  Dkt. 108 at 5.  On
8  November 30, 2012, Mark Paxson, attorney for STO, provided a sworn statement addressing the
9  two categories of documents sought by MetWest — those relating to the PMIB, and those
10 concerning STO's involvement with CEA.  Dkt. 114.  As to the PMIB documents, Mr. Paxson
11 declares that the division of his office that was responsible for PMIB investment activity
12 undertook an exhaustive search of records to identify all responsive documents.  Id at 3.  This
13 included searching through all staff members' email, electronically stored documents and those
14 located on the STO network.  Id.  Hard copy folders were also inspected.  Id.  Mr. Paxson
15 believes that no additional search for responsive documents is necessary as all such documents
16 have been identified and produced.  There is nothing on the face of this declaration suggesting
17 that other, responsive documents exist that are being improperly withheld by STO.  To the extent
18 that MetWest has specific concerns about STO's non-production of the PMIB documents, Met
19 West may bring an appropriate sanctions motion when it has hard evidence that documents were
20 not produced, and should have been.

21         The documents related to STO's involvement with CEA present a more complex
22 situation.  A single individual serves as the repository for all materials related to CEA.  Id at 4.
23 From June 2008 to the present, that individual has been Grant Boyken, who maintains the
24 documents on a networked drive.  Id.  Mr. Boyken inherited the records maintained by his
25 predecessor at the start of his tenure.  Id.  Since 2008, relevant documents were moved onto the
26 networked drive, but the remainder were destroyed.  Id.  All documents currently residing on the

network were reviewed by Mr. Paxson, Mr. Boyken and another STO staff attorney. Id. Though hard copies of materials prepared by CEA for each board meeting are generally not kept, Mr. Paxson reviewed all hard copy documents and produced responsive, non-privileged material. Id. Mr. Paxson further declares that the e-mail records for former employees are deleted 30 days after the employee's departure. Id. Finally, former Treasurer Phil Angelides maintained 43 boxes of hard-copy documents that were sent to the State Archives for storage after his departure in 2007. Though these documents have not been reviewed by anyone at STO, Mr. Paxson does not believe they would contain material responsive to MetWest's requests.

If STO were a party to this litigation, there might be some reason to probe further into the issue of whether a spoilation of documents occurred. However, STO is simply a third party which has been requested to produce documents otherwise in its possession. The court is unaware of any requirement that a third party, unrelated to a litigation party and at pain of sanctions, must preserve documents in anticipation of a discovery request which a party to the litigation might propound against it. Nor has Met West sought to have a forensic examination performed (at its expense) of specific computers in which deleted materials may be recovered.

The court will not require STO to retrieve and cull through Mr. Angelides' materials. The parties are reminded of the limits to discovery imposed by Fed. R. Civ. Pro. 26(b)(2)(C). This rule requires the court to reign in discovery when the burden or expense of production outweighs its potential benefits. Here, the burden of retrieving from archives 43 boxes of documents and requiring STO attorneys to manually search through all of them far outweighs the seeming minimal benefit that might result from such an undertaking.

CONCLUSION

Accordingly, for the reasons provided herein, IT IS HEREBY ORDERED THAT:

1. MetWest's motion to compel (dkt. 83) is GRANTED in part and DENIED in part, as explained herein, and;

\\\\\

9

2. STO will produce to MetWest, all the documents contained in the production chart (dkt. 101-6) that are currently withheld on the basis of either deliberative process or closed session privilege. This includes documents numbered 3-8 and 10-11. Production shall be made no later than December 26, 2012.

3. All other aspects of Met West's motion is denied.

IT IS SO ORDERED

DATED: December 19, 2012

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE