UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA EARTHQUAKE AUTHORITY,<br><br>             Plaintiff,<br><br>    v.<br><br>METROPOLITAN WEST SECURITIES, LLC; WACHOVIA BANK NATIONAL ASSOCIATION; and DOES 1-25,<br><br>             Defendants. | No. 2:10-CV-00291-MCE-CMK<br><br>**MEMORANDUM AND ORDER** |

Through this action, Plaintiff California Earthquake Authority ("the CEA") seeks relief from Defendants Metropolitan West Securities, LLC ("MetWest") and Wells Fargo, N.A., successor by merger to Wachovia Bank, N.A. ("Wachovia") (collectively, "Defendants") for the alleged loss of some $47 million resulting from Defendants' investment on behalf of the CEA in commercial paper issued by Mainsail II LLC ("Mainsail") and that investment's subsequent collapse. Based on this loss, the CEA asserts claims against Defendants for: (1) breach of contract; (2) breach of fiduciary duty; (3) constructive fraud; and (4) unfair business practices in violation of California Business and Professions Code §§ 17200 et seq.

///

1

Presently before the Court is Defendants' Motion for Summary Adjudication ("Motion"), filed May 30, 2013. Defs. Mot., ECF No. 133. The CEA filed a timely opposition to the Motion, as well as a Cross-Motion for Summary Adjudication ("Cross-Motion"). Opp'n, June 20, 2013, ECF No. 147; CEA Mot., June 20, 2013, ECF No. 148. Also before the Court is Defendants' Request to Strike Declarations of Tim Richison. Request to Strike, July 5, 2013, ECF No. 163. For the reasons set forth below, each of these motions is DENIED.[1]

## BACKGROUND

The CEA was created by the California Legislature in the wake of the 1994 Northridge earthquake and the ensuing homeowners insurance crisis. Richison Dep. 26:12- 30:3. The legislation creating the CEA was passed in 1995, 1995 Cal. Legis. Serv. Ch. 944 (A.B. 13) (approved by Governor October 16, 1995), and the CEA formally commenced operations in 1996, Richison Dep. 33:12. The CEA operates as a public instrumentality on a not-for-profit basis and issues earthquake insurance policies for California homes.

The CEA initially received capital from participating insurance companies in the form of earthquake insurance premiums and invested that money according to the CEA's philosophy, which prioritized portfolio safety, liquidity and yield. Richison Dep. 31:23-35:9, 94:20-92:2. These priorities were intended to allow CEA's assets to be quickly liquidated and made available in the event of an earthquake. Id. at 131:17-133:10. CEA later received additional contributions from insurance companies that were added as participants. Richison Decl. ¶ 6. The CEA also receives revenue through premiums paid on the earthquake insurance policies it issues, as well as through income earned on its invested capital. Id.

---

[1] Because oral argument would not be of material assistance, the Court ordered these matters submitted on the briefs pursuant to Local Rule 230(g).

2

...
...

It is undisputed that in October 1996, the CEA Governing Board, comprised of California's Governor, Treasurer and Insurance Commissioner as its three voting members, approved a document entitled "Investment Policies."[2]  The "Investment Policies" were drafted by Terry Crow and Russell Gould of Metropolitan West Securities and presented to the CEA Governing Board at the October 7, 1996, meeting.[3]  Crow Dep. 22:6-25.  It is undisputed that the "Investment Policies" set forth specific limitations on CEA investments, including commercial paper investments.  The "Investment Policies" contain both Investment Guidelines, which are specific rules and restrictions for the investment of CEA's funds, and Investment Policies, which set forth the CEA's "objectives and social principles and philosophies . . . ."  Richison Dep. 102:16-23.  The restrictions for commercial paper investments contained therein are as follows:

> 1) Maximum maturity:
>
> Statutory:      180 days
>
> Policy:         180 days
>
> 2) Maximum par value, total portfolio:
>
> Statutory:      30% of current portfolio
>
> Policy:         25%
>
> a) If over 15% of the portfolio is invested in commercial paper, the dollar-weighted average maturity of the entire portfolio cannot exceed 31 days.  Dollar-weighted average maturity means the sum of the amount of each outstanding commercial paper investment multiplied by the days to maturity, divided by the total amount of outstanding commercial paper.

---

[2] This document is alternately referred to, in various depositions and other items of evidence, as the "Investment Policy."

[3] According to Defendants, CEA drafted this document.  Defendants cite to the deposition of Timothy Richison in support of this proposition.  However, Timothy Richison's deposition does not state that CEA drafted the Investment Policies.  Rather, Richison states in his deposition that he was "not . . . involved in the creation of the [document] and the approval by the board."  Richison Dep. 100:13.  Richison himself "oversaw the updates" of the Investment Policies over time, which "were conducted by [the CEA's] investment advisor during this time frame."  Id. 101:16.

      3) Maximum par value per name:

      Statutory:    10% of outstanding

      Policy:    5%

      4) Maximum par value per maturity

      None

      5) Credit

      a) Rated A1/P1 or equivalent quality as defined by a nationally recognized organization that rates such securities.

      b) Organized and operating with the United States.

      c) Have total assets in excess of five hundred million dollars ($500,000,000).

Ex. I to Reidy Decl.

    It is further undisputed that on or about September 12, 1997, the CEA issued a Request for Proposal #12 ("RFP #12") seeking an Investment and Financial Advisor, that RFP #12 attached and incorporated the CEA "Investment Policies" by reference, and that it required the winning bidder to comply with the limitations set forth within those Policies. See Ex. 6 to Pei Decl. MetWest responded to RFP #12, and on January 15, 1998, CEA and MetWest signed an "Agreement to Provide Services—Investment and Financial Advisor" ("1998 Agreement"). Ex. J to Reidy Decl. at 20, 24. The 1998 Agreement became effective July 1, 1998, and expressly incorporates by reference RFP #12, including the "Investment Policies" and MetWest's response to RFP #12. Id. at 2. Section 1 of the 1998 Agreement, titled "Services to be Performed," states that "CEA staff will manage and direct [MetWest's] activities on a day-to-day basis, under the direction of the Chief Executive Officer, the Chief Financial Officer, or a designee of either." Id. Section 1 also specifies that MetWest shall "initiate investments that meet the criteria set forth in the CEA's Investment Policy." The 1998 Agreement was freely negotiated between the parties. Id. at 10.

    Also applicable to the CEA is California Government Code section 16430, as the statutes creating and governing the CEA explicitly state that "[t]he board [of the CEA]

4

may cause moneys in the fund to be invested and reinvested, from time to time, . . . subject to subdivision (b) of Section 10089.6." Cal. Ins. Code § 10089.22. Section 10089.6 of the California Insurance Code states that "[t]he investments of the authority shall be limited to those securities eligible under Section 16430 of the Government Code." Cal. Ins. Code § 10089.6(b)(1). California Government Code section 16430 provides guidelines as to "[e]ligible securities for the investment of surplus moneys," and contains certain requirements for investments in commercial paper. Cal. Gov't Code §16430(f)(1). Specifically, section 16430(f) provides:

> Eligible securities for the investment of surplus moneys shall be any of the following:
>
> (f)(1) Commercial paper of "prime" quality as defined by a nationally recognized organization that rates these securities, if the commercial paper is issued by a corporation, trust, or limited liability company that is approved by the Pooled Money Investment Board [("PMB")] as meeting the conditions specified in either subparagraph (A) or subparagraph (B):
>
> (A) Both of the following conditions:
>
>     (i) Organized and operating within the United States.
>
>     (ii) Having total assets in excess of five hundred million dollars ($500,000,000).
>
> (B) Both of the following conditions:
>
>     (i) Organized within the United States as a special purpose corporation, trust, or limited liability company.
>
>     (ii) Having programwide credit enhancements including, but not limited to, overcollateralization, letters of credit, or surety bond.
>
> (2) A purchase of eligible commercial paper may not do any of the following:
>
> (A) Exceed 180 days' maturity.
>
> (B) Represent more than 10 percent of the outstanding paper of an issuing corporation, trust, or limited liability company.
>
> (C) Exceed 30 percent of the resources of an investment program.
>
> (3) At the request of the Pooled Money Investment Board, an investment made pursuant to this subdivision shall be

>secured by the issuer by depositing with the Treasurer securities authorized by Section 53651 of a market value at least 10 percent in excess of the amount of the state's investment.

Cal. Gov't Code § 16430.

The parties dispute to what extent the guidelines covering commercial paper investments contained within the "Investment Policies" adopt the requirements of California Government Code section 16430, and to what extent the Investment Policies reference section 16430.  The first "recital" of the 1998 Agreement states: "Pursuant to California Insurance Code section 10089.6, subdivision (b)(1), the CEA is authorized to invest its assets through the purchase, holding, or sale of any investment or financial instruments that is among those securities eligible under Section 16430 of the Government Code."  Ex. J to Reidy Decl. at 2.  The 1998 Agreement states that the Governing Board "represents and warrants that: . . . any instructions or rights CEA gives or grants to [MetWest] under this Agreement will be in accordance with the governing instrument and applicable law."  The Agreement also states that CEA and MetWest agree that "the execution of this Agreement, the acts contemplated by this Agreement, and compliance by [MetWest] with any provisions of this Agreement will not: . . . violate any statute or any judgment, decree, order, regulation, or rule of any court or governmental authority applicable to [MetWest]."  The 1998 Agreement also permitted to CEA to examine and audit MetWest on its performance of the Agreement.  Id. at 10.

In 1997, 2000, 2003, and 2005, CEA's Senior Management Auditor William Liu conducted on-site audits of MetWest to examine its compliance with the "Investment Policies" and the 1998 Agreement.  Liu Dep. at 44:16-25; Liu Decl. ¶ 5.  While these audits were intended to ensure that MetWest's investments were in compliance with the requirements set forth in these documents, Liu states that "not every investment was checked by the CEA's auditors, nor were the investments that were in fact reviewed by the CEA auditors checked against every criterion contained in the Guidelines."  Liu Decl. ¶ 6.  The parties dispute to what extent the audits found MetWest to be in compliance

1    with CEA's Investment Policies and the services to be performed under the 1998
2    contract.  In 2000, the Audit Report concludes that "the controlling process over
3    Metropolitan West Financial is satisfactory."  Ex. P to Reidy Decl.  A "satisfactory" rating
4    means that "the level of internal controls is functioning effectively.  This covers
5    effectiveness and efficiency of operations, reliability of accounting records, compliance
6    with applicable laws and regulations, proper supervision and compliance with policies
7    and procedures.  If audit concerns are noted, they are considered minor in nature."  Id.
8    at 7.
9         Similarly, the audit conducted for the period of June 30, 2002, to December 31,
10   2002, issued a "satisfactory" rating.  Ex. Q to Reidy Decl.  In the Compliance Review
11   Report issued September 30, 2005, MetWest was given an "adequate" rating for the
12   items "Metropolitan West has process in place to update, notify, and execute CEA
13   Investment Policy criteria," and "Metropolitan West has appropriate mechanisms to
14   monitor, detect, and correct any investment policy criteria."  Ex. S to Reidy Decl.  The
15   background information for the 2005 report states that MetWest's "investment
16   responsibilities include initiative investments on a discretionary basis that: (i) follow the
17   guidelines in the CEA Investment Philosophy for both the Liquidity and Mitigation Funds,
18   (ii) meet the Investment criteria in the CEA Investment Policy for both the liquidity
19   Reserve and Mitigation funds . . . ."  Id.  The report defines an "Adequate" rating as "the
20   level of internal controls is functioning effectively.  This covers effectiveness and
21   efficiency of operations, reliability of accounting records, compliance with applicable laws
22   and regulations, proper supervision and compliance with CEA policies and procedures.
23   If audit concerns are noted, they are considered minor in nature and will not distort the
24   information."  Id.
25        The parties further dispute whether the audits took into account MetWest's
26   compliance with section 16430.  The reports are ambiguous on this front, as the reports
27   state they tested compliance with "CEA policies and procedures" and "applicable laws
28   and regulations."  However, section 16430 is not explicitly referenced, and Liu stated in

his declaration that "[n]one of the CEA Audit Division's audits of MetWest tested MetWest's compliance with the statutes that govern the CEA's investments. It was my understanding and belief both then and now that the statutory compliance of the CEA's investments was outside the scope of the Audit Division's mandate, and beyond the expertise of its individual auditors, including me." Liu Decl. ¶ 10. It is therefore disputed to what extent the auditors were aware that MetWest was investing in commercial paper that was not listed on the Pooled Money Investment Board ("PMIB") list of approved commercial paper issuers.

Prior to the Mainsail transaction, MetWest made thousands of investments for the CEA, including multiple commercial paper investments that were not on the PMIB approved list. All of the investments prior to the Mainsail transaction earned a profit for the CEA. It is undisputed that prior to the Mainsail transaction in 2007, CEA never furnished a copy of the PMIB list to MetWest. Additionally, it is undisputed that prior to the Mainsail transaction, CEA never complained about prior non-PMIB approved commercial paper investments. However, the parties dispute to what extent, if at all, CEA was aware that MetWest made these investments, and to what extent, if at all, CFO Tim Richison[4] discussed the PMIB list with anyone at MetWest. Between 1997 and 2007, MetWest routinely sent monthly reports to the CEA, detailing the CEA's month-end investment holdings, the individual investment transactions made on the CEA's accounts during that month, and other statistics and metrics. Richison Decl. ¶ 17. The CEA also obtained daily reports from MetWest showing the CEA's investments, including the CEA's investments in commercial paper. Richison Dep. at 137. However, Richison states that "neither I nor any other CEA staff member was tasked with confirming that the individual investments listed were in compliance with either the CEA Investment Guidelines or California Government Code section 16430. I understood that MetWest

---

[4] As CFO of the CEA, Richison familiarized himself with the CEA's governing statutes and was aware of section 16430 and the limitations it placed on the CEA's investment in commercial paper. Richison was a senior manager who had discretion to direct the activities of MetWest when it came to investments and was a fiduciary to the CEA and the Governing Board.

8

was performing that compliance function . . . ."  Richison Decl. ¶ 17.  Despite receiving these monthly reports, Richison states that "prior to the Mainsail purchase, I was not aware of any commercial paper purchased on the CEA's account that was issued by an issuer that had not been approved by the PMIB, nor was I informed by any of my staff that anyone else at the CEA either knew or suspected that such violations were occurring."  Id. ¶ 22.  The parties dispute to what extent these daily and monthly reports were reviewed, or should have been reviewed, by the CEA for compliance with the applicable statutes.

On August 8, 2007, MetWest invested $63,251,184.84 of the CEA's funds in commercial paper issued by Mainsail.  It is undisputed that Mainsail was not an approved commercial paper issuer named on the PMIB list.  The investment in Mainsail satisfied the requirements of maximum maturity, maximum par value (total portfolio), maximum par value (per name), maximum par value (per maturity), and credit, as listed in the "Investment Policies."  Crow Decl. ¶ 15.  However, following a freeze of Mainsail's assets on August 20, 2007, Mainsail failed to meet its payment obligations to the CEA.  Although some funds were recovered, the CEA ultimately lost millions of dollars as a result of the Mainsail investment.  This lawsuit followed.

## STANDARD

### A.  Motion to Strike

"The Federal Rules of Civil Procedure do not provide for a motion to strike documents or portions of documents other than pleadings.  Rule 12(f) provides that "a court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Natural Res. Def. Council v. Kempthorne, 539 F. Supp. 2d 1155, 1161-62 (E.D. Cal. 2008) (quoting Fed. R. Civ. P. 12(f)).  "A motion to strike is limited to pleadings."  Id. (citing Sidney–Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983)).  "However, a 'motion to strike' materials that are not part of the

pleadings may be regarded as an 'invitation' by the movant 'to consider whether [proffered material] may properly be relied upon.'" Id. at 1162. (quoting United States v. Crisp, 190 F.R.D. 546, 551 (E.D. Cal. 1999)). "Motions to strike are disfavored and infrequently granted." Id.

### B. Summary Judgment

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

///

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.

///

Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

Defendants move for summary adjudication of the CEA's claim for Breach of Contract, to the extent that the claim relies on the CEA's allegation that MetWest's investment in commercial paper issued by Mainsail was unlawful because Mainsail was not an approved issuer listed by the PMIB, as required by section 16430 of the California Government Code. Defendants also move for summary adjudication of their Seventeenth Affirmative Defense of Waiver and Estoppel. The CEA's Cross-Motion likewise seeks summary adjudication on the affirmative defense of Waiver and Estoppel. Defendants also move to strike two declarations submitted in support of the CEA's Opposition and the CEA's Motion. The Court will discuss each issue in turn, below.

### A.   Motion to Strike

Defendants move to strike the identical declarations of the CEA's Chief Financial Officer Timothy Richison ("Richison Declarations") submitted in support of the CEA's opposition to Defendants' Motion, as well as the CEA's Motion. Defendants contend that in the Declarations, Richison states that he did not consult the CEA's attorneys for advice on compliance with section 16430 during the period of 1998 and 2007, and that he and the CEA instead relied on MetWest for such advice. According to Defendants, this statement is false and misleading because MetWest has evidence, obtained through discovery, showing that Richison did in fact consult the CEA's lawyers on compliance questions. Defendants also contend the declaration is improper because it answers a question that Richison refused to answer at deposition on the grounds of attorney-client privilege. Thus, Defendants argue, the entire declaration should be stricken.

Here, the Court declines to strike the Richison Declarations in their entirety, as Defendants fail to show that all statements contained in these Declarations are false.

12

Defendants contest only paragraph 14 of the Richison Declarations. However, the Court also declines to strike paragraph 14, as the Court did not rely on this paragraph in ruling on the merits of the Motions. As such, the Motion to Strike is DENIED AS MOOT.

### B. Breach of Contract Claim

"Under California law, a claim for breach of contract includes four elements: that a contract exists between the parties, that the plaintiff performed his contractual duties or was excused from nonperformance, that the defendant breached those contractual duties, and that plaintiff's damages were a result of the breach." Gentry v. State Farm Mut. Auto. Ins. Co., 726 F. Supp. 2d 1160, 1170 (E.D. Cal. 2010) (citing Reichert v. General Ins. Co., 68 Cal.2d 822, 830 (1968); First Commercial Mortgage Co. v. Reece, 89 Cal. App. 4th 731, 745 (2001)). Here, there is no dispute that a contract existed between the parties, and for purposes of this motion, it is not disputed that the CEA performed its contractual duties. However, the CEA alleges that MetWest breached the 1998 Agreement when it made the Mainsail investment, as that investment was in commercial paper not approved by the PMIB.

Defendants move for summary adjudication on the CEA's theory that MetWest breached the contract by investing in non-PMIB approved commercial paper, arguing that the terms of the 1998 Agreement did not require MetWest to invest only with issuers on PMIB's approved list. Rather, according to Defendants, the plain language of the contract provided different guidelines—the "Investment Policies" governing commercial paper investments—and the undisputed evidence establishes that MetWest complied with those guidelines. Thus, Defendants conclude, the CEA cannot establish that MetWest breached its contractual duties because investing in PMIB-approved commercial paper was not one of MetWest's duties under the 1998 Agreement. Thus, to decide Defendants' Motion, the Court must determine whether the terms of the contract required MetWest's commercial paper investments on behalf of the CEA to be limited by the requirements of section 16430. If the Court finds that, under the terms of the contract, section 16430 did not apply, Defendants' Motion must be granted. If the Court

finds that compliance with section 16430 was a term of the contract, or if it is ambiguous whether this is a contract term, then the Motion must be denied.

There are several clauses of the 1998 Agreement relevant to determining whether MetWest was contractually required to comply with the regulations of commercial paper set forth in section 16430.  First, and perhaps most importantly, under "Background and Recitals," Recital No. 1 states: "Pursuant to California Insurance Code section 10089.6, subdivision (b)(1), the CEA is authorized to invest its assets through the purchase, holding, or sale of any investment or financial instrument that is among those securities eligible under Section 16430 of the Government Code."  Ex. J to Reidy Decl. at 2.  Next, under "Services to be performed" is subsection "A. Investment Services," which states that MetWest will, among other things, "[m]anage assets in the CEA's liquidity Operating Fund and initiate investments that meet the criteria set forth in the CEA's Investment Policy."  Id.  Under "General Provisions," the contract states: "Titles and section headings are not part of this Agreement."  Id. at 8.  Under "Affirmative Promises" is the subsection "A. Permits and Licenses," which states that MetWest

> must observe, comply with, and carry out its duties and responsibilities under this Agreement in accordance with all federal, state, city and county laws, rules, and regulations that affect its services under this Agreement. [MetWest] must procure and keep in effect during the term of this Agreement all permits and licenses necessary to accomplish the services it will furnish under this Agreement.

Id. at 10.  Also under "Affirmative Promises" is the subheading "R. Fiduciary," which states:

> [MetWest] acknowledges it is a fiduciary under this Agreement and as a fiduciary shall discharge its duties and exercise its power with due care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of any enterprise of like character and aims.

Id. at 14.  Additionally, under "Representations and Warranties," the contract contains subsection "C. Agreement Does Not Violate Law," which states: "the execution of this Agreement, the acts contemplated by this Agreement, and compliance by [MetWest] with

14

any provisions of this Agreement will not: (1) violate any provision of the charter documents of [MetWest]; (2) Violate any statute or any judgment, decree, order, regulation, or any court or governmental authority applicable to [MetWest] . . . ." Id. at 16. Additionally, under the "J. Compliance with Laws" subsection of "Representations and Warranties," the contract states: "[MetWest] must comply with all laws applicable to it, including those laws applicable to it specifically because of its relationship to the CEA." Id. Finally, the contract incorporates by reference RFP #12, id., which in turn has the CEA's "Investment Policies" as an attachment.

Defendants contend that the "general provisions on which CEA relies," namely "Permits and Licenses"[5] and "Representations and Warranties,"[6] "do not override the contract terms specifically pertaining to commercial paper investments and providing explicit guidelines for those investments . . . ." Defs. Mot. at 17. The gravamen of Defendants' argument is that because the 1998 Agreement contains specific terms applicable only to commercial paper investments, the other contract terms do not apply to MetWest's investments in commercial paper under the contract.

The language of the contract is ambiguous as to whether, under the contract, section 16430 applied to MetWest's commercial paper investments. While the terms of the contract do not specifically reference section 16430's requirements for investing in commercial paper, and make no reference to the PMIB-approved list of commercial paper issuers, the contract makes multiple references to the need for the contract to abide by applicable laws. "If we find a contract to be ambiguous, we 'ordinarily' are hesitant to grant summary judgment 'because differing views of the intent of parties will

---

[5] "[MetWest] must observe, comply with, and carry out its duties and responsibilities under this Agreement in accordance with all federal, state, city and county laws, rules, and regulations that affect its services under this Agreement. [MetWest] must procure and keep in effect during the term of this Agreement all permits and licenses necessary to accomplish the services it will furnish under this Agreement."

[6] "The execution of this Agreement, the acts contemplated by this Agreement, and compliance by [MetWest] with any provisions of this Agreement will not: (1) violate any provision of the charter documents of [MetWest]; (2) Violate any statute or any judgment, decree, order, regulation, or any court or governmental authority applicable to [MetWest], . . . ."

raise genuine issues of material fact.'" New Line Prods., Inc. v. Little Caesar Enterprises, Inc., 9 F. App'x 658, 662 (9th Cir. 2001) (quoting San Diego Gas & Electric Co. v. Canadian Hunter Marketing Ltd., 132 F.3d 1303, 1307 (9th Cir. 1997)).  Here, the evidence submitted in support of Defendants' Motion and the CEA's Opposition demonstrates that the parties have very different views of their intent at the time of the contract.  There are therefore multitudinous genuine issues of material fact precluding summary adjudication of this issue.

Accordingly, Defendants' motion for summary adjudication on this aspect of the CEA's breach of contract claim is DENIED.

### C. Waiver and Estoppel Defense

Both Defendants and the CEA move for summary judgment on Defendants' affirmative defense of waiver and estoppel.  Generally, Defendants assert that the CEA knew that MetWest made investments that were not compliant with section 16430 and did not complain about these investments to MetWest, and the CEA is therefore estopped from challenging, or waived its right to challenge, the Mainsail investment.  The CEA also moves for summary judgment on this affirmative defense, arguing that because the undisputed evidence shows that the CEA did not know that MetWest had repeatedly made investments that were noncompliant with section 16430, and MetWest repeatedly assured the CEA that is was complying with the law.  Additionally, the CEA argues, it lacked the power to waive MetWest's statutory compliance, and thus any reliance by MetWest on any waiver by the CEA would be unreasonable.

Four elements are necessary to establish estoppel: "1) the party to be estopped must know the facts; 2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; 3) the latter must be ignorant of the true facts; and 4) he must rely on the former's conduct to his injury."  Civic Ctr. Drive Apartments Ltd. P'ship v. Sw. Bell Video Servs., 295 F. Supp. 2d 1091, 1104 (N.D. Cal. 2003) (quoting United States v. King Features Entm't, Inc., 843 F.2d 394, 399 (9th Cir. 1988)).  "Generally, the determination of either waiver or

estoppel is a question of fact . . . ." Platt Pac., Inc. v. Andelson, 6 Cal.4th 307, 319 (1993) (citing (Keating v. Superior Court, 31 Cal.3d 584, 605 (1982); Sawday v. Vista Irrigation Dist., 64 Cal.2d 833, 836 (1966); Albers v. County of Los Angeles, 62 Cal.2d 250, 266 (1965)).

In this case, there are numerous issues of fact precluding the grant of summary judgment on the affirmative defense of waiver and estoppel. First, the evidence submitted in support of the cross-motions make clear that it is disputed whether the CEA knew that MetWest was making investments in commercial paper that was not compliant with section 16430. Furthermore, even assuming that the CEA knew that MetWest was making such investments, the facts as to whether the CEA intended that this conduct would be acted upon, and whether MetWest was ignorant of the true facts, are also in dispute. Accordingly, both MetWest and the CEA's motions for summary adjudication on the affirmative defense of waiver and estoppel are DENIED.

## CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion for Summary Adjudication, ECF No. 133, is DENIED;
2. CEA's Motion for Summary Adjudication, ECF No. 148, is DENIED; and
3. Defendants' Request to Strike, ECF No. 163, is DENIED AS MOOT.

IT IS SO ORDERED.

Dated:  April 11, 2014

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT