1
2
3
4
5
6
7

8               UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11  CALIFORNIA EARTHQUAKE                    No.  2:10-cv-00291 MCE-CMK
    AUTHORITY,
12
                    Plaintiff,
13                                           FINAL PRETRIAL ORDER
             v.
14                                           TRIAL DATE: February 23, 2015
    METROPOLITAN WEST                        TIME: 9:00 a.m.
15  SECURITIES, LLC, et al.,

16                  Defendants.

17

18          Pursuant to Court Order, a Final Pretrial Conference was held on January 20,

19  2015.  Michael Strumwasser, Bryce Gee and Patricia Pei appeared as counsel for

20  Plaintiff.  David Powell, Rosalie Kim, David Reidy and Benjamin Spohn appeared as

21  counsel for Defendants.  After hearing, the Court makes the following findings and

22  orders:

23  I.      JURISDICTION/VENUE

24          Jurisdiction is predicated upon 28 U.S.C. section 1332(a).  Jurisdiction and venue

25  are not contested.

26  II.     JURY

27          Plaintiff timely demanded a jury trial pursuant to Rule 38(b) of the Federal Rules

28  of Civil Procedure.

1

III.     UNDISPUTED FACTUAL ISSUES

      **A.**     **Undisputed Facts Relevant to All Claims and Affirmative Defenses**

            **1)**     **Parties and Key Witnesses**

      1.     The CEA is a not-for-profit public instrumentality of the State of California that provides residential earthquake insurance to Californians.

      2.     The CEA was created by state legislation passed in 1995 and 1996, and commenced operations in December 1996.

      3.     The CEA is overseen by a Governing Board composed of three voting members—the Governor, the State Treasurer, and the State Insurance Commissioner—along with two non-voting members—the Speaker of the Assembly and the Chair of the Senate Rules Committee, all of whom may act through their appointed designees.

      4.     Tim Richison is the CEA's Chief Financial Officer. Mr. Richison has held that position since 1997.

      5.     Daniel Marshall is the CEA's General Counsel. Mr. Marshall has held that position since 1997.

      6.     Mark Dawson was the CEA's Assistant Chief Financial Officer from 2002 to 2013.

      7.     William Liu was the CEA's Senior Management Auditor from 1998 to 2006.

      8.     MetWest was a private investment management firm incorporated in California in 1992.

      9.     In 2004, MetWest was acquired by Wachovia Corporation. Between 2004 and 2008, MetWest operated as a subsidiary of Wachovia Bank, which was itself a subsidiary of Wachovia Corporation. During that period, MetWest also operated under the names Wachovia Portfolio Services and Wachovia Global Securities Lending.

      10.     In 2008, Wachovia Corporation was acquired by Wells Fargo & Company.

      11.     Tom Hayes was the California State Treasurer from 1989 to 1991, and the California State Director of Finance from 1991 to 1993. In 1993, Mr. Hayes became the President of MetWest until his retirement in 2002. In 2002 Mr. Hayes entered into a

1    personal services contract with MetWest to continue providing financial advice to the
2    CEA.

3        12.    Russell Gould was Assistant California State Treasurer under Tom Hayes
4    in 1989. Mr. Gould later became State Director of Finance from 1993 to 1996. In 1996,
5    Mr. Gould joined MetWest, where he worked until Wells Fargo & Company acquired
6    Wachovia Corporation (and MetWest) in 2008.

7        13.    Terry Crow was MetWest's Chief Investment Officer from 1994 until his
8    retirement in 2008.

9        14.    Richard Chen was MetWest's Credit Analyst from 2002 until 2011.

10       15.    Cherry Zhang was a MetWest Associate Portfolio Manager from 2007 to
11    2008.

12               **2)    The Mainsail Investment**

13       16.    Between 1996 and 2008, MetWest was authorized to invest certain funds
14    for the CEA pursuant to a series of contracts.

15       17.    During this time, the CEA's investment portfolio was divided into anywhere
16    between two and eight different funds, depending on the time in question. Those funds
17    were: (1) the Liquidity Fund, (2) the Primary Fund, (3) the Loss Mitigation Fund, (4) the
18    Supplemental Fund, (5) the Supplemental Reinsurance Fund, (6) the Claims Paying
19    Fund, (7) the Supplemental Claims Paying Fund, and (8) the Cost of Issuance Fund.
20    Responsibility for investing these funds was distributed among several different asset
21    managers, including MetWest.

22       18.    MetWest maintained an internal list of pre-approved A1/P1-rated asset-
23    backed commercial paper ("ABCP") for investment on behalf of its clients.

24       19.    On July 17, 2006, Richard Chen added Mainsail II LLC ("Mainsail") to
25    MetWest's approved A1/P1 ABCP list.

26       20.    Mainsail was a type of investment vehicle that issued asset-backed
27    commercial paper. Mainsail was incorporated in Delaware. Its co-issuer, Mainsail II Ltd.,
28    was a company based in the Cayman Islands that held certain assets backing the

1  obligations that Mainsail issued. Mainsail was managed by Solent Capital Partners LLP,

2  a hedge fund based in the United Kingdom.

3       21.    Mainsail remained on MetWest's approved A1/P1 ABCP list until August

4  20, 2007.

5       22.    Evergreen Investment Management Company, LLC ("Evergreen") was

6  another private investment management firm that became a subsidiary of Wachovia

7  Bank in 2001.

8       23.    Evergreen maintained its own list of approved commercial paper for

9  investment on behalf of its clients.

10       24.    Evergreen added Mainsail to its approved commercial paper list no later

11  than September 30, 2006.

12       25.    Evergreen removed Mainsail from its approved commercial paper list no

13  later than March 6, 2007. Following its removal, Mainsail was never reinstated to that list.

14       26.    The Pooled Money Investment Account ("PMIA") is an account through

15  which the California State Treasurer invests certain state funds. The PMIA is governed

16  by the Pooled Money Investment Board ("PMIB"), which consists of the State of

17  California's Treasurer, Controller, and Director of Finance.

18       27.    The PMIB maintains a list of "Approved Commercial Paper Issuers" (the

19  "PMIB List").

20       28.    Mainsail was not named on the PMIB List.

21       29.    On July 9, 2007, Cherry Zhang, in her capacity as a MetWest Associate

22  Portfolio Manager, executed an investment of $44,253,308.75 of the CEA's funds in

23  asset-backed commercial paper issued by a company called Rhineland Funding Capital

24  Corporation ("Rhineland"). The investment was made in three separate purchases of 30-

25  day paper in the amounts of $29,867,250.00, $11,946,900.00, and $2,439,158.75 from

26  the CEA's Liquidity Fund, Claims Paying Fund, and Supplemental Claims Paying Fund,

27  respectively.

28  *///*

30.     The CEA's Rhineland investment matured on August 8, 2007. On that date, the CEA received payments from Rhineland of $30,000,000.00, $12,000,000.00, and $2,450,000.00 to its Liquidity Fund, Claims Paying Fund, and Supplemental Claims Paying Fund, respectively.

31.     On August 8, 2007, Cherry Zhang, in her capacity as a MetWest Associate Portfolio Manager, executed an investment of $62,251,184.84 of the CEA's funds in asset-backed commercial paper issued by Mainsail. The investment was made in three separate purchases: two pieces of 33-day paper were purchased in the amounts of $47,859,700.42 (from the Liquidity Fund) and $11,940,050.00 (from the Claims Paying Fund), and one piece of 23-day paper was purchased in the amount of $2,451,434.42 (from the Supplemental Claims Paying Fund).

32.     On August 20, 2007, Mainsail announced it was winding down its operations.

33.     Mainsail defaulted on its payments to the CEA when the CEA's investments matured on August 31, 2007, and September 10, 2007. The CEA was supposed to receive $2,460,000.00 (to the Supplemental Claims Paying Fund) on August 31, 2007, and two payments of $48,100,000.00 (to the Liquidity Fund) and $12,000,000.00 (to the Claims Paying Fund) on September 10, 2007, for a total of $62,560,000.00.

34.     Of the $62,251,184.84 of CEA funds that MetWest invested in Mainsail, the CEA ultimately recovered $16,054,132.55 of its lost principal in a series of payments as follows: $11,031,734.12 received on September 24, 2008; $4,074,776.16 received on September 30, 2008; and $910,359.64 received on November 1, 2012. There is no expectation of any further payments from Mainsail. The CEA's net loss of principal on Mainsail is $46,197,052.29.

///

///

///

**B.    Undisputed Facts Relevant to Specific Claims**

    **1)    Breach of Contract**

35.    MetWest first became involved with the CEA in 1995 through a contract with the California Department of Insurance (the "1995 Contract").

36.    MetWest subsequently entered into a second contract with the California Department of Insurance in 1996 (the "1996 Contract").

37.    On October 7, 1996, the CEA's Governing Board voted unanimously to adopt the CEA's Investment Policies. The proposed Investment Policies were presented to the Governing Board by Terry Crow and Russell Gould of MetWest at that October 7, 1996, meeting.

38.    The CEA's Investment Policies contain certain guidelines for commercial paper investments made on behalf of the CEA.

39.    On or around September 12, 1997, the CEA issued a Request for Proposal ("RFP") seeking applicants to contract with the CEA to be its Investment and Financial Advisor.

40.    On or around, October 17, 1997, MetWest sent the CEA a proposal in response to its RFP, which the CEA subsequently accepted.

41.    On January 15, 1998, the CEA and MetWest entered into a contract to provide investment and financial advisory services to the CEA, titled "Agreement to Provide Services—Investment and Financial Advisor" (the "1998 Contract"), to go into effect July 1, 1998. The 1998 Contract incorporated by reference the RFP, including the CEA's Investment Policies, as well as MetWest's response to the RFP.

42.    The 1998 Contract was freely negotiated between the parties.

43.    The 1998 Contract governed the relationship between the parties from 1998 to 2008, when MetWest ceased to provide services for the CEA.

44.    Plaintiff's Exhibit No. 40 (Bates-numbered CEA0000347-71) is a true and correct copy of the 1998 Contract that governed the CEA-MetWest relationship from 1998 to 2008.

1       45.    There were five subsequent amendments to the 1998 Contract made in April 1998, June 1998, April 2002, August 2004, and August 2006. All of these amendments were also made in writing. None of the contract amendments is material to the present dispute.

**2)    Breach of Fiduciary Duty**

46.    In its role as investment and financial advisor to the CEA, MetWest owed the CEA a fiduciary duty.

**3)    Constructive Fraud**

47.    In its role as investment and financial advisor to the CEA, MetWest owed the CEA a fiduciary duty.

**C.    Undisputed Facts Relevant to Defendants' Affirmative Defenses**

48.    Between 1997 and 2008, MetWest sent the CEA daily holdings reports that summarized the investments held in those CEA funds that were under MetWest's management.

49.    Between 1996 and 2008, MetWest sent the CEA monthly reports that detailed the CEA's month-end investment holdings, the individual investment transactions that MetWest made on the CEA's accounts during that month, and other statistics and metrics.

50.    The 1998 Contract permitted the CEA to examine and audit MetWest on its performance under that contract.

51.    Between 1997 and 2005, the CEA's Senior Management Auditor William Liu conducted four audits of MetWest in 1997, 2000, 2003, and 2005.

52.    The first audit of MetWest in 1997 identified one concern related to a discrepancy between investment maturities and the CEA's Investment Policies, which was subsequently resolved.

53.    The 2000 and 2003 audits of MetWest concluded that MetWest's internal controls were "satisfactory." The 2005 audit of MetWest concluded that MetWest's internal controls were "adequate."

54.     Prior to August 8, 2007, MetWest had purchased commercial paper for the CEA from issuers that were not on the PMIB List at the time such purchases were made.

55.     Prior to August 8, 2007, the CEA had never provided a copy of the PMIB List to MetWest.

IV.     <u>DISPUTED FACTUAL ISSUES</u>

The remaining claims for trial are:

**A.      The CEA's Disputed Facts**

**1)      Facts Relevant to All Claims & Defenses**

1.     The CEA was established by legislation that imposed strict limits on the size of its staff.

2.     The CEA's enabling legislation provided for it to contract with outside vendors for expertise in certain areas, including private money managers to handle the CEA's investments.

3.     At all times that it was providing investment services to the CEA, MetWest had discretionary authority to make investments on the CEA's behalf without the CEA's prior approval.

4.     The CEA reasonably and invariably relied on MetWest's advice and recommendations on investment decisions.

5.     MetWest did not inform the CEA of the Mainsail investment before making the purchase on the CEA's behalf.

6.     Prior to the Mainsail investment, the CEA was never aware that MetWest was purchasing commercial paper for its account from issuers that were not approved by the PMIB.

**a.      MetWest Was Responsible for the CEA's Investment Policies**

7.     Under the 1995 Contract, MetWest provided advice related to the initial establishment and design of the CEA.

8.     Under the 1996 Contract, MetWest continued to provide the same services set forth in the 1995 Contract. The 1996 Contract also required MetWest to take on a

1   number of additional duties, including formulating investment guidelines for the CEA and

2   assisting the CEA in the selection of a Chief Financial Officer.

3         9.      Pursuant to the 1996 Contract, MetWest drafted the CEA's written

4   Investment Policies and presented them to the CEA's Governing Board on October 7,

5   1996, recommending their approval.

6         10.     The Investment Policies adopted by the CEA's Governing Board at that

7   October 7, 1996 meeting were the ones drafted and presented by MetWest.

8                       **b.      MetWest's Investment of CEA Funds in Mainsail Was Illegal**

9         11.     The CEA is subject to California Insurance Code § 10089.6(b)(1), which

10  limits the CEA's investments "to those securities eligible under Section 16430 of the

11  Government Code."

12        12.     California Government Code § 16430 also governs the investments of the

13  PMIA.

14        13.     California Government Code § 16430(f) requires investments in

15  commercial paper to be made from issuers that have been approved by the PMIB.

16        14.     The PMIB maintains a list of commercial paper issuers it has approved, as

17  contemplated by California Government Code § 16430(f).

18        15.     Under California Insurance Code § 10089.6(b)(1) and California

19  Government Code § 16430(f), the CEA's funds may only be invested in commercial

20  paper from issuers that have been approved by the PMIB.

21        16.     Mainsail was never a PMIB-approved commercial paper issuer.

22        17.     Because Mainsail was not and had never been approved by the PMIB,

23  MetWest's purchase of Mainsail for the CEA in August 2007 was not in compliance with

24  California Government Code § 16430.

25                       **c.      Mainsail Was Risky**

26        18.     The CEA was an extremely conservative investor whose priority was safety

27  of principal above all else.

28  *///*

19.    Mainsail was a type of investment vehicle known as a structured investment vehicle–lite, or "SIV-lite."

20.    In 2007, SIV-lites were novel, untested financial instruments.

21.    The structure and design of SIV-lites made them inherently risky and unstable instruments.

22.    Mainsail possessed additional characteristics that made it particularly risky, even  among SIV-lites.

23.    Mainsail was backed by assets that were themselves backed primarily by subprime mortgages.

24.    As the market for housing and subprime mortgages steadily deteriorated in 2006 and 2007, there were ample warning signs that SIV-lites generally, and Mainsail in particular, were coming under increasing pressure and were at heightened risk of collapsing.

25.    On August 8, 2007, Mainsail was an extremely risky investment that was fundamentally unsuitable for the CEA.

   **2)**  **Facts Relevant to the CEA's Causes of Action**

     **a.**  **Breach of Contract**

26.    MetWest's retention by the California Department of Insurance and, later, the CEA, was based in significant part on MetWest's perceived and advertised expertise in, and experience with, California government finance and, in particular, the laws governing government finance.

27.    MetWest represented to the CEA that the Investment Policies it had drafted for the CEA in 1996 were designed to correspond to and comply with the restrictions of California Government Code § 16430.

28.    Under the 1998 Contract, MetWest was obligated to invest the CEA's funds in accordance with California Government Code § 16430.

29.    From  1996 through 2007, MetWest made numerous representations to the CEA and others that it had special expertise in managing investments for government

1   entities, including expertise in complying with the laws that governed the investments of

2   those entities.

3       30.     From 1996 through 2007, the CEA made numerous statements to MetWest

4   confirming that the CEA expected MetWest to comply with California Government Code

5   § 16430 when investing the CEA's money.

6       31.     From 1996 through 2007, MetWest made numerous representations to the

7   CEA that it was in fact complying with California Government Code § 16430 when it

8   invested the CEA's money.

9       32.     From 1996 through 2007, MetWest regularly advised the CEA about the

10  legal compliance of the CEA's investments. When questions arose about the compliance

11  of the CEA's investments with state statutes, including California Government Code §

12  16430, the CEA routinely turned to MetWest for the answers, and deferred to MetWest's

13  advice and judgment on these matters.

14      33.     From 1996 through 2007, MetWest was aware that the CEA was deferring

15  to MetWest's advice and judgment about the compliance of its investments with the law,

16  including compliance with California Government Code § 16430.

17      34.     From 1996 through 2007, the CEA relied on MetWest to ensure its

18  investments complied with the law, including California Government Code § 16430.

19      35.     From 1996 through 2007, MetWest was aware that the CEA was relying on

20  MetWest to ensure the statutory compliance of the CEA's investments.

21      36.     The Mainsail investment was a breach of the 1998 Contract because, inter

22  alia, Mainsail was not an issuer approved by the PMIB, and therefore did not comply

23  with California Government Code § 16430.

24      37.     Under the 1998 Contract, MetWest was obligated to invest the CEA's funds

25  in accordance with the CEA's extremely conservative, safety-first investment philosophy.

26      38.     Between 1996 and 2007, the CEA repeatedly instructed MetWest to invest

27  the CEA's funds in accordance with the CEA's extremely conservative, safety-first

28  investment philosophy.

39.     Between 1996 and 2007, MetWest made numerous statements to the CEA acknowledging the CEA's extremely conservative, safety-first investment philosophy.

40.     The Mainsail investment was a breach of the 1998 Contract because Mainsail was not a safe and conservative investment in August 2007.

41.     MetWest acted negligently or with reckless disregard of its contractual duties when it breached the 1998 Contract.

42.     MetWest's purchase of Mainsail for the CEA was a substantial factor in causing the CEA to lose $46,197,052.29 in lost principal, exclusive of other damages and costs the CEA is entitled to, such as prejudgment interest and attorneys' fees. (See infra Section VI, "Relief Sought.")

### b.     Breach of Fiduciary Duty

43.     MetWest was aware of the statutory restrictions on CEA investments, including California Government Code § 16430's limitations on eligible securities for the CEA.

44.     MetWest was aware of the CEA's conservative investment philosophy and knew it was required to make investments for the CEA in accordance with that philosophy.

45.     MetWest knew, or should have known, about the problems in the housing and subprime markets as they were occurring in 2006 and 2007.

46.     MetWest knew, or should have known, about the problems being experienced by structured securities backed by housing- and subprime-related investments in 2006 and 2007.

47.     In 2006-2007, MetWest knew, or should have known, that it should take steps to reduce its clients' exposure to housing- and subprime-related investments.

48.     In the first half of 2007, MetWest knew, or should have known, its affiliate, Evergreen, was taking steps to reduce its own clients' exposure to housing- and subprime-related investments, including removing the names of certain issuers from its approved commercial paper list.

12

49.     MetWest had access to Evergreen's research, including Evergreen's approved commercial paper list and the names of commercial paper issuers like Mainsail that Evergreen had deemed too risky for its clients.

50.     MetWest had notice that Evergreen had removed certain commercial paper issuers from its own approved list in early 2007 based on those issuers' exposure to subprime assets.

51.     Nevertheless, MetWest did not remove Mainsail from its own approved commercial paper list until after Mainsail's collapse.

52.     In 2006-2007, MetWest did not have adequate procedures or resources for reviewing investments before they were approved for its clients.

53.     In July 2006, Richard Chen did not conduct an adequate analysis of the Mainsail vehicle before adding it to the list of approved investments for MetWest's clients.

54.     In 2006-2007, MetWest did not have adequate procedures or resources for monitoring investments once they had been approved for its clients.

55.     In 2006-2007, Richard Chen did not adequately monitor Mainsail while it remained on the list of approved investments for MetWest's clients, and failed to respond appropriately to changes in Mainsail's condition and market circumstances generally.

56.     In 2007, MetWest did not have adequate procedures or resources for selecting suitable investments for individual clients' accounts.

57.     In 2007, MetWest did not make available to its Associate Portfolio Managers sufficient analytical tools and information to select suitable investments for MetWest's clients.

58.     In 2007, Cherry Zhang did not have adequate knowledge about the investments she was selecting and purchasing for MetWest's clients, including the CEA.

59.     In 2007, Cherry Zhang did not exercise sufficient discretion in selecting and purchasing investments for MetWest's clients, including the CEA.

13

1   ///

2   60.     Rhineland was heavily invested in housing- and subprime-related assets.

3   At the end of July, it became clear that Rhineland was experiencing significant problems

4   because of the steep decline in value of those assets. On July 30, 2007, a German

5   state-owned bank was forced to step in to bail out Rhineland's manager, IKB Deutsche

6   Industriebank, in order to prevent Rhineland from collapsing and defaulting on its ABCP

7   payments to investors like the CEA.

8   61.     The proceeds from the CEA's Rhineland investment that matured on

9   August 8, 2007 were then reinvested in Mainsail and comprise part of the principal the

10   CEA later lost.

11   62.     By investing the CEA in Mainsail—an investment that was both illegal for

12   the CEA to own and unsuitable under the CEA's investment policy—MetWest failed to

13   act as a reasonably careful investment manager would have acted under the same or

14   similar circumstances, and thereby breached its fiduciary duty to the CEA.

15   63.     MetWest's purchase of Mainsail for the CEA was a substantial factor in

16   causing the CEA to lose $46,197,052.29 in lost principal and other damages and costs

17   the CEA is entitled to, such as prejudgment interest and attorneys' fees. (See infra

18   Section VI, "Relief Sought.")

19   64.     In breaching its fiduciary duty to the CEA, MetWest acted with oppression,

20   fraud, or malice.

21   **c.     Constructive Fraud**

22   65.     Under the 1998 Contract, MetWest was obligated to invest the CEA's funds

23   in accordance with California Government Code § 16430.

24   66.     Between 1996 and 2007, MetWest made numerous representations to the

25   CEA that it was complying with California Government Code § 16430 when it invested

26   the CEA's money.

27   67.     Between 1996 and 2007, MetWest made numerous representations to the

28   CEA that MetWest was making investments for the CEA in accordance with the CEA's

14

1   extremely conservative, safety-first investment philosophy.

2       68.    MetWest failed to disclose material information about Mainsail to the CEA

3   prior to purchasing that investment for the CEA.

4       69.    MetWest intended for the CEA to rely on these representations and

5   omissions.

6       70.    The CEA did in fact reasonably rely on these representations and

7   omissions.

8       71.    The Mainsail investment did not comply with California Government Code

9   § 16430 because Mainsail was not an issuer approved by the PMIB. MetWest failed to

10  disclose to the CEA that Mainsail did not comply with California Government Code §

11  16430 prior to purchasing Mainsail for the CEA.

12      72.    Mainsail was also a risky investment with high subprime exposure that was

13  inconsistent with the CEA's extremely conservative, safety-first investment philosophy.

14  MetWest failed to disclose to the CEA any of the risk factors of Mainsail prior to

15  purchasing Mainsail for the CEA.

16      73.    The CEA's reliance on MetWest's representations and omissions was a

17  substantial factor in causing harm to the CEA in the form of the loss on its Mainsail

18  investment.

19      74.    In committing constructive fraud against the CEA, MetWest acted with

20  oppression, fraud, or malice.

21          **3)    Facts Relevant to MetWest's Affirmative Defenses**

22      75.    Prior to the Mainsail failure, the CEA had no knowledge that MetWest was

23  purchasing investments on its behalf that were not compliant with California Government

24  Code § 16430, and specifically, had no knowledge that MetWest was purchasing

25  commercial paper from issuers that had not been approved by the PMIB.

26      76.    At no time prior to the Mainsail failure did the CEA intentionally relinquish

27  its right to have MetWest invest its funds in compliance with the law, including California

28  Government Code § 16430.

1    ///

2        77.    At no time prior to the Mainsail failure did the CEA act in a way that would

3    have led MetWest to believe that MetWest did not have to comply with the law, including

4    California Government Code § 16430, when making investments for the CEA.

5        78.    At no time prior to the Mainsail failure did the CEA intend to lead MetWest

6    to believe that MetWest did not have to comply with the law, including California

7    Government Code § 16430, when making investments for the CEA.

8        79.    From 1996 to 2008, MetWest was at all times aware that it was required to

9    comply with the law when making investments for the CEA.

10       80.    At no time prior to the Mainsail failure did MetWest reasonably rely on the

11   CEA's conduct to make investments not compliant with the law.

12

13       **B.    MetWest's Disputed Facts Relevant to Plaintiff's Claims and
            Defendants' Affirmative Defenses**

14       1.    The CEA did not suffer any injuries caused by any improper or illegal

15   actions by Defendants.

16       2.    Defendants made all investments for the CEA, including the Mainsail

17   investment, at the CEA's direction and with the CEA's permission, and did not act

18   unlawfully or recklessly, make high-risk investments, disregard or breach the guidelines

19   governing permissible CEA investments.  At the time of the Mainsail investment, market

20   indicators showed that Mainsail was a safe and suitable investment for the CEA.

21       3.    The 1998 Contract that governed Defendants' services for the CEA did not

22   require Defendants to comply with Insurance Code § 10089.6 or Government Code §

23   16430.

24       4.    The Investment Policies incorporated into the 1998 Contact did not require

25   commercial paper investments to comply with Section 16430, or to be separately

26   approved by the PMIB.

27       5.    The Investment Guidelines as to Asset Backed Commercial Paper

28   ("ABCP") such as Mainsail, incorporated the criteria for such investments from Section

16

1    16430 and thereby complied with PMIB approval guidelines.

2        6.     Neither the State Insurance Commissioner, nor any other State official

3    empowered to notify the CEA that its ABCP Guidelines or specific ABCP investments

4    violated Section 16430, ever did so.

5        7.     The 1998 Contract was freely negotiated between the parties, and the

6    Investment Policies incorporated therein were prepared for the CEA at the CEA's

7    direction, and were adopted by the CEA's Governing Board.

8        8.     At the time the 1998 Contract was agreed to, and in the years that followed

9    prior to Mainsail, it was the parties' intention that if an investment complied with the

10   Guidelines then that investment was proper, and indeed the 1998 Contract provided

11   Defendants with a representation by the CEA's Governing Board that it would not be

12   deemed to have acted unlawfully or in breach provided it acted pursuant to the 1998

13   Contract and according to the instructions given by the CEA.

14       9.     Pursuant to the 1998 Contract, Defendants provided daily, monthly and

15   other periodic reports that listed the investments made for the CEA, and these reports for

16   August 2007 contained the Mainsail investment which was ratified and approved by the

17   CEA.

18       10.    At all relevant times the CEA had the authority under the 1998 Contract to

19   instruct Defendants to divest the CEA of any investment made on its behalf, including

20   Mainsail, and could have done so on a daily basis as it obtained the reports listing the

21   investments made on that day.

22       11.    MetWest's investment in Mainsail satisfied the criteria of the Investment

23   Policies and Guidelines applicable to ABCP, as approved by the CEA's Governing

24   Board.  At all times relevant to this action, the CEA knew that Defendants did not select

25   ABCP investments from any list issued by the PMIB, and the CEA accepted, ratified and

26   approved this course of dealing over a decade-long period.

27       12.    Under the 1998 Contract and applicable law, the CEA—and specifically its

28   Chief Financial Officer Tim Richison, and General Counsel Daniel Marshall—assumed

17

1   full responsibility for ensuring that the CEA's investments and other conduct complied

2   with Section 16430 and the CEA's other governing statutes;  Defendants assumed no

3   compliance duty to the CEA with regard to its governing statutes and neither the CEA

4   nor Mr. Richison or Mr. Marshall, was permitted to "outsource" or delegate its/his

5   fiduciary or legal responsibilities in this regard to any outside third party, including to any

6   of the Defendants.

7       13.    Defendants were not engaged to provide legal compliance advice to the

8   CEA.

9       14.    Defendants did not instruct the CEA to retain its holdings in Mainsail

10  because such a decision was solely the CEA's to make.

11      15.    The CEA did not detrimentally rely on any representation by Defendants

12  that the CEA should retain its holdings in Mainsail.

13      16.    Defendants did not make any representation to the CEA that caused the

14  CEA not to sell the Mainsail investment when it could have recouped some of its losses.

15      17.    The CEA did not suffer any damages as a result of the fact that Mainsail

16  did not appear on any PMIB list.

17      18.    Prior to the Mainsail investment, the CEA did not inform Defendants that

18  they were restricted to purchasing ABCP from issuers that were identified on a PMIB list.

19      19.    At all relevant times, the CEA had actual knowledge of the fact that

20  Defendants had purchased ABCP for the CEA from issuers that were not identified on

21  the PMIB List for the corresponding month.

22      20.    The 1998 Contract permitted CEA to examine and audit Defendants on

23  their "performance of [the 1998 Contract]," and Defendants' compliance was also

24  "monitored and reviewed continually by the Chief Financial Officer" pursuant to the

25  Investment Policy.

26      21.    In addition to receiving and reviewing daily and monthly reports that

27  allowed CEA to check Defendants' investment activity for compliance against the PMIB

28  list or any other requirement, the CEA also regularly conducted extensive audits of

1    Defendants.

2        22.    In 2000, 2003 and 2005, the CEA's senior auditor William Liu conducted

3    on-site audits of Defendants to examine compliance with both the Investment Policy and

4    the 1998 Contract.

5        23.    Each time it audited Defendants, the CEA found them to be in full

6    compliance with CEA's Investment Policy and the 1998 Agreement and gave

7    Defendants full "satisfactory" ratings.

8        24.    During the audits, CEA reviewed all commercial paper investments, many

9    of which were not PMIB-listed during a particular audit period, yet none of the audits

10   mentioned a PMIB list and the CEA never complained that ABCP investments were not

11   on a PMIB list, or otherwise non-compliant with the 1998 Contract or the CEA's

12   governing statutes.

13       25.    There was nothing that prevented CEA from knowing that non-PMIB listed

14   investments had been made, and indeed the CEA has admitted that it could have

15   compared its commercial paper investments to the PMIB list at any time because it

16   always had access to the PMIB list and the regular reports received from Defendants.

17       26.    At no time prior to the August 2007 Mainsail transaction, or indeed for

18   months thereafter, did the CEA ever mention a "PMIB list" to Defendants, or furnish

19   Defendants with a copy of such a list, or provide any instructions related to such a list.

20       27.    Defendants relied on the audits, and on the CEA's conduct, when it

21   continued to make investments consistent with its prior practice and when it continued to

22   make investments that were not PMIB-listed or that might not have complied with the

23   CEA's governing statutes.

24       28.    Had Defendants been told that ABCP investments that were not PMIB-

25   listed, or otherwise compliant with Section 16430, constituted a breach of the 1998

26   Contract, Defendants would have acted differently and would not have purchased

27   Mainsail.

28       29.    At all relevant times, the parties believed that compliance with the ABCP

19

1    Guidelines constituted compliance with any requirement for PMIB approval.

2            30.    As long as Defendants' investments for the CEA were profitable, the CEA

3    never accused Defendants of breaching the 1998 Agreement by purchasing commercial

4    paper not on PMIB's approved list.

5            31.    The scope of the CEA's audits of Defendants encompassed MetWest's

6    compliance with the 1998 Contract and, specifically, the Investment Policies.

7            32.    Prior to the Mainsail investment, the CEA profited from, and retained the

8    profits of, every ABCP investment that Defendants made for the CEA from issuers that

9    were not identified on the PMIB List for the corresponding month, or that otherwise might

10   not have complied with the CEA's obligations under its governing statutes, including

11   Section 16430.

12           33.    At all relevant times, and currently, the parties had and have substantially

13   equal economic strength.

14           34.    At all relevant times, the CEA employed an in-house legal team, led by

15   General Counsel Daniel Marshall, as well at outside counsel at the Orrick and

16   Strumwasser law firms, whose job it was to provide legal, statutory and compliance

17   advice to the CEA, and to ensure that the CEA complied with all applicable laws.

18           35.    At all relevant times, the CEA assumed all responsibility for complying with

19   its governing statutes and all applicable laws.

20           36.    Any erroneous belief by Defendants that investments were not required to

21   separately comply with governing statutes was an excusable legal and/or factual

22   mistake.

23           37.    As the CEA knew, Defendants were not law firms; they employed no

24   attorneys; and they were not engaged by the CEA to provide legal advice, including

25   without limitation statutory interpretation or compliance advice.

26           38.    The CEA relied on its attorneys for advice regarding its compliance with all

27   governing statutes.

        All issues of fact remaining in dispute are subject to proof at the time of trial.

28

1    ///

2    V.      WITNESSES

3           Plaintiff anticipates calling the witnesses listed on Attachment "A".

4           Defendants anticipate calling the witnesses listed on Attachment "B".

5           Each party may call a witness designated by the other.

6           A.      No other witnesses will be permitted to testify unless:

7                   (1)     The party offering the witness demonstrates that the witness is for

8    the purpose of rebutting evidence which could not be reasonably anticipated at the Final

9    Pretrial Conference, or

10                  (2)     The witness was discovered after the Final Pretrial Conference and

11   the proffering party makes the showing required in "B" below.

12          B.      Upon the post-pretrial discovery of witnesses, the attorney shall promptly

13   inform the Court and opposing parties of the existence of the unlisted witnesses so that

14   the Court may consider at trial whether the witnesses shall be permitted to testify.  The

15   evidence will not be permitted unless:

16                  (1)     The witnesses could not reasonably have been discovered prior to

17   pretrial;

18                  (2)     The Court and opposing counsel were promptly notified upon

19   discovery of the witnesses;

20                  (3)     If time permitted, counsel proffered the witnesses for deposition;

21                  (4)     If time did not permit, a reasonable summary of the witnesses'

22   testimony was provided by opposing counsel.

23   VI.     EXHIBITS - SCHEDULES AND SUMMARIES

24          At present, Plaintiff contemplates by way of exhibits those listed on Attachment

25   "C".

26          At present, Defendants contemplate by way of exhibits those listed on Attachment

27   "D".

28          **Plaintiff's exhibits shall be listed numerically.   Defendants' exhibits shall be**

1    **listed alphabetically.**  The parties shall use the standard exhibit stickers provided by

2    the Court Clerk's Office:  pink for Plaintiff and blue for Defendants.  After three letters,

3    note the number of letters in parenthesis (i.e., "AAAA(4)" to reduce confusion during the

4    trial.  All multi-page exhibits shall be stapled or otherwise fastened together and each

5    page within the exhibit shall be numbered.  All photographs shall be marked individually.

6    The list of exhibits shall not include excerpts of depositions which may be used to

7    impeach witnesses.

8            Each party may use an exhibit designated by the other.  In the event that Plaintiff

9    and Defendants offer the same exhibit during trial, that exhibit shall be referred to by the

10   designation the exhibit is <u>first</u> <u>identified</u>.  The Court cautions the parties to pay attention

11   to this detail so that all concerned, including the jury, will not be confused by one exhibit

12   being identified with both a number and a letter.

13           A.      No other exhibits will be permitted to be introduced unless:

14                   (1)      The party proffering the exhibit demonstrates that the exhibit is for

15   the purpose of rebutting evidence which could not be reasonably anticipated at the

16   Pretrial Scheduling Conference, or

17                   (2)      The exhibit was discovered after the Pretrial Scheduling Conference

18   and the proffering party makes the showing required in paragraph "B", below.

19           B.      Upon the post-pretrial discovery of exhibits, the attorneys shall promptly

20   inform the Court and opposing counsel of the existence of such exhibits so that the

21   Court may consider at trial their admissibility.  The exhibits will not be received unless

22   the proffering party demonstrates:

23                   (1)      The exhibits could not reasonably have been discovered prior to

24   pretrial;

25                   (2)      The Court and counsel were promptly informed of their existence;

26                   (3)      Counsel forwarded a copy of the exhibit(s) (if physically possible) to

27   opposing counsel.  If the exhibit(s) may not be copied, the proffering counsel must show

28   that he has made the exhibit(s) reasonably available for inspection by opposing counsel.

1    ///

2           C.      As to each exhibit, each party is ordered to exchange a copy identical to

3    the Court's copy, or other reproduction of the exhibit(s) in a three-ring binder(s) by

4    **February 9, 2015**.  The attorney or representative for each party is directed to present

5    the original and two (2) copies of the exhibit(s) and exhibit list to the Court Clerk's Office,

6    no later than **3:00 p.m., February 9, 2015**, or at such earlier time as may be ordered by

7    the Court.  **NO EXCEPTIONS.**

8           D.      **The Court shall be presented with a copy of the exhibit(s) in a 3-ring**

9    **binder(s) with a side tab identifying each exhibit by number or letter.  Each binder**

10   **shall be no larger than three inches in width and have an identification label on the**

11   **front and side panel.**

12   VII.    DISCOVERY DOCUMENTS

13          A.      Filing Depositions.  It is the duty of counsel to ensure that any deposition

14   which is to be used at trial has been lodged with the Clerk of the Court.  In addition, two

15   unmarked copies of the transcripts must be delivered to the Court Clerk's Office.

16   Counsel are cautioned that a failure to discharge this duty may result in the Court

17   precluding use of the deposition or imposition of such other sanctions as the Court

18   deems appropriate.

19          B.      Use of Depositions.  The parties are ordered to file with the Court and

20   exchange between themselves by **February 9, 2015** a statement designating portions of

21   depositions intended to be offered or read into evidence (except for portions to be used

22   only for impeachment or rebuttal).

23          C.      Interrogatories.  The parties are ordered to file with the Court and

24   exchange between themselves by **February 9, 2015** the portions of Answers to

25   Interrogatories which the respective parties intend to offer or read into evidence at the

26   trial (except portions to be used only for impeachment or rebuttal).

27   VIII.   FURTHER DISCOVERY OR MOTIONS

28          Pursuant to the Court's Pretrial Scheduling Order, all discovery and law and

23

1 | motion was to have been conducted so as to be completed as of the date of the Final

2 | Pretrial Conference.  That Order is confirmed.  The parties are free to engage in informal

3 | agreements regarding discovery and law and motion matters.  However, any such

4 | agreements will not be enforceable in this Court.

5 | IX.    AGREED STATEMENTS - JOINT STATEMENT OF CASE

6 | The parties filed their Joint Statement of Case within their Joint Final Pretrial

7 | Conference Statement on December 18, 2014 (ECF No. 219).

8 | X.    PROPOSED JURY INSTRUCTIONS, VOIR DIRE, VERDICT FORM

9 | A.    Jury instructions

10 | Counsel are directed to meet and confer and to attempt to agree upon a

11 | joint set of jury instructions.  Counsel shall use the Ninth Circuit Model Jury Instructions

12 | and any revisions.  Alternate instruction or authority may only be used if a Ninth Circuit

13 | Model Jury Instruction is unavailable.  Attached for counsel's review are the opening and

14 | closing instructions for your use.  The joint set of instructions must be filed by

15 | **February 9, 2015** and shall be identified as the "Jury Instructions Without Objection."

16 | All instructions shall be, to the extent possible, concise, understandable, and free

17 | from argument.  See Local Rule 163(c).  Parties shall also note that any modifications of

18 | instructions from statutory authority, case law or from any form of pattern instructions

19 | must specifically state the modification by underlining additions and bracketing deletions.

20 | B.    Verdict Form

21 | The parties must file a joint verdict form(s) concurrently with proposed jury

22 | instructions by **February 9, 2015**.  If necessary, a special verdict or interrogatories shall

23 | be included for all factual disputes submitted to the jury that must be resolved before

24 | questions of law can be decided, and for any other issue on which specific responses

25 | are desired.  See Local Rule 163(e).

26 | ///

27 | ///

28 | ///

1 | ///

2 |       C.     Voir Dire

3 |      The parties shall submit proposed voir dire questions to the Court.  The Court

4 | reserves the right to conduct all examination of prospective jurors.  Notwithstanding this

5 | reservation, the Court will permit each side up to ten (10) minutes to conduct voir dire, if

6 | desired.  The voir dire questions shall be filed with the Court by **February 9, 2015**.

7 |       D.     Submission of Documents to the Court

8 |      At the time of filing their respective proposed jury instructions, verdict form(s), and

9 | voir dire questions, counsel shall also electronically mail to the Court in digital format and

10 | compatible with Microsoft Word, the proposed jury instructions and verdict form(s).

11 | **These documents should be sent to mceorders@caed.uscourts.gov.**

12 | XI.     AUDIO/VISUAL EQUIPMENT

13 |      The parties are required to **file electronically** a joint request to the Courtroom

14 | Deputy Clerk, Stephanie Deutsch, by **February 2, 2015** if they wish to reserve and

15 | arrange for orientation with all parties on the Court's mobile audio/visual equipment for

16 | presentation of evidence.  There will be one date and time for such orientation.

17 | XII.    DATE AND LENGTH OF TRIAL

18 |      A trial is scheduled for **February 23, 2015**.  The estimated length of trial is **fifteen**

19 | **(15) days.**  The trial will consist of **eight (8) jurors.**  Counsel are to email Stephanie

20 | Deutsch, Courtroom Deputy Clerk, at mceorders@caed.uscourts.gov, or call at (916)

21 | 930-4207, by **February 9, 2015** to ascertain the status of the trial date.

22 |      The Court will permit each side up to one (1) hour for closing arguments.  Plaintiff

23 | will be permitted to reserve time for rebuttal purposes but will be required to monitor any

24 | time so reserved.

25 |      The issue of punitive damages is bifurcated.  Evidence relating to punitive

26 | damages will only be presented to the jury if the jury finds in favor of the Plaintiff as to

27 | general and/or special damages.

28 | ///

XIII.   OBJECTIONS TO PRETRIAL ORDER

Each party is granted five (5) court days from the date of this Final Pretrial Order to object to any part of the order or to request augmentation to it.  A Final Pretrial Order will be modified only upon a showing of manifest injustice.  If no objection or modifications are made, this Order will become final without further order of the Court and shall control the subsequent course of the action, pursuant to Rule 16(e) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

Dated:  January 27, 2015

MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT

26